

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUDGE CONLON

RAGAB EL RASHIDY and ROBERT FAIT,        )
                                          )
         Plaintiffs,                      )
                                          )
              v.                          )
                                          )
ALBERT HUMMEL, JAMES LUMSDEN,             )
HOWARD MYLES. FF-PENTECH. L.P..           )
and PENTECH INVESTORS, LLC                )
                                          )
         Defendants.                      )

01C 2771

Case No.

MAGISTRATE JUDGE SCHENKIER

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiffs, RAGAB EL RASHIDY and ROBERT FAIT, by their attorneys, Ashman &

Stein, complains of Defendants, FF-PENTECH, L.P. (FF), PENTECH INVESTORS, LLC (PI),

ALBERT HUMMEL (Hummel), JAMES LUMSDEN (Lumsden), and HOWARD MYLES (Myles),

as follows:

**NATURE OF THE ACTION**

1.       Plaintiffs bring this action individually and in a derivative capacity on behalf of

Pentech Pharmaceuticals, Inc., an Illinois corporation engaged in the business of developing drugs

for ultimate sale to consumers in the United States and other countries (Pentech), to restrain and

enjoin the implementation of a Rights Offering pursuant to which Defendants FF and PI and

Defendants' allies (the Series A Investors) will acquire up to 4,220,921 common shares, and voting

control, of Pentech at a price per share which is only about 10% of the market value of such shares;

1

for relief under the Illinois Business Corporation Act in respect of certain fraudulent and/or oppressive actions of the Defendants; and to recover damages caused by the breach of fiduciary duties owed by Defendants Hummel, Lumsden and Myles.

## THE PARTIES

2.      Plaintiff Ragab El Rashidy (El Rashidy), a resident of Illinois, and his family, is the beneficial owner, directly or indirectly, of 2,037,500 shares of the Common Stock of Pentech, a majority of Pentech's 4,747,375 issued and outstanding shares, including 1,150,375 Series A Preferred Shares.

3.      Plaintiff Robert Fait (Fait), a resident of Wisconsin, is the next largest holder of Common Stock of Pentech. Fait owns 980,000 such shares.

4.      On information and belief, Defendant FF is a Delaware limited partnership and is the beneficial owner of Series A Preferred Shares in Pentech issued in consideration of its financial investment in Pentech.

5.      On information and belief, Defendant PI is a Delaware limited liability company and is also the beneficial owner of Series A Preferred Shares in Pentech issued in consideration of its financial investment in Pentech.

6.      Defendant Albert Hummel is Pentech's President and a member of Pentech's Board of Directors. As President of Pentech, Hummel introduced Pentech to Franklin Street/Fairview Capital L.L.C. (FSFC), a North Carolina based investment banking firm which arranged investment financing for Pentech from Defendants FF and PI. As part of the transaction, Hummel was also issued Series A Preferred Shares in Pentech in consideration of his financial investment in Pentech. Hummel is a resident of California.

2

7.      Defendant Lumsden is Chairman of Pentech and a member of Pentech's Board of Directors. On information and belief, Lumsden is the Managing Principal of FSFC and its successor, Oberlin Recap LLC (Oberlin), and is also the Manager and/or managing partner of PI and FF and, on information and belief the Manager of PI. On information and belief, FF and PI continue to own most of Pentech's Series A Preferred Shares. Lumsden is a resident of North Carolina.

8.      Defendant Myles is also a member of Pentech's Board of Directors. Myles is a resident of Nevada.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as this is a civil matter in which the amount in controversy exceeds $75,000.00 exclusive of interest and costs, and is between citizens of different States. This action is not a collusive one to confer jurisdiction which this Court would not otherwise have.

10.     The Northern District of Illinois is the proper venue for this action pursuant to 28 U.S.C. § 1391(a)(2), as the events giving rise to the claims herein occurred in the Northern District of Illinois.

## FACTUAL BACKGROUND

11.     On July 14, 1998, Pentech and El-Rashidy entered into an Investor Rights Agreement with, *inter alia*, FF, PI and Hummel. A copy of the Investor Rights Agreement is attached hereto as Exhibit A and is incorporated herein by reference. Pursuant to the Investor Rights Agreement, holders of Pentech's Series A Preferred Shares (the Series A Investors) were granted certain rights, including, among other things, a right of first refusal with respect to any sale or issuance of Pentech stock . [ Investor Rights Agreement § 3.1]

3

12.     On or about March 30, 2000, Pentech entered into an agreement with Oberlin for the purpose of raising additional capital for Pentech through the sale of a new class of stock to be designated Series B Preferred Stock to institutional investors and accredited investors (Series B Investors), some of whom were also Series A Investors. On information and belief, Lumsden acted as a representative of the Series B Investors and Hummel was also involved in obtaining that financing.

13.     On information and belief, in May 2000, after the legal documents had been completed, Oberlin had raised approximately $10,000,000 from prospective Series B Investors (all of whom were either institutional investors or accredited investors), which was being held in escrow by Oberlin pending a closing.

14.     During the following month, FF, PI, Hummel and Lumsden then embarked upon an initially unsuccessful scheme to oust El-Rashidy as CEO, Chairman and Vice President of Research and Development of Pentech, to replace El Rashidy with Hummel, and to seize control of Pentech from its common shareholders. However, when less than the majority of the remaining directors of Pentech (including Plaintiff Fait) refused to go along with the Defendants' aforesaid scheme, Defendants Hummel and Lumsden postponed the Closing of the sale of the Series B Preferred Stock and returned the money raised from the prospective Series B Investors without the knowledge or consent of Pentech's remaining directors.

15.     In September of 1999, after learning that the money deposited by the prospective Series B Investors had been returned, El Rashidy and John Urheim (both of whom were then directors of Pentech) met with representatives of Julphar Pharmaceuticals, Inc. (Julphar) and obtained Julphar's Letter of Intent to invest up to $ 20,000,000 in Pentech in exchange for 1,311,475

4

shares of Series B Preferred Stock, (about $15.25/share) . A copy of said Letter of Intent is attached hereto as Exhibit B.

16.     Defendants then successfully declared a breach under the Investor Rights Agreement, notwithstanding Hummel's earlier certificate to Oberlin that no violation of any provisions of the Investor Rights Agreement existed (Exhibit C), and took control of the Board of Directors of Pentech.

17.     On October 26, 2000, El Rashidy (who was then still a director of Pentech) wrote to Lumsden that it was anticipated that all legal documentation would be in place to complete the Julphar transaction by November 15, 2000 (Exhibit D) and, on the same day, a duly authorized representative of Julphar e-mailed Hummel, stating that "the terms and instruments are ready" and asking when Pentech would be ready to sign them and issue a press release (Exhibit E).

18.     On November 9, 2000, after being warned by Lumsden to refrain from any discussions or further involvements with Julphar, El Rashidy then learned that there had been no progress made by Pentech toward finalizing the transactions contemplated in Julphar's September 6, 2000 Letter of Intent and e-mailed Lumsden as to his concerns that Julphar would become discouraged and Pentech would lose this opportunity to raise $20,000,000 of new capital. (Exhibit F).

19.     In response to El Rashidy's November 9, 2000 e-mail, Lumsden then represented to El Rashidy that Pentech was "putting final touches on a new letter of agreement covering a financing and a manufacturing relationship" and was "committed to try to come to agreement with Julphar if we can" (Exhibit G). A copy of that new letter of agreement, dated January 9, 2001, is attached hereto as Exhibit H. In particular, Paragraph 6 of this document (which, on information and belief,

5

was prepared by the attorneys representing Defendants PI and FF) required that Julphar vote their shares in common with the Series A Investors for a period of five years. This requirement was neither demanded nor suggested by Julphar; nor did any of the Defendants previously notify Plaintiffs that Julphar's $20,000,000 investment would not be accepted unless Julphar agreed to vote in common with the Series A Investors (who would have a lesser financial investment in Pentech and continue to own only a minority of Pentech's outstanding shares).

20.    On January 12, 2001, Defendants Lumsden, Hummel and Myles then notified El Rashidy and Fait of a special Pentech board meeting (Exhibit I). Included with said notice was, *inter alia,* (i) a term sheet for a potential $3,000,000 bridge loan (Exhibit J); (ii) a term sheet for a potential strategic relationship with a company known as Andrx Corporation (Exhibit K); (iii) the aforesaid document purportedly furnished to Julphar "covering a financing and manufacturing relationship"; and (iv) a "draft of a special proxy for the major common shareholders" which, according to Lumsden, was necessary because of the possibility of "a Series B Investors rejection of a deal on the basis of problems in the Company's articles". (Exhibit L)  Under the terms of the special proxy, Plaintiffs were required to relinquish their voting rights to Lumsden and Hummel and to permit the amendment of Pentech's articles of incorporation to do away with the so-called "super-majority" provision of the Illinois Business Corporation Act.

21.    On February 21, 2001, after Plaintiffs refused to give their proxies to Lumsden and Hummel (and instead, continued to urge them to pursue the Julphar transaction), Lumsden then reported to Plaintiffs that Pentech "had been able to arrange a highly favorable strategic transaction involving Andrx" and further insisted that the Julphar transaction had "been pursued by the company, and at present does not exist, or if it does exist, that it would be neither as attractive nor

6

close enough to fruition to be comparable to the proposed Andrx transaction..." (Exhibit M). However, on information and belief, a "term sheet" with Andrx was not then, and has not since, been signed by either Andrx or Pentech.

22.     On March 5, 2001, Julphar's duly authorized U.S. representative informed Lumsden that he intended to "have a final decision about (Julphar's) interest in Pentech" on the 16th of March and, on March 18, 2001, notified Lumsden of Julphar's acceptance of all of Defendants' investment terms, other than Defendants' demand that Julphar vote its shares with Defendants FF and PI, and subject to Julphar having equal representation on Pentech's Board of Directors. (Exhibit N).

23.     Because Julphar's acceptance was also conditioned upon the resolution of Pentech's pending lawsuit against the Defendants, Plaintiffs consented to the dismissal of same so that nothing would stand in the way of Pentech's consummation of a transaction with Julphar (Group Exhibit O).

24.     Lumsden then informed Plaintiffs that Julphar's March 18, 2001 communication "did not contain an offer, but rather set some preconditions for a possible offer" and that he had informed Julphar's representative "that only a signed term sheet, with all terms included, could be considered at this time" (Exhibit P). Three days later, Plaintiffs were then informed by Defendants' counsel that Pentech needed $3,000,000 of bridge financing to avoid bankruptcy, and that it would be "in the best interests of **all** shareholders" to reorganize Pentech as a Delaware corporation. (Exhibit Q). Delaware law does not include the super-majority provision contained in the Illinois Business Corporation Act.

25.     On March 26, 2001, Julphar furnished a signed term sheet to Lumsden, in accordance with his March 19, 2001 request (Exhibit R). However, on March 30, 2001, Lumsden then conditioned consideration of what he would only describe as Julphar's "expression of interest" upon

7

Julphar's first providing a $3,000,000 bridge loan to Pentech (Exhibit S). Plaintiffs are informed and believe that on the same day (after Defendants' counsel represented that Pentech was insolvent), Defendants Lumsden, Hummel and Myles caused Pentech to pay in excess of $200,000 in lump sum bonus and severance payments to Pentech's employees.

26.     Julphar responded to Lumsden's March 30, 2001 letter on April 1, 2001, stating that although Julphar had never before been requested to furnish bridge financing to Pentech, it would consider said request upon return of a signed term sheet (Exhibit T).

27.     On April 3, 2001, Julphar then informed Defendant Lumsden that it would be willing to loan part of the proceeds of its intended $20,000,000 investment in Pentech until such time as due diligence and documentation was completed (Exhibit U). However, Defendants Lumsden, Hummel and Myles failed and refused to respond to Julphar.

28.     Instead, on April 10, 2001, Defendants Lumsden, Hummel and Myles held a special Board meeting, without giving sufficient or prior notice to El Rashidy or Fait (who were entitled to be invited to said meeting pursuant to Section 5.2 of the Investor Rights Agreement) and, on information and belief, adopted a Rights Offering (Offering) pursuant to which Pentech will issue up to 4,229,921 shares of its common stock to the Series A Investors at a price of only $1.00 per share, nearly a 90% discount from the price per share offered by Julphar. The Plaintiffs and Pentech's other common shareholders will only have the right to purchase shares at the bargain basement price proposed in the Offering if the Series A Investors waive their right of first refusal with respect to said shares.

29.     On April 12, 2001, Defendants Lumsden, Hummel and Myles then represented to Plaintiffs and Pentech's other common shareholders that Pentech was "in dire need of capital"; had

trade and other payables that exceeded its cash and receivables by more than $850,000; that Pentech "could find no prospective third party to come forward with emergency capital within the time frame within which it is needed"; and that management of Pentech estimated the amount needed for these purpose to be "slightly over $4,000,000" (Exhibit V). On information and belief, and as hereinbefore set forth in the preceding paragraphs of this Complaint, said representations are demonstrably false in virtually all material respects.

## Count I

## Derivative Action

30.     Plaintiffs reallege Paragraphs 1-29 as and for their Paragraph 30 of this Count I, as if fully set forth herein.

31.     Plaintiffs sue individually and in a derivative capacity on behalf of Pentech.

32.     Plaintiffs have made a demand upon the Board of Directors of Pentech to raise the offering price set forth in the Offering to $10 per share and to cause Pentech to pursue its legal remedies against the Defendants herein. A copy of said demand is attached hereto as Exhibit W.

33.     On information and belief, the actions of Defendants Lumsden, Hummel and Myles in approving a $1 per share offering price while there existed, and exists, a $9.35 per share purchase offer from an independent third party investor were made for the sole purpose of benefitting Defendants FF, PI and the other Series A Investors, without fair consideration of the interests of Pentech and Pentech's other shareholders.

34.     On information and belief, Pentech will be damaged through the issuance of all or virtually all of its remaining authorized common shares for an unfair price.

35.     On information and belief, Defendants Lumsden, Hummel and Myles approved the

terms of the Offering without regard to the fair value of Pentech's common shares or to Pentech's immediate or long term needs.

36.     On information and belief, rather than acting for the benefit of Pentech, Defendants Lumsden, Hummel and Myles acted, and are acting, on their own personal desires to assist their allies FF, PI and the Series A Investors to secure two-thirds, or a super-majority, of the voting shares of Pentech.

37.     As a result of the above actions, Pentech has been damaged.

WHEREFORE, Plaintiffs respectfully pray that the Court award the following relief:

A.      Allowing this action to proceed as a derivative action on behalf of Plaintiffs and derivatively on behalf of Pentech against the Defendants;

B.      Awarding attorneys' fees and costs as a result of the prosecution of this action;

C.      Grant such other and further relief as this Court shall deem just and equitable.

### Count II

### Relief To Which Plaintiffs Are Entitled
### Pursuant to the Illinois Business Corporation Act

38.     Plaintiffs reallege Paragraphs 1-37 as and for their Paragraph 38 of this Count II, as if fully set forth herein.

39.     On information and belief, Pentech's survival neither depends upon a "dire need of capital", nor any additional capital at all. The stated reasons for the actions of Defendants Lumsden, Hummel and Myles with respect to the Offering are, therefore, based upon fraud.

40.     On information and belief, the sole and only reason Defendants Lumsden, Hummel and Myles have authorized an Offering of more than 4.2 million shares is to enable their allies FF,

PI and the Series A Investors to acquire at least two-thirds, or a super-majority, of the voting shares of Pentech, to dilute the voting and financial interests of the present owners of a majority of Pentech's shares, and to prevent the present owners of a majority of Pentech's stock to have any voice in the management of the company. The stated reasons for the actions of Defendants Lumsden, Hummel and Myles with respect to the Offering are, therefore, based upon fraud and the real reasons therefor are oppressive to Plaintiffs.

41.    The terms of the Offering, as it relates solely to the Plaintiffs, is not an Offering at all. Rather, the right of the Plaintiffs to acquire additional Pentech common stock being offered at 10% of the price which Julphar is prepared and willing to pay for a noncontrolling interest in the company is expressly contingent upon Defendants PI and FF, and the other Series A Investors, first waiving their rights of first refusal to acquire said shares at an "insider" price, which said Defendants and the Series A Investors are unlikely to do. The actions of Defendants Lumsden, Hummel and Myles with respect to the Offering are, therefore, oppressive to the Plaintiffs.

42.    The terms of the Offering, as it relates solely to the Plaintiffs, require a cash deposit of nearly $3 million, on less than ten days notice, without any assurance whatsoever that the Offering will be completed or that Defendants PI and FF, or the other Series A Investors, will waive their rights of first refusal to acquire the shares purportedly being offered. The actions of Defendants Lumsden, Hummel and Myles with respect to the Offering are, therefore, oppressive to the Plaintiffs.

43.    The terms of the Offering prohibiting Plaintiffs from securing, with the shares to be acquired, any borrowings necessary to take advantage of the Offering is a requirement which, on information and belief, was designed by Defendants for the sole purpose of making it difficult or

impossible for the Plaintiffs, each of whom are individual investors, to take advantage of the Offering, even in the unlikely event that Defendants PI and FF and the other Series A Investors are willing to waive their rights of first refusal. The actions of Defendants with respect to the Offering are, therefore, oppressive to the Plaintiffs.

44.     On information and belief, part of the $200,000 in lump sum bonuses and severance payments made by Pentech on or about March 30, 2001 included severance amounts equal to four (4) months of salary to employees who had only been employed by Pentech for about a year. Defendants Hummel, Lumsden and Myles are, therefore, causing Pentech's assets to be misapplied and wasted.

45.     Because Defendants are in control of Pentech and have acted, and are acting, in a manner that is oppressive and fraudulent with respect to Plaintiffs and, further, because Defendants are misapplying and wasting Pentech's assets, Plaintiffs are entitled to relief pursuant to Section 12.56 of the Illinois Business Corporation Act.

WHEREFORE, Plaintiffs respectfully pray that the Court award the following relief:

A.     Order the removal of Defendants Lumsden, Hummel and Myles as directors of Pentech and appoint one or more provisional directors to serve in their stead for a term and under such conditions as the Court, in its discretion, deems necessary and advisable;

B.     Order the removal of Defendant Hummel as President of Pentech and appoint a custodian to manage the business and affairs of the company for a term and under such conditions as the Court, in its discretion, deems necessary and advisable;

C.     Order an accounting as to Pentech's cash, receivables and trade and other payables;

D.     Order Defendants FF and PI to purchase not less than all of the common stock of Pentech held by Plaintiffs at a price of not less than $10.00 per share;

E.     Award Plaintiffs their attorneys' fees and costs incurred in this action; and

F.     Grant such other and further relief as this Court shall deem just and equitable.

<div align="center">

**Count III**

**Temporary Restraining Order, Preliminary and Permanent Injunction
Against Defendants**

</div>

46.     Plaintiffs reallege Paragraphs 1-45 as and for its Paragraph 46 of this Count III, as if fully set forth herein.

47.     Should the Offering proceed in the absence of some showing that Pentech is "in dire need of capital", or any additional capital at all; that Pentech requires more than $4.2 million in new capital to "avoid being forced to accept undesirable deal terms from potential outside investors" (when the only potential outside investor who has submitted such terms has offered ten times the amount of the proposed $1 per share Offering price to the Series A Investors; or that the terms of the Offering price is not based upon a fraudulent or improper intent and is not oppressive as to the Plaintiffs: (i) Plaintiffs' voting rights with respect to their Pentech shares will be adversely affected; (ii) the interests of Plaintiffs will be irreparably harmed, as the Series A Investors (including Defendants PI and FF), who now own only a minority interest in Pentech will, as a result of the Offering, obtain two-thirds of the voting shares, or full control, of Pentech for a price per share that is only about 10% of the price per share being offered by Julphar to acquire only 27.2% of its fully diluted outstanding shares; and Plaintiffs and Pentech's other common shareholders will have no adequate remedy at law, as total control of Pentech will be transferred to persons with whom they

<div align="center">13</div>

have no relationship, over whom they have no control or influence and who, by virtue of their acknowledged refusal to permit independent investors to acquire Pentech's shares at a far more favorable price, are clearly not acting in the best interests of Pentech or the owners of the majority of Pentech's outstanding stock.

48.     As a result, equitable relief is appropriate and should be granted to Plaintiffs.

WHEREFORE, Plaintiffs respectfully pray that the Court award the following relief:

A.     Enter a temporary restraining order and a preliminary injunction, both without bond, restraining ALBERT HUMMEL, JAMES LUMSDEN and HOWARD MYLES from authorizing or permitting Pentech to consummate the Offering or to take any further actions in connection therewith;

B.     Granting any and all other relief which this Court deems necessary to preserve the status quo;

C.     That the preliminary injunction be made permanent after final hearing;

D.     Award plaintiff its attorney s fees and costs incurred in this action; and

E.     Grant such other and further relief as this Court shall deem just and equitable.

### Count IV

### Breach of Fiduciary Duty Against Defendants Hummel, Lumsden and Myles

49.     Plaintiffs reallege Paragraphs 1-48 as and for its Paragraph 49 of this Count IV, as if fully set forth herein.

50.     As directors of Pentech in whom Pentech and its shareholders put their trust and confidence, Defendants Lumsden, Hummel and Myles owed Plaintiffs a fiduciary duty of, *inter*

14

*alia*, loyalty, care, and good faith and fair dealing.

51.     Defendants Lumsden, Hummel and Myles breached their fiduciary obligations by, *inter alia*, interfering with the investment funding offered to Pentech by Julphar and conspiring with Defendants FF and PI and the other Series A Investors to allow them to purchase a controlling interest in Pentech at an unfair price and in transaction which is both unfair and oppressive to Pentech, Plaintiffs and Pentech's other common shareholders.

52.     Defendants Lumsden, Hummel and Myles' breaches of their fiduciary obligations as aforesaid have caused and, if allowed to continue, will cause, substantial, immediate and irreparable harm to Plaintiffs in that the value of Plaintiffs' financial interests in Pentech have been seriously undermined and may be destroyed; and Pentech has sustained and will continue to sustain injury to its goodwill and investor base, and may and will continue to lose its competitive advantage and position in the marketplace and/or its ability to obtain financing for its continued operations.

WHEREFORE, Plaintiffs, respectfully pray that the Court award them the following relief:

A.     Damages against Defendants Hummel, Lumsden and Myles in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of costs and attorney's fees as shall be proved at trial;

B.     Punitive damages against Defendants Hummel, Lumsden and Myles in the amount of Ten Million Dollars ($10,000,000.00), to deter them from engaging in these or similar acts in the future;

C.     Such other and further relief as this Court deems necessary to ensure that no further violations will occur and to enable this Court to address such violations, should they hereafter occur;

D.     Plaintiffs' attorney s fees and costs incurred in this action; and

E.     Such other and further relief as this Court shall deem just and equitable.

RAGAB EL RASHIDY and ROBERT FAIT

By:_____
     One of  their  Attorneys

ASHMAN & STEIN
Attorneys for Plaintiff
150 North Wacker Drive
Suite 3000
Chicago, Illinois  60606
(312) 782-3484

C:\WPWIN60\WPDOCS\INJOIN.CMP

16

STATE OF ILLINOIS )
)
COUNTY OF COOK )

## VERIFICATION

Under penalties of perjury, RAGAB EL RASHIDY, being first duly sworn on oath, deposes

and states that he is one of the persons named as Plaintiff in the foregoing Complaint, and that he

has read the foregoing Complaint and that he knows the contents thereof to be true and correct to

the best of his knowledge, except for such matters being stated as alleged on information and belief,

and with respect to such matters, that these are true and correct based on said information and belief.

Subscribed and sworn to before
me this 18th day of April, 2001

NOTARY PUBLIC

"OFFICIAL SEAL"
CAREY M. STEIN
Notary Public, State of Illinois
My Commission Expires 05/30/04

R:\STEIN\ELRASHIDY\VERIFIC.IND

# EXHIBIT A

PENTECH PHARMACEUTICALS, INC.

INVESTOR RIGHTS AGREEMENT

July 14, 1998

CORP-8088-44-91161-06

## Table of Contents

SECTION 1. ........................................................................................................................ 1

    1.1   RESTRICTIVE LEGEND .............................................................................................. 1
    1.2   NOTICE OF PROPOSED TRANSFERS ...................................................................... 2

SECTION 2. ........................................................................................................................ 3

    2.1   CERTAIN DEFINITIONS ............................................................................................ 3
    2.2   DEMAND REGISTRATION ......................................................................................... 4
    2.3   PIGGYBACK REGISTRATION ................................................................................... 5
    2.4   EXPENSES OF REGISTRATION ................................................................................ 7
    2.5   OBLIGATIONS OF THE COMPANY ......................................................................... 7
    2.6   INDEMNIFICATION ................................................................................................... 9
    2.7   INFORMATION BY HOLDER ................................................................................... 11
    2.8   TRANSFER OF REGISTRATION RIGHTS ............................................................. 11
    2.9   FORM S-3 .................................................................................................................. 12
    2.10  DELAY OF REGISTRATION .................................................................................... 12
    2.11  LIMITATIONS ON SUBSEQUENT REGISTRATION RIGHTS ............................ 12
    2.12  RULE 144 REPORTING ............................................................................................ 12
    2.13  "MARKET STAND-OFF" AGREEMENT .................................................................. 13
    2.14  AMENDMENT OF REGISTRATION RIGHTS ........................................................ 13
    2.14  INCLUSION OF STOCK HELD BY MAJOR HOLDERS ....................................... 13
    2.16  TERMINATION OF REGISTRATION RIGHTS ...................................................... 14

SECTION 3. ...................................................................................................................... 14

    3.1   RIGHT OF FIRST REFUSAL .................................................................................... 14
    3.2   NEW SECURITIES .................................................................................................... 14
    3.3   REQUIRED NOTICES ............................................................................................... 15
    3.4   COMPANY'S RIGHT TO SELL ............................................................................... 15
    3.5   EXPIRATION OF RIGHT .......................................................................................... 15
    3.6   ASSIGNMENT ........................................................................................................... 15

SECTION 4. ...................................................................................................................... 15

    4.1   FINANCIAL INFORMATION ................................................................................... 15
    4.2   INSPECTION ............................................................................................................. 17
    4.3   PROMPT PAYMENT OF TAXES ............................................................................ 17
    4.4   EMPLOYEES ............................................................................................................. 17
    4.5   RELATED PARTY TRANSACTIONS ...................................................................... 17
    4.6   OBSERVATION RIGHTS ......................................................................................... 17
    4.7   NATURE OF BUSINESS ........................................................................................... 17
    4.8   USE OF PROCEEDS .................................................................................................. 18
    4.9   DILUTIVE ISSUANCES ........................................................................................... 18
    4.10  PAYMENT OF TRADE DEBT .................................................................................. 18
    4.11  MAINTENANCE OF INSURANCE .......................................................................... 18
    4.12  PRESERVATION OF CORPORATION EXISTENCE ............................................. 18
    4.13  INTELLECTUAL PROPERTY ................................................................................. 18
    4.14  COMPLIANCE WITH LAWS ................................................................................... 18
    4.15  RECORDS AND BOOKS OF ACCOUNT ............................................................... 19
    4.16  MAINTENANCE OF PROPERTIES ......................................................................... 19
    4.17  FINANCINGS ............................................................................................................ 19
    4.18  KEY-MAN INSURANCE .......................................................................................... 19
    4.19  NONDISCLOSURE AND ASSIGNMENT OF INVENTIONS ................................ 19
    4.20  REDEMPTION OF SERIES A PREFERRED STOCK ............................................. 19
    4.21  FUTURE ISSUANCE OF OPTIONS ........................................................................ 19

4.22   EXPIRATION OF COVENANTS ................................................................................. 20

SECTION 5. ...................................................................................................................... 21

5.1   ELECTION OF DIRECTORS ..................................................................................... 21
5.2   ELECTION OF DIRECTORS IN CASE OF DEFAULT .................................................. 21
5.3   BINDING EFFECT OF VOTING AGREEMENT ......................................................... 21
5.4   LEGENDS .............................................................................................................. 22
5.5   TERMINATION OF VOTING AGREEMENT .............................................................. 22

SECTION 6. ...................................................................................................................... 22

MISCELLANEOUS ......................................................................................................... 22

6.1   GOVERNING LAW ................................................................................................ 22
6.2   SUCCESSORS AND ASSIGNS ................................................................................. 22
6.3   ENTIRE AGREEMENT ............................................................................................ 22
6.4   SEVERABILITY ..................................................................................................... 22
6.5   AMENDMENT AND WAIVER .................................................................................. 23
6.6   DELAYS OR OMISSIONS ....................................................................................... 23
6.7   NOTICES, ETC ...................................................................................................... 24
6.8   TITLES AND SUBTITLES ....................................................................................... 24
6.9   COUNTERPARTS ................................................................................................... 24

## EXHIBITS

A - Schedule of Series A Investors
B – Schedule of Major Holders
C – Use of Proceeds Schedule

# PENTECH PHARMACEUTICALS, INC.

## INVESTOR RIGHTS AGREEMENT

This Investor Rights Agreement (the "Agreement") is entered into as of July 14, 1998, by and among Pentech Pharmaceuticals, Inc., an Illinois corporation (the "Company"), with its principal office at 1110 Lake Cook Road, Suite 257, Buffalo Grove, Illinois 60089, those holders of the shares of the Company's Series A Preferred Stock listed on Exhibit A attached hereto (the "Series A Stock"), and those holders of the Company's Common Stock listed on Exhibit B attached hereto (the "Major Holders"). The holders of Series A Stock are referred to herein as the "Series A Investors" or as the "Investors" and each individually as an "Investor." The Series A Stock shall also be referred to herein as the "Preferred Stock."

WHEREAS, in connection with the issuance and sale of Series A Stock to the Series A Investors pursuant to that certain Series A Preferred Stock Purchase Agreement, dated as of the date hereof, by and among the Company and the Series A Investors (the "Series A Agreement") the Company and the Investors desire to provide the Series A Investors certain rights with respect to registration of the shares of stock held by them and certain other rights with respect to such shares as an inducement to the Series A Investors to purchase the Series A Shares;

NOW, THEREFORE, in consideration of the mutual agreements, covenants and conditions contained herein, the Company and each of the Investors hereby agree as follows.

Section 1.

## RESTRICTIONS ON TRANSFER

1.1    Restrictive Legend.  Each certificate representing (i) the Series A Stock, (ii) the Company's Common Stock issued upon conversion of the Series A Stock, and (iii) any other securities issued in respect of the Series A Stock or Common Stock issued upon conversion of the Series A Stock upon any stock split, stock dividend, recapitalization, merger, consolidation or similar event, shall (unless otherwise permitted by the provisions of Section 1.2 below) be stamped or otherwise imprinted with a legend in substantially the following form (in addition to any legend required under applicable state securities laws).

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THESE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE, AND MAY NOT BE SOLD, MORTGAGED, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT FOR SUCH SECURITIES UNDER THE

CORP-8088-44-91161-06

1

SECURITIES ACT OF 1933, AS AMENDED, AND ANY APPLICABLE STATE SECURITIES LAWS, OR THE AVAILABILITY OF AN EXEMPTION FROM THE REGISTRATION PROVISIONS OF THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS. COPIES OF THE INVESTOR RIGHTS AGREEMENT PROVIDING FOR RESTRICTIONS ON TRANSFER OF THESE SECURITIES MAY BE OBTAINED UPON WRITTEN REQUEST BY THE HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OF THE CORPORATION AT THE PRINCIPAL EXECUTIVE OFFICES OF THE CORPORATION."

Each Holder (as defined below) consents to the Company making a notation on its records and giving instructions to any transfer agent of the Series A Stock or the Common Stock in order to implement the restrictions on transfer established in this Section 1. Such legend shall be removed by the Company from any certificate at such time as the holder of the shares represented by the certificate satisfies the requirements of Rule 144(k) under the Securities Act of 1933, as amended (the "1933 Act"), provided that Rule 144(k) as then in effect does not differ substantially from Rule 144(k) as in effect as of the date of this Agreement, and provided further that the Company has received from the Holder a written representation that (i) such Holder is not an affiliate of the Company and has not been an affiliate during the preceding three months, (ii) such Holder has beneficially owned the shares represented by the certificate for a period of at least three years, (iii) such Holder otherwise satisfies the requirements of Rule 144(k) as then in effect with respect to such shares, and (iv) such Holder will submit the certificate for any such shares to the Company for reapplication of the legend at such time as the holder becomes an affiliate of the Company or otherwise ceases to satisfy the requirements of Rule 144(k) as then in effect.

1.2   Notice of Proposed Transfers. The holder of each certificate representing Registrable Securities (as defined below) by acceptance thereof agrees to comply in all respects with the provisions of this Section 1.2. Prior to any proposed sale, assignment, transfer or pledge of any Registrable Securities, unless there is in effect a registration statement under the 1933 Act covering the proposed transfer, the holder thereof shall give written notice to the Company of such holder's intention to effect such transfer, sale, assignment or pledge. Each such notice shall describe the manner and circumstances of the proposed transfer, sale, assignment or pledge in sufficient detail, and shall be accompanied at such holder's expense by either (i) a written opinion of legal counsel who shall, and whose legal opinion shall, be reasonably satisfactory to the Company, to the effect that the proposed transfer of the Registrable Securities may be effected without registration under the 1933 Act, or (ii) a "no action" letter from the SEC to the effect that the transfer of such securities without registration will not result in a recommendation by the staff of the Securities and Exchange Commission (the "SEC") that action be taken with respect thereto, whereupon the holder of such Registrable Securities shall be entitled to transfer such Registrable Securities in accordance with the terms of the notice delivered by the holder to the Company. The Company will not require such a legal opinion or "no action" letter (a) in any transaction in compliance with Rule 144, or (b) in any transaction in which an Investor that is a partnership, limited liability company or corporation distributes Series A Stock or Common Stock issuable upon conversion thereof after six months after the purchase of such securities hereunder solely to partners, members or shareholders (as the case may be) thereof for no

consideration, provided that each transferee agrees in writing to be subject to the terms of this Section 1.2. Each certificate evidencing the Registrable Securities transferred as above provided shall bear, except if such transfer is made pursuant to Rule 144, the appropriate restrictive legend set forth in Section 1.1 above, except that such certificate shall not bear such restrictive legend if in the opinion of counsel for such holder and the Company such legend is not required in order to establish compliance with any provisions of the 1933 Act.

Section 2.

REGISTRATION RIGHTS

The Company hereby grants to each of the Holders (as defined below) the registration rights set forth in this Section 2, with respect to the Registrable Securities (as defined below) owned by such Holders. The Company and the Holders agree that the registration rights provided herein set forth the sole and entire agreement, and supersede any prior agreement, between the Company and the Holders with respect to registration rights for the Company's securities.

2.1    Certain Definitions.  As used in this Section 2:

(a)    The terms "register," "registered" and "registration" refer to a registration effected by filing with the SEC a registration statement (the "Registration Statement") in compliance with the 1933 Act, and the declaration or ordering by the SEC of the effectiveness of such Registration Statement.

(b)    The term "Registrable Securities" means (i) shares of Common Stock of the Company (the "Common Stock") issued or issuable upon conversion of the shares of Series A Stock held by Series A Investors, as such shares are set forth on Exhibit A or any transferee in a Permitted Transfer (as defined in Section 2.8 below), and (ii) any shares of Common Stock issued as (or issuable upon the conversion or exercise of any warrant, right or other security that is issued as) a dividend or other distribution with respect to, or in exchange or in replacement of, such Registrable Securities; provided, however, that shares of Common Stock or other securities shall only be treated as Registrable Securities if and so long as (A) they have not been sold to or through a broker or dealer or underwriter in a public distribution or a public securities transaction, (B) they have not been sold in a transaction exempt from the registration and prospectus delivery requirements of the 1933 Act under Section 4(1) thereof so that all transfer restrictions and restrictive legends with respect thereto are removed upon the consummation of such sale, and (C) the registration rights associated with such securities have not been terminated pursuant to Section 2.16 hereof.

(c)    The term "Holder" (collectively, "Holders") means any Investor (and any transferee as permitted by Section 2.8 hereof) holding Registrable Securities, securities exercisable or convertible into Registrable Securities or securities exercisable for securities convertible into Registrable Securities.

(d)     The term "Initiating Holders" means any Holder or Holders of at least twenty percent (20%) of the Registrable Securities then outstanding and not registered at the time of any request for registration made pursuant to Section 2.2 of this Agreement.

## 2.2    Demand Registration.

(a)     Demand for Registration. If the Company shall receive from Initiating Holders a written demand that the Company effect any registration (a "Demand Registration") of the Registrable Securities (other than a registration on Form S-3 or any related form of registration statement, such a request being provided for under Section 2.9 hereof) having an anticipated net aggregate offering price (after deduction of underwriter commissions and offering expenses) of at least 50% of the total amount received by the Company pursuant to the issuance and sale of the Series A Stock (including proceeds from all closings or sales of such stock), the Company will:

(i)     promptly (but in any event within 10 days) give written notice of the proposed registration to all other Holders; and

(ii)     use its best efforts to effect such registration as soon as practicable and as will permit or facilitate the sale and distribution of all or such portion of such Initiating Holders' Registrable Securities as are specified in such demand, together with all or such portion of the Registrable Securities of any Holder or Holders joining in such demand as are specified in a written demand received by the Company within 15 days after such written notice is given, provided that the Company shall not be obligated to take any action to effect any such registration, pursuant to this Section 2.2:

(A)     In any particular jurisdiction in which the Company would be required to execute a general consent to service of process in effecting such registration, qualification or compliance unless the Company is already subject to service in such jurisdiction and except as may be required by the 1933 Act;

(B)     After the Company has effected two (2) such registrations pursuant to this Section 2.2 and the sales of the shares of Common Stock under such registrations have closed;

(C)     If the Company shall furnish to such Holders a certificate signed by the President of the Company, stating that in the good faith judgment of the Board of Directors of the Company it would be seriously detrimental to the Company and its shareholders for such Registration Statement to be filed at the date filing would be required, then the Company shall have an additional period of not more than 90 days within which to file such Registration Statement; provided, however, that the Company shall not use this right more than twice in any 12-month period;

(D)     Prior to the earlier of (I) the date three (3) years following the date hereof, or (II) 180 days after the Company shall have completed its initial offering of its

equity securities for sale to the public pursuant to an effective registration statement under the 1933 Act; or

(E)     If the demand for such registration occurs within 180 days of an earlier registration pursuant to this Section 2.2

(b)     <u>Underwriting</u>. If the Initiating Holders intend to distribute the Registrable Securities covered by their demand by means of an underwriting, they shall so advise the Company as part of their demand made pursuant to this Section 2.2; and the Company shall include such information in the written notice referred to in Section 2.2(a)(i). In such event, the right of any Holder to registration pursuant to this Section 2.2 shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein.

The Company shall, together with all holders of capital stock of the Company proposing to distribute their securities through such underwriting, enter into an underwriting agreement in customary form with the underwriter or underwriters selected by a majority-in-interest of the Initiating Holders and reasonably satisfactory to the Company. Notwithstanding any other provision of this Section 2.2, if the underwriter shall advise the Company that marketing factors (including, without limitation, an adverse effect on the per share offering price) require a limitation of the number of shares to be underwritten, then the Company shall so advise all Holders of Registrable Securities that have requested to participate in such offering, and the number of shares of Registrable Securities that may be included in the registration and underwriting shall be allocated pro rata among such Holders thereof in proportion, as nearly as practicable, to the respective amounts of Registrable Securities held by such Holders at the time of filing the Registration Statement. No Registrable Securities excluded from the underwriting by reason of the underwriter's marketing limitation shall be included in such registration.

If any Holder disapproves of the terms of the underwriting, such Holder may elect to withdraw therefrom by written notice to the Company, the underwriter and the Initiating Holders. The Registrable Securities so withdrawn shall also be withdrawn from registration.

If the underwriter has not limited the number of Registrable Securities to be underwritten, the Company may include securities for its own account (or for the account of other shareholders) in such registration if the underwriter so agrees and if the number of Registrable Securities would not thereby be limited.

2.3     <u>Piggyback Registration</u>.

(a)     <u>Company Registration</u>. If at any time or from time to time the Company shall determine to register any of its securities, either for its own account or for the account of security holders, other than a registration relating solely to employee benefit plans, a registration on Form S-4 relating solely to an SEC Rule 145 transaction or a registration pursuant to Section 2.2 or 2.9 hereof, the Company will:

notice thereof; and

(i) promptly (but in any event within 10 days) give to each Holder written

(ii) include in such registration (and any related qualification under state securities laws or other compliance), and in any underwriting involved therein, all the Registrable Securities specified in a written request or requests, made within 15 days after receipt of such written notice from the Company, by any Holder or Holders, except as set forth in Section 2.3(b) below.

Such Registrable Securities shall only be included to the extent that inclusion will not diminish the number of securities included by the Company.

(b)     Underwriting.  If the registration of which the Company gives notice is for a registered public offering involving an underwriting, the Company shall so advise the Holders as a part of the written notice given pursuant to Section 2.3(a)(i).  In such event, the right of any Holder to registration pursuant to this Section 2.3 shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein.

All Holders proposing to distribute their Registrable Securities through such underwriting shall, together with the Company and the other parties distributing their securities through such underwriting, enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Company.  Notwithstanding any other provision of this Section 2.3, if the underwriter determines that marketing factors require a limitation of the number of shares to be underwritten, the underwriter may limit the number of Registrable Securities to be included in the registration and underwriting, or may exclude Registrable Securities entirely from such registration and underwriting subject to the terms of this Section 2.3.  The Company shall so advise all holders of the Company's securities that would otherwise be registered and underwritten pursuant hereto, and the number of shares of such securities, including Registrable Securities, that may be included in the registration and underwriting shall be allocated in the following manner: shares, other than Registrable Securities and other securities that have contractual rights with respect to registration similar to those provided for in this Section 2.3, requested to be included in such registration by shareholders shall be excluded, and if a limitation on the number of shares is still required, the number of Registrable Securities and other securities that have contractual rights with respect to registration that may be included shall be allocated among the holders thereof in proportion, as nearly as practicable, to the amounts of Registrable Securities and such other securities held by each such holder at the time of filing the Registration Statement.  For purposes of any such underwriter cutback, all Registrable Securities and other securities held by any holder that is a partnership or corporation, shall also include any Registrable Securities held by the partners, retired partners, shareholders or affiliated entities of such holder, or the estates and family members of any such partners and retired partners and any trusts for the benefit of any of the foregoing persons and such holder and other persons shall be deemed to be a single "selling holder," and any pro rata reduction with respect to such "selling holder" shall be based upon the aggregate amount of shares carrying registration rights owned by all entities and individuals included in such "selling holder," as defined in this sentence.  No securities excluded from the underwriting by reason of

the underwriter's marketing limitation shall be included in such registration. Nothing in this Section 2.3(b) is intended to diminish the number of securities to be included by the Company in the underwriting.

If any Holder disapproves of the terms of the underwriting, it may elect to withdraw therefrom by written notice to the Company and the underwriter. The Registrable Securities so withdrawn shall also be withdrawn from registration.

(c) <u>Right to Terminate Registration</u>. The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 2.3 prior to the effectiveness of such registration whether or not any Holder has elected to include securities in such registration.

2.4 <u>Expenses of Registration</u>. All expenses incurred in connection with all registrations effected pursuant to Sections 2.2, 2.3 and 2.9, including without limitation all registration, filing and qualification fees (including state securities law fees and expenses), printing expenses, escrow fees, fees and disbursements of counsel for the Company (and, if it is reasonably determined that a separate special counsel for the participating Holders is necessary, the reasonable fees and disbursements of one such counsel) and expenses of any special audits incidental to or required by such registration shall be borne by the Company; provided, however, that the Company shall not be required to pay stock transfer taxes or underwriters' discounts or selling commissions relating to Registrable Securities. Notwithstanding anything to the contrary above, the Company shall not be required to pay for any expenses of any registration proceeding under Section 2.2 if the registration request is subsequently withdrawn at the request of the Holders of a majority of the Registrable Securities to have been registered, provided, however, that in the event that Holders holding at least a majority of the Registrable Securities agree to forfeit their right to a demand registration pursuant to Section 2.2 (in which event such right shall be forfeited by all Holders), then the Company shall be required to pay the expenses of such withdrawn registration. In the absence of such an agreement to forfeit, the Holders of Registrable Securities to have been registered shall bear all such expenses pro rata on the basis of the Registrable Securities to have been registered. Notwithstanding the preceding sentence, however, if at the time of the withdrawal, the Holders have learned of a materially adverse change in the condition, business or prospects of the Company from that known to the Holders at the time of their request, then the Holders shall not be required to pay any of said expenses and shall retain their rights pursuant to Section 2.2.

2.5 <u>Obligations of the Company</u>. Whenever required under this Section 2 to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(a) prepare and file with the SEC a Registration Statement with respect to such Registrable Securities and use its diligent efforts to cause such Registration Statement to become effective, and keep such Registration Statement effective for the lesser of 120 days or until the Holder or Holders have completed the distribution relating thereto.

(b)    prepare and file with the SEC such amendments and supplements to such Registration Statement and the prospectus used in connection with such Registration Statement as may be necessary to keep such Registration Statement effective and to comply with the provisions of the 1933 Act with respect to the disposition of all securities covered by such registration statement.

(c)    furnish to the Holders such numbers of copies of a prospectus, including a preliminary prospectus, in conformity with the requirements of the 1933 Act, and such other documents as they may reasonably request in order to facilitate the disposition of Registrable Securities owned by them.

(d)    use its diligent efforts to register or otherwise qualify the securities covered by such Registration Statement under such other securities laws of such states and other jurisdictions as shall be reasonably requested by the Holders or the managing underwriter, provided that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

(e)    in the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing underwriter of such offering. Each Holder participating in such underwriting shall also enter into and perform its obligations under such an agreement.

(f)    notify each Holder of Registrable Securities covered by such Registration Statement, at any time when a prospectus relating thereto is required to be delivered under the 1933 Act, of the happening of any event as a result of which the prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing.

(g)    use its diligent efforts to list the Registrable Securities covered by such Registration Statement with any securities exchange on which the Common Stock is then listed.

(h)    make available for inspection by each Holder that is including Registrable Securities in such registration, any underwriter participating in any distribution pursuant to such registration, and any attorney, accountant or other agent retained by such Holder or underwriter, all financial and other records, pertinent corporate documents and properties of the Company, as such parties may reasonably request, and cause the Company's officers, directors and employees to supply all information reasonably requested by any such Holder, underwriter, attorney, accountant or agent in connection with such Registration Statement.

(i)    cooperate with Holders that are including Registrable Securities in such registration and the managing underwriters, if any, to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be sold, such certificates to be in such denominations and registered in such names as such Holders or the managing underwriters may request at least two business days prior to any sale of Registrable Securities.

(j)     permit any Holder which Holder, in the sole and exclusive judgment, exercised in good faith, of such Holder, might be deemed to be a controlling person of the Company, to participate in good faith in the preparation of such Registration Statement and to require the insertion therein of material, furnished to the Company in writing, that in the reasonable judgment of such Holder and its counsel should be included.

2.6     <u>Indemnification</u>.

(a)     The Company will, and does hereby undertake to, indemnify and hold harmless each Holder of Registrable Securities, each of such Holder's officers, directors, partners, agents and representatives, and each person controlling such Holder, with respect to any registration, qualification or compliance effected pursuant to this Section 2, and each underwriter, if any, and each person who controls any underwriter, of the Registrable Securities held by or issuable to such Holder, against all claims, losses, damages and liabilities (or actions in respect thereto) to which they may become subject under the 1933 Act, the Securities Exchange Act of 1934, as amended (the "1934 Act"), or other federal or state law arising out of or based on (i) any untrue statement (or alleged untrue statement) of a material fact contained in any prospectus, offering circular or other similar document (including any related Registration Statement, notification, or the like) incident to any such registration, qualification or compliance, or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances in which they were made, (ii) any violation or alleged violation by the Company of any federal, state or common law rule or regulation applicable to the Company in connection with any such registration, qualification or compliance, or (iii) any failure to register or qualify Registrable Securities in any state where the Company or its agents have affirmatively undertaken or agreed in writing that the Company (the undertaking of any underwriter chosen by the Company being attributed to the Company) will undertake such registration or qualification on behalf of the Holders of such Registrable Securities (provided that in such instance the Company shall not be so liable if it has undertaken its best efforts to so register or qualify such Registrable Securities) and will reimburse, as incurred, each such Holder, each such underwriter and each such director, officer, partner, agent and controlling person, for any legal and any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action; provided that the Company will not be liable in any such case to the extent that any such claim, loss, damage, liability or expense arises out of or is based on any untrue statement or omission made in conformity with written information furnished to the Company by an instrument duly executed by such Holder or underwriter and stated to be specifically for use therein.

(b)     Each Holder will, and if Registrable Securities held by or issuable to such Holder are included in such registration, qualification or compliance pursuant to this Section 2, does hereby undertake to indemnify and hold harmless the Company, each of its directors and officers, and each person controlling the Company, each underwriter, if any, and each person who controls any underwriter, of the Company's securities covered by such a Registration Statement, and each other Holder, each of such other Holder's officers, partners, directors, agents and representatives, and each person controlling such other Holder, against all claims, losses,

damages and liabilities (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any such Registration Statement, prospectus, offering circular or other document, or any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances in which they were made, and will reimburse, as incurred, the Company, each such underwriter, each such other Holder, and each such director, officer, partner and controlling person of the foregoing, for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) was made in such Registration Statement, prospectus, offering circular or other document, in reliance upon and in conformity with written information furnished to the Company by an instrument duly executed by such Holder and stated to be specifically for use therein; provided, however, that the liability of each Holder hereunder shall be limited to the proportion of any such claim, loss, damage or liability that is equal to the proportion that the public offering price of the shares sold by such Holder under such Registration Statement bears to the total public offering price of all securities sold thereunder, but in any event not to exceed the net proceeds received by such Holder from the sale of securities under such Registration Statement. It is understood and agreed that the indemnification obligations of each Holder pursuant to any underwriting agreement entered into in connection with any Registration Statement shall be limited to the obligations contained in this subsection 2.6(b).

(c)    Each party entitled to indemnification under this Section 2.6 (the "Indemnified Party") shall give notice to the party required to provide such indemnification (the "Indemnifying Party") of any claim as to which indemnification may be sought promptly after such Indemnified Party has actual knowledge thereof, and shall permit the Indemnifying Party to assume the defense of any such claim or any litigation resulting therefrom; provided that counsel for the Indemnifying Party, who shall conduct the defense of such claim or litigation, shall be subject to approval by the Indemnified Party (whose approval shall not be unreasonably withheld) and the Indemnified Party may participate in such defense at the Indemnifying Party's expense if representation of such Indemnified Party would be inappropriate due to actual or potential differing interests between such Indemnified Party and any other party represented by such counsel in such proceeding; and provided further that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Section 2.6, except to the extent that such failure to give notice shall materially adversely affect the Indemnifying Party in the defense of any such claim or any such litigation. An Indemnifying Party, in the defense of any such claim or litigation, may, without the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement that includes as an unconditional term thereof the giving by the claimant or plaintiff therein, to such Indemnified Party, of a release from all liability with respect to such claim or litigation.

(d)    In order to provide for just and equitable contribution to joint liability under the 1933 Act in any case in which either (i) any Holder exercising rights under this Agreement, or any controlling person of any such Holder, makes a claim for indemnification pursuant to this Section 2.6 but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of

the last right of appeal) that such indemnification may not be enforced in such case notwithstanding the fact that this Section 2.6 provides for indemnification in such case, or (ii) contribution under the 1933 Act may be required on the part of any such Holder or any such controlling person in circumstances for which indemnification is provided under this Section 2.6; then, and in each such case, the Company and such Holder will contribute to the aggregate claims, losses, damages or liabilities to which they may be subject (after contribution from others) in such proportion so that such Holder is responsible for the portion represented by the percentage that the public offering price of the securities offered by such Holder pursuant to the Registration Statement bears to the public offering price of all securities offered by such Registration Statement, and the Company will be responsible for the remaining portion; provided, however, that, in any case, (A) no such Holder will be required to contribute any amount in excess of the public offering price of all securities offered by it pursuant to such Registration Statement, after deduction of underwriting discounts and commissions; and (B) no person or entity guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the 1933 Act) will be entitled to contribution from any person or entity who was not guilty of such fraudulent misrepresentation.

(e)     The indemnities provided in this Section 2.6 shall survive the transfer of any Registrable Securities by such Holder.

2.7     <u>Information by Holder</u>.  The Holder or Holders of Registrable Securities included in any registration shall furnish to the Company such information regarding such Holder or Holders and the distribution proposed by such Holder or Holders as the Company may reasonably request in writing and as shall be required in connection with any registration, qualification or compliance referred to in this Section 2.

2.8     <u>Transfer of Registration Rights</u>.

(a)     The rights, contained in Sections 2.2, 2.3 and 2.9 hereof, to cause the Company to register the Registrable Securities, may be assigned or otherwise conveyed to a transferee or assignee of Registrable Securities, who shall be considered a "Holder" for purposes of this Section 2, provided that (i) such transfer is effected in compliance with Section 1.2 hereof; and (ii) such transfer is a "Permitted Transfer" as defined herein.

(b)     For purposes of this Agreement, a "Permitted Transfer" shall mean:  (i) a transaction not involving a change in beneficial ownership; (ii) transactions involving distribution without consideration by a shareholder that is a partnership, limited liability company or corporation to any of its partners, members or shareholders (as the case may be), retired partners, members or shareholders, or to the estate of any of its partners, members or shareholders; (iii) transactions involving distribution without consideration by a shareholder that is a corporation to any of its shareholders; (iv) transfers by any shareholder who is an individual to a trust for the benefit of such shareholder or his family; (v) a transfer in which the transferee acquires at least 50,000 shares of Registrable Securities, subject to adjustment for combinations, consolidations, recapitalizations, stock splits, stock dividends and the like; or (vi) transfers by gift, will or intestate succession to the spouse, lineal descendants or ancestors of any shareholder or spouse of a shareholder.

2.9  Form S-3.  If the Company's stock becomes publicly traded, the Company shall use its diligent efforts to qualify for registration on Form S-3 and to that end the Company shall register the Common Stock under the 1934 Act within 12 months following the effective date of the first registration of any securities of the Company on Form S-1.  After the Company has qualified for the use of Form S-3, the Holders of Registrable Securities shall have the right to request registrations on Form S-3 thereafter under this Section 2.9.  The Company shall give notice to all Holders of Registrable Securities of the receipt of a request for registration pursuant to this Section 2.9 and shall provide a reasonable opportunity for other Holders to participate in the registration.  Subject to the foregoing, the Company will use its best efforts to effect as soon as practicable the registration of all shares of Registrable Securities on Form S-3, as the case may be, to the extent requested by the Holder or Holders thereof for purposes of disposition; provided, however, that the Company shall not be obligated to effect any such registration if (i) the Holders, together with the holders of any other securities of the Company entitled to inclusion in such registration, propose to sell Registrable Securities and such other securities (if any) at an aggregate price to the public of less than $500,000, or (ii) the Company shall have already made two registrations on Form S-3 within the 12-month period immediately preceding the request.  Notwithstanding the foregoing, nothing herein shall restrict, prohibit, or limit in any way a Holder's ability to exercise its registration rights under Sections 2.2 or 2.3 hereof.

2.10  Delay of Registration.  Each Holder shall hereby waive its right to obtain or seek an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Section 2.

2.11  Limitations on Subsequent Registration Rights.  From and after the date of this Agreement, the Company shall not, without the prior written consent of the Holders of at least a majority of the Registrable Securities then outstanding and not registered, enter into any agreement with any holder or prospective holder of any securities of the Company that would allow such holder or prospective holder to (i) require the Company to effect a registration or (ii) include any securities in any registration filed under Section 2.2, 2.3 or 2.9 hereof, unless, under the terms of such agreement, such holder or prospective holder may include such securities in any such registration only to the extent that the inclusion of such securities will not diminish the amount of Registrable Securities that are included in such registration.

2.12  Rule 144 Reporting.  With a view to making available to the Holders the benefits of certain rules and regulations of the SEC that may permit the sale of the Registrable Securities to the public without registration, the Company agrees to use its diligent efforts to:

(a)  Make and keep current public information available, within the meaning of SEC Rule 144 or any similar or analogous rule promulgated under the 1933 Act, at all times after it has become subject to the reporting requirements of the 1934 Act;

(b)  File with the SEC, in a timely manner, all reports and other documents required of the Company under the 1933 Act and 1934 Act (after it has become subject to such reporting requirements);

(c)     So long as a Holder owns any Registrable Securities, furnish to such Holder forthwith upon request a written statement by the Company as to its compliance with the reporting requirements of said Rule 144 (at any time commencing 90 days after the effective date of the first registration filed by the Company for an offering of its securities to the general public), the 1933 Act and the 1934 Act (at any time after it has become subject to such reporting requirements); a copy of the most recent annual or quarterly report of the Company; and such other reports and documents as a Holder may reasonably request in availing itself of any rule or regulation of the SEC allowing it to sell any such securities without registration.

2.13    "Market Stand-Off" Agreement.  Each Major Holder and each Holder that is a "One Percent Shareholder," as defined below, hereby agrees that during the 180-day period following the effective date of a registration statement of the Company filed under the 1933 Act, it shall not, to the extent requested by the Company and any underwriter, sell, pledge, transfer, make any short sale of, loan, grant any option for the purchase of, or otherwise transfer or dispose of (other than to donees who agree to be similarly bound) any Common Stock held by it at any time during such period except Common Stock included in such registration; provided, however, that:

(a)     such agreement shall be applicable only to the first such registration statement of the Company that covers Common Stock (or other securities) to be sold on its behalf to the public in an underwritten offering; and

(b)     all other "One Percent Shareholders" with registration rights (whether or not pursuant to this Agreement) and all officers and directors of the Company enter into similar agreements.

For purposes of this Section 2.13, the term "One Percent Shareholder" shall mean a shareholder of the Company who holds at least one percent of the outstanding Common Stock of the Company (assuming conversion of all outstanding Preferred Stock of the Company).

In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to the Registrable Securities of each Holder and the Common Stock of each Major Holder (and the shares or securities of every other person subject to the foregoing restriction) until the end of such period.

2.14    Amendment of Registration Rights.  Any provision of this Section 2 may be amended and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and the Holders of at least a majority of the Registrable Securities then outstanding and not registered. Any amendment or waiver effected in accordance with this Section shall be binding upon each Holder, each future Holder of Registrable Securities and the Company.

2.15    Inclusion of Stock Held by Major Holders.  In connection with any registration effected pursuant to Section 2.3 hereof, the Major Holders shall be entitled to include in such registration (on the same terms and conditions as Holders selling their Registrable Securities in

such registration) shares of Common Stock held by such Major Holders; provided that any limitation by the underwriter on the number of shares to be underwritten in connection with such registration shall first be applied to the shares so included by such Major Holders before being applied to shares of Registrable Securities, and provided further that each such Major Holder's right to include shares of Common Stock in a registration pursuant to this Section 2.15 is contingent upon such Major Holder's compliance with the obligations of a Holder of Registrable Securities under this Agreement.

2.16   Termination of Registration Rights.  The rights of any particular Holder to cause the Company to register securities under Sections 2.2, 2.3 or 2.9 hereof shall terminate as to any Holder on the date such Holder is able to dispose of all of its Registrable Securities in any 90-day period pursuant to SEC Rule 144 (or any similar or analogous rule promulgated under the 1933 Act).

Section 3.

RIGHTS OF FIRST REFUSAL

3.1   Right of First Refusal. The Company hereby grants to each Investor, subject to the terms and conditions specified in this Section 3, the right of first refusal to purchase up to its pro rata share of all New Securities that the Company may, from time to time, propose to sell and issue. An Investor's pro rata share, for purposes of this right of first refusal, is the ratio (A) the numerator of which is the number of shares of Common Stock issued or issuable to such Investor upon the conversion of shares of Preferred Stock held by such Investor on the date of the Company's written notice pursuant to Section 3.3 hereof, and (B) the denominator of which is the number of shares of Common Stock issued or issuable to all the Investors upon the conversion of shares of Preferred Stock held by such Investors on the date of the Company's notice pursuant to Section 3.3 hereof.

3.2   New Securities.  "New Securities" shall mean any capital stock of the Company, whether now authorized or not, and rights, options or warrants to purchase capital stock, and securities of any type whatsoever that are, or may become, convertible into capital stock; provided that the term "New Securities" does not include (i) the Series A Stock issued to the Investors pursuant to the Series A Agreement; (ii) securities issuable upon conversion of or with respect to Series A Stock; (iii) securities issued pursuant to the acquisition of another corporation by the Company by merger, purchase of substantially all the assets or other reorganization whereby the Company owns more than 50% of the voting power of such corporation; (iv) capital stock or securities exercisable for or convertible into such capital stock issued in connection with any borrowings, direct or indirect, from financial or other institutions regularly engaged in the business of lending of money; (v) shares of Common Stock, and options, warrants or rights convertible into such Common Stock, issued to employees, consultants or directors of the Company pursuant to any incentive agreement or arrangement approved by the Board of Directors of the Company pursuant to Section 4.21; (vi) shares of Common Stock issued upon exercise of options or warrants outstanding on the date hereof; or (vii) securities issued pursuant to any stock dividend, stock split, combination or other reclassification by the Company of any of its capital stock.

3.3    <u>Required Notices</u>.  In the event the Company proposes to undertake an issuance of New Securities, it shall give each Investor written notice of its intention, describing the type of New Securities, the price and the general terms upon which the Company proposes to issue the same.  Each Investor shall have 15 days from the date of any such notice to agree to purchase such New Securities in accordance with Section 3.1 if such Section is then in effect or if Section 3.1 is not then in effect, the Investor's pro rata share of such New Securities for the price and upon the general terms specified in the notice by giving written notice to the Company and stating therein the quantity of New Securities to be purchased.

3.4    <u>Company's Right to Sell</u>.  In the event the Investors fail to exercise their rights of first refusal as to all New Securities offered within said 15-day period, the Company shall have 90 days thereafter to sell all such New Securities with respect to which the Investors' rights of first refusal hereunder were not exercised, at a price and upon general terms no more favorable in any material respect to the purchasers thereof determined in accordance with Section 3.1 if such Section 3.1 is then in effect or if Section 3.1 is not then in effect, then at a price and upon general terms specified in the Company's notice.  In the event the Company has not sold all such New Securities within said 90-day period, the Company shall not thereafter issue or sell any New Securities, without first offering such securities to the Investors in the manner provided herein.

3.5    <u>Expiration of Right</u>.  The rights of first refusal granted under this Section 3 shall not apply to, and shall expire upon, the effectiveness of the Company's initial registration statement for the sale of its shares of Common Stock in a firm commitment underwritten public offering registered under the 1933 Act generating proceeds (net of underwriters' commissions and discounts) to the Company of $10,000,000 or more and the price per share to the public is not less than $24.21 per share, subject to adjustment for stock splits, stock dividends and the like (other than a registration relating solely to employee benefit plans or to a transaction under Rule 145 under the 1933 Act or any successor rule thereto) (a "Qualified Public Offering").

3.6    <u>Assignment</u>.  The rights of first refusal set forth in this Section 3 are nonassignable, except that (a) such right is assignable by each Investor to any wholly owned subsidiary or parent of, or to any corporation, entity or other person that is, within the meaning of the 1933 Act, controlling, controlled by or under common control with, such Investor, and (b) such right is assignable in any Permitted Transfer (as defined in Section 2.8(b)) by an Investor.

Section 4.

<u>COMPANY COVENANTS</u>

The Company hereby covenants and agrees as follows.

4.1    <u>Financial Information</u>.

(a)    So long as any Investor or any subsidiary, affiliate or partner of such Investor shall own any shares of Investor Stock or any shares of Common Stock issued upon conversion thereof, the Company will furnish such Investor the following reports:

(i) As soon as practicable after the end of each fiscal year, and in any event within 90 days thereafter, (1) audited consolidated balance sheets of the Company and its subsidiaries, if any, as at the end of such fiscal year, and audited consolidated statements of income and losses, shareholders' equity and cash flows of the Company and its subsidiaries, if any, for such fiscal year, prepared in accordance with generally accepted accounting principles and setting forth in each case in comparative form the figures for the previous fiscal year, if any, all in reasonable detail and accompanied by a report and opinion thereon by independent auditors selected by the Company's Board of Directors; and (2) a copy of such auditors' management letter prepared in connection therewith, if any; and

(ii) As soon as practicable after the end of each of the first three quarters of the fiscal year, but in any event within 30 days after the end of each such quarter, the unaudited consolidated balance sheets of the Company and its subsidiaries, if any, as of the end of such quarter, and its unaudited consolidated statements of income and losses, shareholders' equity and cash flows for such quarter, all in reasonable detail and prepared in accordance with generally accepted accounting principles, except that such financial statements may not contain notes and will be subject to year-end adjustment, and certified by the principal financial or accounting officer of the Company. Such quarterly report shall include a written or verbally transmitted summary description of the Company's operations for such quarter.

(b)     So long as any Investor or any subsidiary, affiliate or partner of such Investor shall own not less than 50,000 shares of Common Stock issued or issuable upon conversion of the Investor Stock, subject to adjustment for combinations, consolidations, recapitalizations, stock splits, stock dividends and the like, to furnish to such Investor the following:

(i) As soon as practicable after the end of each month, but in any event within 30 days thereafter, the unaudited consolidated balance sheet of the Company and its subsidiaries, if any, as of the end of such month and its unaudited statement of income and losses, shareholders' equity and cash flows for such month, all in reasonable detail and prepared in accordance with generally accepted accounting principles, except that such financial statements may not contain notes and will be subject to year-end adjustment, and certified by the principal financial or accounting officer of the Company;

(ii) As soon as practicable after its adoption or approval by the Company's Board of Directors, but not later than the commencement of such fiscal year, an annual plan summary for each fiscal year, which shall include monthly capital and operating expense budgets, cash flow statements, projected balance sheets for each quarter, and profit and loss projections for each month and for the end of the year, itemized in such detail as the Board of Directors may reasonably determine.

(c)     The rights granted pursuant to this Section 4.1 may not be assigned or otherwise conveyed by any Investor or by any subsequent transferee of any such rights without the written consent of the Company, which consent shall not be unreasonably withheld; provided that the Company may refuse such written consent if the proposed transferee is reasonably

believed by the Company to be a competitor of the Company; and provided further, that no such written consent shall be required if the transfer is a Permitted Transfer (as defined in Section 2.8(b) hereof, other than a transfer described in Section 2.8(b)(v) hereof) by any Investor.

4.2     Inspection. The Company shall permit each Investor and each transferee in a Permitted Transfer (as defined in Section 2.8(b) hereof), its attorney or its other representative to visit and inspect the Company's properties, to examine the Company's books of account and other records, to make copies or extracts therefrom and to discuss the Company's affairs, finances and accounts with its officers, management employees and independent auditors all at such reasonable times and as often as such Investor or transferee may reasonably request; provided, however, that the Company shall not be obligated pursuant to this Section 4.2 to provide trade secrets or confidential information or to provide information to any person whom the Company reasonably believes is a competitor of the Company; provided, further, that such Investor shall bear any costs or expenses of such investigations or inquiries.

4.3     Prompt Payment of Taxes. The Company and its subsidiaries, if any, will timely pay and discharge, or cause to be paid and discharged, all lawful taxes, assessments and governmental charges or levies imposed upon any of their income, profits, properties or businesses; provided, however, that any such tax, assessment, charge or levy need not be paid if the validity thereof shall currently be contested in good faith by appropriate proceedings; and provided, further, that the Company and its subsidiaries will pay all such taxes, assessments, charges or levies forthwith upon the commencement of proceedings to foreclose any tax lien that may have attached as security therefor or with respect thereto.

4.4     Employees. Without the consent of the holders of a majority of the Preferred Stock, the Company shall not terminate the employment of either Ragab El-Rashidy or Albert F. Hummel. Without the approval of the Board of Directors, the Company shall not retain or dismiss any employee whose total annual compensation is, or would be, in excess of $150,000. Upon the expiration of Ragab El-Rashidy's current employment agreement on October 1, 1998, the Company will negotiate in good faith with Ragab El-Rashidy to enter into an employment agreement with Dr. El-Rashidy on terms and conditions mutually agreeable to Board of Directors and Dr. El-Rashidy.

4.5     Related Party Transactions. Without the consent of the holders of a majority of the Preferred Stock, the Company shall not enter into any material agreement, transaction or relationship with an officer or director of the Company or any person that controls, is controlled by, or is under common control with, the Company.

4.6     Observation Rights. Each Investor and each transferee in a Permitted Transfer (as defined in Section 2.8(b) hereof) who holds no less than 50,000 shares of Common Stock issued or issuable upon conversion of the Preferred Stock, subject to adjustment for stock splits, stock dividends and the like, shall have the right to receive notice of all meetings of the Board of Directors and to attend any such meeting as a nonvoting observer.

4.7     Nature of Business. The Company will continue to conduct its business without material change from the nature of the business as conducted or contemplated as of the date of

this Agreement or enter into material transactions not in the ordinary course of business, except as approved by the Board of Directors, including the unanimous approval of the directors nominated by the Investors.

4.8     Use of Proceeds.  The Company will expend the proceeds from the sale of the Preferred Stock substantially in accordance with the Use of Proceeds Schedule attached hereto as Exhibit C and incorporated herein by reference, except as otherwise approved by the Board of Directors, including the unanimous approval of the directors nominated by the Investors.

4.9     Dilutive Issuances.  Without the consent of the holders of a majority of the Preferred Stock, the Company shall not sell New Securities at a price per share less than $13.45, subject to adjustment for stock splits, stock dividends, reorganizations and the like.

4.10    Payment of Trade Debt.  The Company will pay, and cause each subsidiary to pay, when due, or in conformity with customary trade terms but not later than ninety (90) days from the due date, all lease obligations, all trade debt, and all other indebtedness incident to the operations of the Company or its subsidiaries, except as are being contested in good faith and by proper proceedings if the Company or subsidiary concerned shall have set aside on its books sufficient reserves, if any, with respect thereto.

4.11    Maintenance of Insurance.  The Company will maintain, and cause each subsidiary to maintain, insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in the same general areas in which the Company or such subsidiary operates.

4.12    Preservation of Corporation Existence.  The Company will preserve and maintain, and, unless the Company reasonably deems it not to be in its best interests, cause each subsidiary to preserve and maintain, its corporate existence, rights, franchises and privileges in the jurisdictions of its incorporation, and qualify and remain qualified, and cause each subsidiary to qualify and remain qualified, as a foreign corporation in each jurisdiction in which such qualification is necessary or desirable in view of its business and operations or the ownership or lease of its properties, except when the failure to be so qualified would not have a material adverse effect on the Company and its subsidiaries taken as a whole; provided that nothing in this Section 4.12 shall prohibit the Company or any of its subsidiaries from engaging in a corporate transaction contemplated by Section 3.2(iii) hereof.

4.13    Intellectual Property.  The Company will secure, preserve, and maintain, and cause each subsidiary to secure, preserve, and maintain, all licenses and other rights to use patents, processes, licenses, permits, trademarks, trade names, inventions, intellectual property rights, or copyrights owned or used by it to the extent necessary to the conduct of its business or the business of any subsidiary.

4.14    Compliance with Laws.  The Company will comply, and cause each subsidiary to comply, with the requirements of all applicable laws, rules, regulations, and orders of any

governmental authority, the noncompliance with which could materially adversely affect its business or condition, financial or otherwise.

4.15  <u>Records and Books of Account</u>.  The Company will keep, and cause each subsidiary to keep, adequate and accurate records and books of account in which complete entries will be made in accordance with generally accepted accounting principles consistently applied, reflecting all financial transactions of the Company and any subsidiary, and in which, for each fiscal year, all proper reserves for depreciation, depletion, returns of merchandise, obsolescence, amortization, taxes, bad debts, and other purposes in connection with its business shall be made.

4.16  <u>Maintenance of Properties</u>.  The Company will maintain and preserve, and cause each subsidiary to maintain and preserve, all of its properties and assets necessary for the proper conduct of its business, in good repair, working order, and condition, ordinary wear and tear excepted.

4.17  <u>Financings</u>.  The Company will promptly, fully, and in detail, inform the Board of Directors of any discussions, offers, or contracts relating to possible financings of any nature for the Company, whether initiated by the Company or any other person, except for arrangements with trade creditor in the ordinary course of business.

4.18  <u>Key-Man Insurance</u>.  As soon as practicable after the date hereof, the Company will obtain and maintain "key-man" insurance policies on the lives of Ragab El-Rashidy and Albert F. Hummel with minimum coverage of $5,000,000 per person, with all proceeds payable to the Company, provided that the use and distribution of such proceeds shall be determined by unanimous consent of the Board of Directors.

4.19  <u>Nondisclosure and Assignment of Inventions</u>.  The Company will require each officer of the Company and each employee who authors, designs, or maintains the Company's proprietary products to enter into, prior to the commencement of their employment, the Company's standard Nondisclosure and Developments Agreement, in a form and substance reasonably satisfactory to the Investors.

4.20  <u>Redemption of Series A Preferred Stock</u>.  In the event that a holder of Series A Preferred Stock demands redemption of such stock pursuant to Article IV, Section H of the Amended and Restated Articles of Incorporation, the Company shall redeem all shares for which redemption is demanded no later than one (1) year after the date such demand is received by the Company.

4.21  <u>Future Issuance of Stock Purchase Rights</u>.  The Company shall not issue any Stock Purchase Rights (as defined below) unless such issuance is pursuant to, and in accordance with any one of the following subsections (a), (b) or (c) of this Section 4.21.

(a)  The Company may issue Stock Purchase Rights at any time with the unanimous consent of the Board of Directors.

(b)　　The Company may issue Stock Purchase Rights without unanimous consent of the Board of Directors if (i) such issuance occurs within ninety (90) days of the issuance of any capital stock of the Company to a third party, whether now authorized or not, or securities of any type whatsoever that are, or may become, convertible into capital stock that results in net proceeds to the Company of not less than $2,000,000, and (ii) the consideration per share for which shares of Common Stock may at any time thereafter be issuable upon exercise thereof (or, in the case of Stock Purchase Rights exercisable for the purchase of Convertible Securities (as defined below), upon the subsequent conversion or exchange of such Convertible Securities) is equal or greater than the consideration per share for which the capital stock or securities convertible into capital stock issued pursuant to clause (i) above is convertible to Common Stock.

(c)　　Subject to subsection (b), the Company may issue Stock Purchase Rights without the unanimous consent of the Board of Directors, provided, that the consideration per share for which shares of Common Stock may at any time thereafter be issuable (the "Purchase Price") upon the exercise of such Stock Purchase Rights is agreed upon by Series A Investors and the Company; or if the Series A Investors and the Company fail to agree upon a Purchase Price, such Purchase Price as may be determined by an independent qualified appraiser appointed jointly by Series A Investors and the Company, which appraiser shall be experienced and possess a national reputation in the pharmaceutical industry and which appraiser has not otherwise dealt with the Company or directly with a Series A Investor for two (2) years prior to its appointment. If the Series A Investors and the Company fail to agree on an independent appraiser pursuant, each of Series A Investors and the Company shall appoint its own qualified appraiser, and, (A) if the resulting appraisals differ by ten percent (10%) or less, the Purchase Price shall be the average of the Purchase Prices determined by such qualified appraisers, or (B) if the resulting appraisals differ by more than ten percent (10%), then the two appraisers shall appoint a third qualified appraiser who shall determine the Purchase Price. The total cost of all appraisals shall be borne by the Company. Each appraisal shall be completed within thirty (30) days of the date of appointment of the appraiser.

For the purposes of this Section 4.21 "Stock Purchase Rights" shall mean any warrants, options or other rights to subscribe for, purchase or otherwise acquire any shares of Common Stock or any Convertible Securities, and "Convertible Securities" shall mean evidences of indebtedness, shares of stock or other securities that are convertible into or exchangeable for, with or without payment of additional consideration, shares of Common Stock.

4.22　　Expiration of Covenants The covenants set forth in this Section 4 shall expire and be of no further force or effect upon the effectiveness of a Qualified Public Offering (as defined in Section 3.5 hereof). After such time, the Investors shall be entitled to receive such annual and quarterly reports as the Company shall distribute to its shareholders generally.

Section 5.

## VOTING AGREEMENT

5.1  Election of Directors.  The authorized size of the Board of Directors of the Company will, as of the Closing, consist of not less than five (5) persons nor more than seven (7) persons. Each time the shareholders of the Company meet, or act by written consent in lieu of meeting, for the purpose of electing the directors to serve on the Board of Directors, each Investor and each Major Holder shall vote the share of the Company's stock owned by such Investor or Major Holder for the election of one designee of the Investors. Any remaining directors (if any) will be elected in the manner specified by the Amended and Restated Articles of Incorporation and Bylaws of the Company.

5.2  Election of Directors in Case of Default.  In the event of any material default by the Company in its covenants and obligations specified in Section 4 of this Agreement, and the failure of the Company to cure such default within thirty (30) days after written notice of such default by any Investor (or if the Company determines in good faith that such default is not reasonably curable within thirty (30) days, but is curable within ninety (90) days, the failure of the Company to cure such default within ninety (90) days after notice thereof, the Investor or Investors notifying the Company of such default shall have the right to call a special meeting of shareholders of the Company and to designate such number of nominees to serve as directors of the Company as is equal to a majority of the total number of directors authorized in the Company's Amended and Restated Articles of Incorporation and Bylaws. The Investors and the Major Holders each shall vote the shares of the Company's stock owned by such Investors and Major Holders so as to cause all existing directors to be removed from office (except for Ragab El-Rashidy, if still serving as a director) and all such Investor nominees (representing a majority of the total number of directors) to be elected to serve as directors of the Company until the date two (2) years after the date of such special meeting of shareholders. Any remaining directors (other than such Investor nominees and Ragab El-Rashidy, if still serving as a director) shall be elected as provided in the Company's Amended and Restated Articles of Incorporation and Bylaws. To ensure the prompt enforcement of the rights of the Investors under this Section 5.2, each Major Holder hereby grants each Investor an irrevocable proxy to vote such Major Holder's shares in favor of the election of the designees of the Investors in the manner and under the circumstances permitted by this Section 5.2, to change the size of the Board of Directors as necessary to accomplish the foregoing, and to take such other actions as the Investors or their counsel reasonably deem necessary or advisable to accomplish the intents and purposes of this Section 5.2. The Major Holders agree that this grant of a proxy is coupled with an interest and is irrevocable. The Major Holders shall have the right to attend all meetings of the directors of the Company occurring after the exercise of the Investors' rights under this Section 5.2.

5.3  Binding Effect of Voting Agreement.  The voting agreement set forth in this Section 5 shall be binding upon any transferee of shares of the Company's stock held by the Investors and Major Holders. Each such transferee shall execute documents assuming the obligations of the transferor under this Section 5 prior to the completion of such transfer.

5.4 <u>Legends</u>. Each certificate held by or issued to the Investors or the Major Holders, whether now outstanding or subsequently issued, shall be surrendered to the Company for endorsement or be endorsed by the Company prior to its issuance with substantially the following legend:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A VOTING AGREEMENT AMONG THE HOLDER OF THESE SECURITIES AND CERTAIN OTHER HOLDERS OF THE ISSUER'S SECURITIES. BY ACCEPTING ANY INTEREST IN SUCH SECURITIES, THE PERSON ACCEPTING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL OF THE PROVISIONS OF SUCH AGREEMENT. COPIES OF SUCH VOTING AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST BY THE HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OF THE CORPORATION AT THE PRINCIPAL EXECUTIVE OFFICES OF THE CORPORATION"

5.5 <u>Termination of Voting Agreement</u>. The covenants set forth in this Section 5 shall terminate upon the earliest of (a) the closing of a Qualified Public Offering (as defined in Section 3.5 hereof), (b) such time as the Company shall be subject to the reporting requirements arising under the 1934 Act, or any successor statute and any applicable rules promulgated thereunder by the SEC or (c) the date ten years from the date hereof.

Section 6.

## MISCELLANEOUS

6.1 <u>Governing Law</u>. This Agreement shall be governed by, and construed and interpreted in accordance with the laws of the State of North Carolina as applied to agreements among North Carolina residents made and to be performed entirely within the State of North Carolina.

6.2 <u>Successors and Assigns</u>. Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

6.3 <u>Entire Agreement</u>. This Agreement constitutes the full and entire understanding and agreement among the parties with regard to the subjects hereof. Nothing in this Agreement, express or implied, is intended to confer upon any party, other than the parties hereto and their successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided herein.

6.4 <u>Severability</u>. Any invalidity, illegality or limitation of the enforceability with respect to any Investor of any one or more of the provisions of this Agreement, or any part thereof, whether arising by reason of the law of any such person's domicile or otherwise, shall in

no way affect or impair the validity, legality or enforceability of this Agreement with respect to other Investors. In case any provision of this Agreement shall be invalid, illegal or unenforceable, it shall to the extent practicable, be modified so as to make it valid, legal and enforceable and to retain as nearly as practicable the intent of the parties, and the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

6.5     Amendment and Waiver. Except as otherwise expressly provided herein, any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance, either retroactively or prospectively and either for a specified period of time or indefinitely) with the written consent of the Company and Investors (or their transferees) holding at least a majority of the shares of Preferred Stock, voting together as a single group (treated as if converted at the conversion rate then in effect and including, for such purposes, shares of Common Stock into which any shares of Preferred Stock shall have been converted that are held by a Holder); provided, however, that no such amendment or waiver shall reduce the aforesaid percentage of Preferred Stock and Common Stock issued upon conversion thereof, the holders of which are required to consent to any waiver or supplemental agreement, without the consent of the holders of all of such Preferred Stock and Common Stock; provided, further, that any amendment to Section 2.15 (or to Section 2.3 that would affect the rights under 2.15) or to Section 3 shall also require the consent of the Major Holders holding at least a majority of the shares of Common Stock issued to, and issuable upon exercise of options held by, the Major Holders. Any amendment or waiver effected in accordance with this Section 6.5 shall be binding upon each Investor and each transferee of the Registrable Securities. Upon the effectuation of each such amendment or waiver, the Company shall promptly give written notice thereof to the Investors who have not previously consented thereto in writing. Notwithstanding anything to the contrary in this Section 6.5, the Company shall be entitled to include additional purchasers of its Series A Stock pursuant to the Series A Agreement as parties to this Agreement, and to treat such purchasers as "Investors" and "Holders" hereunder, by amending Exhibit A attached hereto and providing such Exhibit A, as amended, to the other parties to this Agreement; provided that such purchasers execute signature pages to this Agreement.

6.6     Delays or Omissions. No delay or omission to exercise any right, power or remedy accruing to the Company, any Investor, or any transferees upon any breach, default or noncompliance of any Investor or any transferee or the Company under this Agreement, shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach, default or noncompliance, or any acquiescence therein, or of any similar breach, default or noncompliance thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character on the part of the Company or the Investors of any breach, default or noncompliance under this Agreement or any waiver on the Company's or the Investors' part of any provisions or conditions of this Agreement must be in writing and shall be effective only to the extent specifically set forth in such writing and that all remedies, either under this Agreement, by law, or otherwise afforded to the Company and the Investors, shall be cumulative and not alternative.

6.7    Notices, etc. All notices and other communications required or permitted hereunder shall be in writing and shall be deemed effectively given upon personal delivery or upon confirmed delivery by facsimile or telecopy, or on the fifth day (or the tenth day if to a party with an address outside of the United States) following mailing by registered or certified mail, return receipt requested, postage prepaid, addressed:  (a) if to an Investor, at such Investor's address as set forth on the schedule attached hereto, or at such other address as such Investor shall have furnished to the Company in writing, (b) if to a Major Holder, at such Holder's address as set forth on the schedule attached hereto, or at such other address as such Holder shall have furnished to the Company in writing, or (c) if to the Company, at its address first above written, or at such other address as the Company shall have furnished to the Investors and Major Holders in writing.

6.8    Titles and Subtitles. The titles of the sections and subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

6.9    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the parties as of the date first above written.

PENTECH PHARMACEUTICALS, INC.

ATTEST:

*R El Rashidy*

R. EL-RASHIDY

_____ Asst. Secretary

By: _____
Albert F. Hummel, President

(Corporate Seal)

INVESTORS:

FF-PENTECH, L.P.

By: _____ (Seal)
James D. Lumsden, Manager

CURRAN PARTNERS

By: _____ (Seal)
    (Signature)

Name: _____

Title: _____

MEL SHAROKY

By: _____ (Seal)
    (Signature)

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the parties as of the date first above written.

PENTECH PHARMACEUTICALS, INC.

ATTEST:

By: _____
         Albert F. Hummel, President

_____

_____ Secretary

(Corporate Seal)

INVESTORS:

FF-PENTECH, L.P.

By:_____(Seal)
        James D. Lumsden, Manager

CURRAN PARTNERS

By: _John P. Curran_____ (Seal)
    (Signature)

Name: _JOHN P. CURRAN_

Title: _Gen'l Partner_

MEL SHAROKY

By:_____(Seal)
  (Signature)

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the parties as of the date first above written.

PENTECH PHARMACEUTICALS, INC.

ATTEST:

By: _____
       Albert F. Hummel, President

_____

_____, Secretary

(Corporate Seal)

INVESTORS:

FF-PENTECH, L.P.

By:_____ (Seal)
       James D. Lumsden, Manager

*JOHN P & CONSTANCE A. CURRAN CHARITABLE FOUNDATIO[N]*

~~CURRAN PARTNERS~~

By: *John Curran* (Seal)
  (Signature)

Name: *JOHN P. CURRAN*

Title: *Granton & Trustee*

MEL SHAROKY

By:_____ (Seal)
  (Signature)

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the parties as of the date first above written.

PENTECH PHARMACEUTICALS, INC.

ATTEST:

By: _____
      Albert F. Hummel, President

_____

_____, Secretary

(Corporate Seal)

INVESTORS:

FF-PENTECH, L.P.

By:_____ (Seal)
      James D. Lumsden, Manager

*Delaware Charter Guarantee & Trust*
~~CURRAN PARTNERS~~ *John P. Curran, IRA*

By: *John P. Curran* (Seal)
      (Signature)

Name: *JOHN P. CURRAN*

Title: *self-directed IRA*

MEL SHAROKY

By:_____(Seal)
      (Signature)

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the parties as of the date first above written.

PENTECH PHARMACEUTICALS, INC.

ATTEST:

By: _____
    Albert F. Hummel, President

_____, Secretary

(Corporate Seal)


INVESTORS:

FF-PENTECH, L.P.

By:_____ (Seal)
    James D. Lumsden, Manager

CURRAN ~~PARTNERS~~ *Family Partnership*

By: _~John P. Curran~_ (Seal)
   (Signature)

Name: *John P. Curran*

Title: *Gen'l Partner*


MEL SHAROKY

By:_____(Seal)
   (Signature)

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the parties as of the date first above written.

PENTECH PHARMACEUTICALS, INC.

ATTEST:

By: _____
_____        Albert F. Hummel, President

_____ Secretary

(Corporate Seal)

INVESTORS:

FF-PENTECH, L.P.

By:_____(Seal)
        James D. Lumsden, Manager

CURRAN PARTNERS

By:_____(Seal)
  (Signature)

Name: _____

Title: _____

MEL SHAROKY

By: _____(Seal)
  (Signature)

JOSEPH RICARDO

By:_____(Seal)
  (Signature)


ALBERT F. HUMMEL

By:_____(Seal)
  (Signature)


TOM KEARNS

By:_____(Seal)
  (Signature)


North Carolina State Employees Retirement
System

By:_____(Seal)
  (Signature)

Name: _Richard V. Fulp_

Title: _Franklin Street Trust Company,
Trustee NC State Employees
Retirement System_

MAJOR HOLDERS

_____
Ragab El-Rashidy

_____
Robert L. Fait

JOSEPH RICARDO

By:_____(Seal)
  (Signature)

ALBERT F. HUMMEL

By:_____(Seal)
  (Signature)

TOM KEARNS

By:_____(Seal)
  (Signature)

North Carolina State Employees Retirement System

By:_____(Seal)
  (Signature)

Name: _____

Title: _____

MAJOR HOLDERS

_____
Ragab El-Rashidy

_____
Robert L. Fait

# EXHIBIT   B

## Letter of Intent

Whereas Pentech Pharmaceuticals Inc. (Pentech) is interested in selling equity interest and Gulf Pharmaceutical Industries (Julphar) is interested in purchasing these equities, therefore Pentech and Julphar enter into following understand with an intent to complete the transaction as detailed:

1. Julphar offers to purchase 1.311.475 (One million three hundred eleven and four hundred seventy five) shares of Preferred Stock of Pentech at a per share price of $15.25 (number rounded off to show the total investment of $20 Million). The terms of payment shall follow the requirements as displayed in the cash flow for the use of proceeds and the payments will be made on a quarterly basis over a period of two years.

2. Pentech accepts the offer made above and agrees to provide any and all additional documents and internal information about the company as deemed necessary by Julphar to complete its due diligence of the offer made here.

3. Pentech further enters into a technology transfer and support agreement whereby Julphar shall assist Pentech in completing the US FDA requirements for the transfer of manufacturing site for paroxetine (for antidepressant use); all technical support to be provided by Julphar leading to approval by the US FDA to supply the product to the US market. Pentech is to provide all raw materials as necessary. In lieu of this service granted by Julphar, Pentech hereby assigns a total of 188,525 (One hundred eighty eight thousand five hundred twenty five) Common shares of Pentech into an escrow to be held by the attorneys appointed by Julphar. Upon successful completion of the US FDA approval, these shares shall be assigned and released to Julphar. The details of this agreement specifying the responsibilities of each party shall be developed in a separate document. However, both of these documents, viz., the sale of Preferred stock and technology support shall be signed simultaneously and concurrently.

4. The minutes of meeting (dated 6 September, 2000) between Pentech and Julphar as appended heretofore are included in this letter of Intent to specify other areas of collaboration and cooperation as planned by and between the two companies.

5. This Letter of Intent is subject to approval and or ratification by the Boards of Directors of each company in accordance with their own internal bylaws of the company. Each company shall keep the other company informed and appraised of the status of this approval. However, in the meantime, both Pentech and Julphar shall begin drafting of legal instruments as necessary and in accordance with the laws of Securities and Exchange Commission.

6. Furthermore both parties agree to expedite their due diligence and completion of necessary documentation to complete the transaction.

Signed this 9th September, 2000

9/9 2000

Mr. Abdul Razzaq Yousef, for Julphar
Managing Director, Julphar

Sep. 9 2000

Dr. Ragab El-Rashidy, for Pentech
CEO & Chairman, Pentech

# EXHIBIT C

# PENTECH PHARMACEUTICALS, INC.
## COMPLIANCE CERTIFICATE

The undersigned, as President of Pentech Pharmaceuticals, Inc., an Illinois corporation (the "Corporation"), hereby certifies, pursuant to Section 5.10 of the Series B Preferred Stock Purchase Agreement of even date herewith (the "Agreement"), pursuant to which shares of the Corporation's Series B Preferred Stock (the "Series B Stock") shall be issued by the Corporation to the Purchasers, as defined in the Agreement, that:

1. The representations and warranties of the Corporation contained in Section 3 of the Agreement are true and correct in all material respects on and as of the date hereof with the same force and effect as if they had been made on and as of this date.

2. The Corporation has performed and complied with all conditions contained in Sections 5.2, 5.3, 5.4, 5.5 and 5.14 of the Agreement that are required to be performed or complied with by it on or before the Closing.

3. All authorizations, approvals or permits, if any, of, and all filings and registrations with, any governmental authority or regulatory body of the United States or any other foreign country or of any state that are required prior to and in connection with the lawful issuance of the Series B Stock pursuant to the Agreement have been duly obtained or made and are effective as of the date hereof.

All capitalized terms used herein shall have the meanings set forth in the Agreement.

IN WITNESS WHEREOF, the undersigned has executed this certificate this ___ day of June, 2000.

PENTECH PHARMACEUTICALS, INC.

Albert F. Hummel, President

# EXHIBIT **D**



**PENTECH**
PHARMACEUTICALS, INC.

# MEMORANDUM

**Date:** October 26, 2000

**To:** Jim Lumsden

**From:** Ragab El-Rashidy

**cc:** Al Hummel, Dr. Niazi, Abdul Razzaq Yousef and Jeff Grolig

**RE:** Julphar Investment

---

As you are well aware the meeting that took place yesterday with Julphar representatives went well. The $20 MM investment commitment along with their first class GMP manufacturing capabilities in Dubai is a tremendous opportunity for Pentech. The two companies compliment each other well and I feel strongly that this will only benefit Pentech. In my opinion, Pentech and all of its shareholders are winners.

I spoke with Dr. Niazi and my other contacts at Julphar in Dubai and they are interested in moving forward quickly especially after the six (6) weeks of delay since we signed the letter of intent on September 9, 2000 in London. We have all the necessary legal documentation drawn up by Amstein & Lehr for the preferred "B" investors, which should be modified slightly to reflect the Julphar investment terms. Amstein & Lehr has also drawn up a draft manufacturing agreement between Pentech and Julphar that was sent to all directors on October 12, 2000. We are hoping to have all legal documentation in place by November 15, 2000. Julphar owners and management would like Pentech's directors to visit their manufacturing plant in Dubai, United Arab Emirates (UAE) sometime in late November or early December.

Please call me at home (847) 948-7955 so we may discuss.

# EXHIBIT E

**From:** Julphar Pharma Inc [skniazi@julpharpharma.com]
**Sent:** Thursday, October 26, 2000 10:26 AM
**To:** pentech@msn.com
**Cc:** alhummel@pentechinc.com
**Subject:** Investment in Pentech

Dear Al

It was indeed our pleasure to meet with you yesterday. There is a sense of urgency for us to proceed with our Board approval as we have already convened a special meeting for the purpose. All communication should be directly through me and not through Dr. El-Rashidy. Pursuant to our discussion this morning, the terms and instruments are ready. We want to know how soon you will be in a position to meet with in the UAE for the signing of both agreements and a press announcement.

With best regards.

Sarf

Sarfaraz K Niazi, Ph.D
CEO, Julphar Pharma Inc
111 Pfingsten Road Suite 180
Deerfield, Illinois 60015
Phone 847-205-0899
Fax 847-205-0926

# EXHIBIT F

Date: November 9, 2000

Jim : I left message on your voice machine yesterday. I called you to get updates on Julphar deal. They are becoming impatient with lake of progress. It is more than 2 months since I signed the original letter of Intent with Julphar Principles in London On Sept.9, 2000. It was good for 2 months for the negotiation of a final definitive agreement.

Please let me what has been done so far. I gave Dr. Niazi your phone no. so that he can contact you and convay their concerns. We all have agreed that this is the only available best deal for the company and all its shareholders. I am sure you will do what is best for all parties involved.

Also I have not received the last board meeting minutes on Octo.18, 2000 for review. Please fax them to me at fax. 847-948-0790 or better yet e mail them to me at my email Pentech@msn.com

Ragab

```
----------------- Headers -----------------
Return-Path: <pentech@email.msn.com>
Received: from rly-yg01.mx.aol.com (rly-yg01.mail.aol.com [172.18.147.1]) by air-yg01.mail.aol.com
(v76_r1.23) with ESMTP; Thu, 09 Nov 2000 17:10:47 -0500
Received: from smtp.email.msn.com (cpimssmtpu08.email.msn.com [207.46.181.30]) by rly-yg01.mx.aol.com
(v76_r1.19) with ESMTP; Thu, 09 Nov 2000 17:10:25 -0500
Received: from ragportable - 207.220.191.108 by email.msn.com with Microsoft SMTPSVC;
    Thu, 9 Nov 2000 14:10:05 -0800
Reply-To: <pentech@msn.com>
From: "Ragab El-Rashidy" <pentech@email.msn.com>
To: <bialystock@aol.com>
Subject: FW: Board meeting minutes/Julphar Negotiations updates
Date: Thu, 9 Nov 2000 16:11:07 -0600
Message-ID: <000001c04a99$f60a5d60$0e01a8c0@ragportable>
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3 (Normal)
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook CWS, Build 9.0.2416 (9.0.2910.0)
Importance: Normal
X-MimeOLE: Produced By Microsoft MimeOLE V5.00.2615.200
```

# EXHIBIT G

| | |
|---|---|
| Subj: | **FW: Board meeting minutes/Julphar Negotiations updates** |
| Date: | 11/9/00 4:10:47 PM Central Standard Time |
| From: | pentech@email.msn.com (Ragab El-Rashidy) |
| Reply-to: | |
| To: | bialystock@aol.com |

-----Original Message-----
From:   Jim Lumsden [mailto:jlumsden@thehalifaxgroup.com]
Sent:   Thursday, November 09, 2000 1:57 PM
To:   pentech@msn.com
Subject:   RE: Board meeting minutes/Julphar Negotiations updates

Ragab,

Thanks for your message. Earlier this month you promised not to interject
yourself into this transaction. By your comments regarding their supposed
impatience you confirm that you did not keep your promise. I had hoped to
believe you. Even you must know how dangerous this kind of behavior is to
any negotiation. Your efforts are putting the transaction - and the
company - at greater risk, and are affecting our ability to negotiate from
strength. The other side must ask: who is in control? Are they in disarray?
Which story is true? Is the company strong, with other options it may
choose from, as one side says, or desperate and weak, as the other seems to
indicate? I must ask you to cease and desist.
For my part, I told you I would keep you up to date; so here is a report: we
have been on the phone with Dr. Niazi and with Mr. Yousef throughout the
week. We are putting final touches on a new letter of agreement covering a
financing and a manufacturing relationship. There are many potential
rewards from creating a relationship with Julphar, but many potential
dangers and pitfalls as well. Your documents with them of September, while
possibly well-intended, fall far short of any transaction either we or they
should have agreed to. They appear to understand the logic of this as well.

We are committed to try to come to agreement with Julphar if we can. I have
been in frequent communication with Dr. Niazi and believe that both he and
Mr. Yousef are comfortable with the rate of progress. They understand that
we are required to spend a large proportion of time and effort on the
litigation with you, and that that is a necessary but unfortunate
distraction to the company. They have given me no reason to believe that
their interest in a transaction is diminished and have indicated, at least,
that the opposite is true.
The company does not yet have corporate counsel, which is the main reason
the minutes have not been finalized. This is another hindrance to our
efforts with Julphar as well. We expect to resolve this within a day or
two, and shortly thereafter the minutes will be distributed. The continuous
arrival of threatening letters from your attorneys is not helping. We will
not be intimidated out of our doing our duty to you and all the
shareholders; however, it takes its toll.
Jim

# EXHIBIT H

ID:PENTECH00000000000          TEL NO:1-708-459-5602          #631 P09

CONFIDENTIAL DRAFT

January 9, 2001

Dr. Sarfaraz K. Niazi
Julphar Pharma, Inc.
111 Pfingsten Road
Suite 180
Deerfield, Illinois 60015

Dear Dr. Niazi:

It was our pleasure meeting with you recently in Chicago to discuss Julphar Pharmaceuticals, Inc. ("Julphar") and Pentech Pharmaceuticals, Inc. ("Pentech" or the "Company"). The purpose of this letter is to indicate the Company's interest in cooperating with Julphar with respect to a financing of up to $20.0 million for Pentech (the "Financing"), subject to the finalization of appropriate documentation for closing, and subject further to the other terms and conditions as described in this letter.

In addition, as we discussed in our meeting, we understand that Julphar's interest in participating in the Financing is conditioned upon the simultaneous execution of a contract manufacturing agreement between Julphar and Pentech, under which Julphar would be a supplier of finished products to Pentech, and, subject to its ability to meet production requirements in accordance with the terms of a manufacturing agreement, the company's primary supplier of paroxetine products for distribution in the United States. This relationship relates to certain proprietary products developed by Pentech utilizing paroxetine HCL.

To facilitate our mutual consideration of these two separate but inextricably linked potential associations, we have set forth below the principal proposed terms for the Financing, in sufficient detail to permit our attorneys to produce draft documentation upon execution of this letter. We also have attached a proposed draft form of manufacturing agreement (the "Agreement") which is incorporated in this letter by reference, for your consideration, and which may form the basis for final documentation of the contract manufacturing agreement between Julphar and Pentech.

The principal terms of the Financing would be as follows:

1.  The Company will issue up to $20 million of Series B Convertible Preferred Stock to Julphar (and/or certain others investors as described below), convertible into 27.2 percent of the fully diluted shares of the Company (i.e., a $50 million pre-money valuation for Pentech). The Series B issue would be identical to, and pari passu with, the Series A Convertible Preferred Issue now outstanding, except it shall be senior to the Series A issue with respect to liquidation preference, and shall differ otherwise as described below.

2.  Of the $20 million to be raised in the Financing, a maximum of $5 million of the Series B issue will be made available to Series A investors, and

FEB-14-'01 WED 05:47 ID:PENTECH00000020000    TEL NO:1-708-459-5602    #631 P10

(should the Series A investors not commit to all $5 million made available to them) to common shareholders of the Company. Prior to the initial closing of the Financing, Series A investors and/or common holders will be required to indicate their interest in participating in the Financing.    We expect these investors to desire between $2 and $4 million, and therefore we would expect Julphar's total investment therefore to be between $16 and $18 million (22.2 percent and 25 percent, respectively).

3.    The Series B investment would be divided into four $5 million tranches (or lesser equal amounts if the Financing is less than $20 million as provided at 2 above), with $5 million (or one-fourth of the Financing) to be delivered at the first closing. The remainder would be callable by the Company, in amounts equal to the first closing amount at its option with 15 days' notice; however, notices and calls shall not occur more often than quarterly, and shall be authorized by the Board of Directors of Pentech. The Company may issue such calls for capital during the two years following the initial closing. To secure its obligations under the Series B Financing, Julphar will provide to Pentech irrevocable Letters of Credit, drawn upon a recognized international bank with a least $2 billion of assets in the United States. [See Exhibit A, Sample Letter of Credit]

4.    Julphar and/or any other Series B investors will have the right to invest the remainder of their commitment, if any such commitments remain uncalled by the Company, at their option during the final 90 days prior to the end of the two-year post-closing period. The above notwithstanding, both the Company's ability to call capital and the investors' rights to purchase Series B preferred stock shall terminate at such time as the Board of Directors shall have committed the Company to any of the following: (1) a sale of all or substantially all of the company's assets or a merger; (2) an underwritten Initial Public Offering by which the Company shall raise gross proceeds of $25 million or more; or (3) a subsequent round of financing of at least $20 million, all at a valuation in excess of $100 million pre-money;  provided however, that both the Company's rights to call for capital and the investors' rights to invest shall be reinstated 90 days after such commitment by the Board, and shall be extended by 90 days, if the action committed to by the Board shall fail to close within 90 days, and such rights will remain outstanding for 90 days past the second anniversary of the initial closing.

5.    The Company may require Series B holders to convert during the first five years of the investment if there is a liquidity event such as (1) an initial public offering of at least $25.0 million, or (2) sale of 50 percent or more of the Company's common stock, either of which establishes a valuation for the Company of $150.0 million or more.

6.    For a period of five years from the initial closing, when and as matters requiring the approval of all shareholders arise, but excluding matters related to the Manufacturing and Supply Agreement between Pentech and

Julphar, and such other contractual agreements between Julphar and Pentech, the Series B investors will agree to vote their underlying shares in common with the vote of the Series A investors.

7.    At closing, Pentech will reimburse Julphar for its expenses related to the Financing in particular such expenses as are necessary as in the negotiating and preparing closing documentation, including the reasonable fees of accountants, attorneys and other representatives. Such amounts will be limited to $25,000 unless a larger amount is agreed to in writing by Pentech in advance. Each party shall be responsible for its own expenses in connection with the preparation of the Manufacturing Agreement.

8.    Pentech agrees to afford Julphar and its representatives prompt and full access to its books, records, properties and key personnel, so that Julphar may complete its due diligence as expeditiously as possible.

9.    Closing of the transaction shall occur within 90 days from the execution date of this letter.

10.    In the event the Company elects to raise any additional Financing, the Series B investors shall have pro rata rights pari passu to Series A investors to provide said Financing upon the same terms and conditions.

11.    Julphar shall have the right to name up to two (2) voting members to the Board of Directors and the Board of Directors shall be comprised of not more than nine (9) voting members. Julphar shall appoint one director at the initial closing, and shall have the right to appoint a second at such time as two-thirds of the financing has been called by the Company.

12.    This letter is an expression of intent between the parties and is non-binding to either Julphar or Pentech.

As to the manufacturing relationship: in our meeting, you indicated that Julphar would be willing to provide pricing terms to Pentech which would at least match those which Pentech could expect to obtain from other manufacturing sources approved as an alternate manufacturing site by the FDA for this particular product. Pentech will enter into a supply contract with Julphar for these products concurrent with the closing of the Financing. However, even though the contract would be executed concurrently, its effectiveness would depend upon a number of future events, all of which are outside Pentech's control. Among these are:

1.    Success by Pentech in its litigation concerning paroxetine HCL;

2.    Receipt by Pentech of an "approval letter" from the FDA;

3.    Market conditions at the time Pentech's success in 1. and 2. above is assured; and

FEB 14 '01 WED 05:48 ID:PENTECH00000020000    TEL NO:1-708-459-5602    #631 P12

4.    Receipt by Julphar of any approvals necessary from the FDA to qualify as a
supplier of Pentech. Pentech will provide all reasonable assistance required
for achieving such qualification by Julphar; however, the primary
responsibility for this important task will be Julphar's.

Notwithstanding the above, should Pentech at any time be able to market paroxetine HCL in the
United States, Julphar, in accordance with the Agreement, shall have the right to act as
Pentech's primary manufacturer of finished products for distribution in the United States. This
right shall be subject to success with respect to Item 4 above.
Though of course no assurances as to demand can be given to Julphar at this date, Pentech
believes that unit volumes likely to be required (again, assuming success in the four items
above) would be between 100 and 200 million units annually. The Company estimates that it
will be free to begin marketing these products in the United States beginning in the fourth
quarter of 2002. During the interim between the receipt of an approvable letter from the FDA
and success in the related litigation, Pentech and Julphar will cooperate in good faith to help
ensure that Julphar will be in position to supply Pentech at the earliest possible date. This
assistance would include, but not be limited to, providing technical information and assistance
to Julphar so it may produce test batches and the like. Pentech shall, upon execution of the
Agreement, commence to transfer the technology and development process to facilitate
Pentech's ultimate performance under the Agreement.
Pentech's advisors in the ANDA have strongly asserted, however, that it is clearly in the best
interests of both Julphar and Pentech for the parties to refrain from amending Pentech's ANDA,
and or naming Julphar as its supplier for paroxetine HCL, until after Pentech receives its
"approval letter" from the FDA. In their opinion, to do so would cause a delay of up to 18
months of the expected date of receipt of such a letter from the FDA. Such a delay would likely
remove Pentech's current legal advantages, put the Company at a severe competitive
disadvantage in the marketplace at large, and provide little or no advance in the timing of
Julphar's likely start of production under the Agreement.

Pentech shall provide Julphar with suitable representations and warranties that the contemplated
Financing and Agreement are duly authorized by the Board of Directors, and not in
contravention or otherwise violative of any other business relationship, agreement, association,
contract, state, federal or local law, regulation or statute.

We hope these basic terms are agreeable to you. We believe this is an attractive opportunity and
we are anxious to move expeditiously towards a closing. Upon your execution of this letter, we
will work aggressively towards finalizing the Financing and the Agreement.

If the foregoing is consistent with your understanding, please indicate by signing below and
returning the executed copy to us prior to this letter's expiration on _____.

                        Sincerely,

                        Pentech Pharmaceuticals, Inc.

FEB-14-'01 WED 09:49    PENTECH00000020000    TEL NO:1-708‑459-5602              #631 P13

James D. Lumsden
Chairman of the Board

Agreed and accepted this _____ day of _____ , 2001.

Pentech Pharmaceuticals, Inc.

By _____

Its _____

EXHIBIT   I

FEB. 12. 2001  5:07PM   CHEROKEE INV PARTNERS          TEL NO:1-708-45    302      #620 P03
                                                                      NO. 0195   P. 2

January 12, 2001

*Via facsimile and Federal Express*

Mr. Armistead Burwell, Jr.
3214 Rutherford Drive
Raleigh, NC 27609

Mr. Al Hummel
5276 Avenida Canaria
P.O. Box 3407
Rancho Santa Fe, CA 92067

Mr. Howard Myles
11558 Caminito Corriente
San Diego, CA 92128-4563

Dr. Ragab El-Rashidy
130 Exmoor Court
Deerfield, IL 60015

Re:   Notice of Reconvening of Special Meeting of Pentech Board of Directors, February 15, 2001

Gentlemen:

    We shall reconvene the special meeting of the Board of Directors of Pentech Pharmaceuticals, Inc., on Thursday, February 15, 2001, at 9:30 a.m. at the Wyndham Garden Hotel, 900 West Lake Cook Road, Buffalo Grove, Illinois 60089.

    The main items on the agenda (shown below) will be related to the company's compliance status and its financial position and potential alternatives, including discussions to date with Julphar, Andrx, and Watson. The agenda will be as follows:

I.    Company Status
      A.    Findings of Compliance Audits
      B.    Products
      C.    Financials
            1.   Cash flow projections
            2.   Unaudited numbers

II.   Financing Alternatives
      A.    Bridge Loan
      B.    Longer-term alternatives

III.  Shareholder Meeting
      A.    Notice and Date
      B.    Proxies: special and general

FEB-12-'01 MON 16:57    PENTECH00000000000    TEL NO:1-708-    5602    #620 P04
12. 2001  6:07PM    CHERWATT INV PARTNERS                    NO. 0195    P. 3

IV.    Other Corporate Matters
       A.    Lawsuit Status
       B.    Special Counsel


   If you have modifications you wish to make to this agenda, please let me know. Enclosed with this letter is the company's current cash flow projections. In addition, we have attached certain draft documents that you may wish to review prior to the meeting. These are drafts, and are presented to focus discussion at the board meeting. They include: a term sheet for a potential bridge loan; a term sheet for a potential strategic relationship with ANDRx corporation; documents provided to Julphar regarding a financing and manufacturing relationship; a draft notice of a call for a shareholder meeting; and a draft of a special proxy for the major common shareholders. The proxy will be necessary for the company to complete both the bridge and permanent financings. Without it, any bridge financing source would be in danger of becoming "hung," either by a manifestation of the historical conflict between the larger shareholders and the Series A preferred, or by virtue of Series B investors' rejection of a deal on the basis of problems in the Company's articles. Therefore, prior to the consummation of any of the potential transactions, there must be certainty as to these items.



                                        Sincerely,



                                        James D. Lumsden
                                        Chairman

# EXHIBIT   J

**DRAFT**                    TERM SHEET                    **DRAFT**
                                FOR
                            BRIDGE LOAN

A.  Lenders:          Existing Company shareholders. Series A Preferred
                      Shareholders have first refusal rights; however, to the
                      extent such rights are not fully exercised, the Company will
                      endeavor to make such amounts as are desired available to
                      common shareholders.

B.  Borrower:         Pentech Pharmaceuticals, Inc. (the "Company").

C.  Form of Security: Subordinated Promissory Note with detachable Warrants.

D.  Loan Amount:      Up to $3,000,000; callable in $500,000 increments.

E.  Interest Rate:    10% per annum.

F.  Security:         None.

G.  Term:             18 months from the date of issuance of each tranche.

H.  Payoff or Note
    Conversion Rights: Upon completion of subsequent financing(s), at option of
                      Holder, notes may be repaid or exchanged for Series B
                      Preferred Stock.

I.  Warrant Coverage: Up to 292,625 shares of Common Stock (adjusted pro-rata
                      amounts called) representing 5% of the Company on a
                      fully-diluted basis.

J.  Warrant Purchase Price:  $.001 per share.

K.  Warrant Exercise Price:  $5.00 per share.

L.  Warrant Term:     Earlier of (i) March 1, 2006, (ii) Company IPO or (iii)
                      closing of the sale of substantially all of the assets of the
                      Company or acquisition of the Company by merger or
                      otherwise.

M.  Default on Note:  In the event of a repayment default by the Company under
                      the subordinated debt, the noteholders will receive warrants
                      for up to an additional 10% of the Company and otherwise
                      upon the same terms and conditions set forth herein.

N.  Documentation:    (1)  Note and Warrant Purchase Agreement
                      (2)  Subordinated Promissory Note

# EXHIBIT   K

TEL NO:1-708-459-5602          #631 P01

**DRAFT**

Letter of Intent
Between
Andrx Corporation
And
Pentech Pharmaceuticals, Inc.

**DRAFT**

February ___, 2001

The following is a summary of the principal terms with respect to a proposed strategic relationship and equity financing between Andrx Corporation ("Andrx") and Pentech Pharmaceuticals, Inc. (the "Company"). Such summary of terms is intended solely as a letter of intent and is not intended to be and does not constitute a legally binding obligation. A legally binding obligation will only be made pursuant to definitive agreements to be negotiated and executed by the parties.

A.    **Strategic Relationship.**      The Company desires to grant Andrx the right to sell, market and promote certain of its products in exchange for assistance in developing such products, the performance of certain sales support functions and remittance of a portion of the proceeds from such sales. Andrx desires to obtain such rights, provide such development assistance and sales support functions, and retain a portion of the proceeds from such sales. The terms of such strategic relationship are as follows:

Products:

All products and applications of the Company utilizing paroxetine HCL, whether currently under development or developed during the term of the relationship.

Territory:

USA

Rights Granted:

The Company will grant Andrx exclusive rights to assist in the development of, and to sell, market and promote, the Products within the Territory. The Company will retain rights to co-market the Products.

The continuation of the rights granted to Andrx will be conditioned upon the achievement of certain performance milestones including, but not limited to, the amount of Net Revenue (as defined below) generated and minimum expenditures on marketing, selling and advertising for the Products. These milestones will be negotiated in good faith by the parties with respect to each specific Product, and attached to the governing agreement as a schedule thereto, once such Product is ready to be introduced to the domestic pharmaceutical market.

Obligations of Andrx:

1.  Andrx will provide the Company with its best advice and

ID:PENTECH00002020000          TEL NO:1-708-45  502          #631 P02

assistance with respect to legal, technical and manufacturing issues associated with bringing the Products to market.

2. Andrx will agree to use its best efforts to sell, market and promote the Products, as they become ready for commercial exploitation, within the Territory.

3. Andrx will agree to share in 50% of budgeted development costs associated with the Products once the Company has exceeded, in the aggregate, Six Million Dollars ($6,000,000) of developmental expenditures for the Products, as incurred from the date of a definitive agreement.

4. Andrx will support all sales made by the Company as set forth below in "Mechanics of Product Sales".

5. Andrx will remit a portion of the proceeds of all sales to the Company as set forth below in "Net Revenue Sharing".

**Mechanics of Product Sales:**

1. **A Sale by Andrx:**
   a. A third party (or Andrx) will manufacture such of the Products as are ready to be introduced into the domestic pharmaceutical market (the "Pharmaceuticals").
   b. Andrx will purchase (or manufacture) and warehouse the Pharmaceuticals.
   c. Andrx will sell and deliver the Pharmaceuticals to third parties and collect the sales proceeds.
   d. Each month, Andrx will pay the Company its Net Revenue Share (as defined below).

2. **A Sale by the Company:**
   a. The Company will secure a purchase order (addressed to the Company) for Pharmaceuticals from third parties.
   b. The Company will provide the purchase order for Pharmaceuticals to Andrx.
   c. Andrx will deliver the Pharmaceuticals to third parties and collect the sales proceeds.
   d. Each month, Andrx will pay the Company its Net Revenue Share (as defined below).

**Net Revenue Sharing:**

The "Net Revenue Share" will be computed as follows:

a. Andrx will remit to the Company (i) the first $10 million of "Net Revenue" (defined below) from each ANDA Pharmaceutical and (ii) the first $15 million of Net Proceeds from each NDA Pharmaceutical, and thereafter will remit to the Company fifty percent (50%) of all Net Revenue.

b. "Net Revenue" means the gross sales revenues derived from the sale of Pharmaceuticals less: (a) any discounts, allowances, rebates, management fees to group purchasing organizations, wholesale charge backs, or

price reductions (retroactive or otherwise) imposed by government authorities, and sales taxes; (b) "Incurred Budgeted Expenses" (defined below) and (c) the direct cost of goods sold.

c. "Incurred Budgeted Expenses" means direct marketing, selling and advertising expenses (but excluding overhead) incurred so long as such expenses do not exceed, by more than 5%, the expenses set forth in an annual budget developed by Andrx and approved by the Company.

d. If Andrx is the manufacturer of the Pharmaceuticals, cost of goods sold will be the direct cost of labor and materials used to manufacture the pharmaceuticals, as agreed annually in advance by the Company.

e. The Company will retain the right to co-promote the Products within the Territory. In accordance with the terms outlined above in "Mechanics of Product Sales", all sales by the Company will be credited to gross sales revenues for the Pharmaceuticals, the purchase orders for such sales will be filled by Andrx, and all payment for Pharmaceuticals sold will be remitted by the purchaser to Andrx. All direct marketing, selling and advertising expenses (but excluding overhead) of the Company will be paid by Andrx and included in the annual budget referred to in subsection (c) hereof.

f. The Company will have the right, but not more than once every six months, to request an audit of the books and records of Andrx relating to the most recent three years of this relationship, and Andrx agrees to keep such books and records available for a minimum of three years. Should such audit disclose an underpayment by Andrx of greater than 5% of the amount that otherwise would have been due and payable to the Company, Andrx will bear the fees and costs of such audit and further, each underpayment will be deemed to have begun accruing interest at the prime rate plus 3% (compounded daily on the basis of a 360 day year), which interest will accrue until final payment has been received by the Company.

g. Andrx will have the right, but not more than once every six months, to request an audit of the books and records of the Company relating to Product development costs for the most recent three years of this relationship, and the Company agrees to keep such books and records available for a minimum of three years. Should such audit disclose an overstatement of such costs by the

FEB-14-'01 WED 15:43 ID:MENTECH00000000000    TEL NO:1-708-459-5602    #631 P04

Company of greater than 5%, the Company will bear the fees and costs of such audit and further, each overpayment of the development costs made by Andrx will be deemed to have begun accruing interest at the prime rate plus 3% (compounded daily on the basis of a 360 day year), which interest will accrue until a full refund has been received by Andrx.

**Labeling and Branding of Pharmaceuticals:**

All NDA Pharmaceuticals will be labeled and branded as directed by the Company, so long as such labeling and branding is in compliance with law. Andrx will have the right to private label all ANDA Pharmaceuticals, so long as such labeling is in compliance with law.

**Term:**

Andrx and the Company will have the relationship described above for the Pharmaceuticals for the longer of (i) a term of ten (10) years or (ii) the date of expiration of the last to expire Company patent covering the Products in the Territory.

**Patent Ownership:**

Each of the Company and Andrx will remain the sole owner of any and all patents currently held or being prosecuted by each of them. Any patentable inventions or developments involving the use of, or related to, paroxetine HCL made by either party without use of the patented inventions or developments of Andrx will be wholly owned by the Company. Any patentable inventions or developments involving the use of, or related to, paroxetine HCL made by either party utilizing any patented inventions or developments of Andrx will be owned jointly; however, should either party fail (and, after written notice and a sixty (60) day cure period, continue to fail) to use commercially reasonable efforts to pursue commercialization, either individually or in cooperation with the joint owner, of any jointly owned patent or development, the failing party will assign all its rights regarding such patent or development to the other party. All patentable products and applications set forth above, regardless of sole or joint ownership, shall be considered Products for the purposes of this relationship.

Either party may, upon advice of counsel and in the event of a third party dispute with regard to the patent rights pertaining to a specific Product, terminate this relationship as to that specific Product, pending resolution of the dispute.

**Regulatory Filings:**

The Company will use commercially reasonable efforts to conduct clinical trials and studies and undertake such other steps and actions as are reasonably necessary to obtain regulatory approval for the Products. These activities will be considered

4

development costs and subject to contribution by Andrx.

B.    **Equity Investment.**  Andrx desires to make an equity investment in the Company through the purchase of shares of the Company's preferred stock, and the Company desires to accept such investment on the terms set forth below:

| | |
|---|---|
| **Amount:** | Up to Twenty Two Million Dollars ($22,000,000) over a period of three years from the date of the Stock Purchase Agreement. The Company has the right to make a request for investment once every three months, but failure to request an investment does not forfeit any rights to make subsequent requests.  Within thirty (30) days of such request, Andrx will tender the investment requested without the requirement of a subsequent "closing" under the Stock Purchase Agreement.  The maximum amount of investment the Company is entitled to request in any given three-month period is Four Million Dollars ($4,000,000).  There is no obligation on the Company to take down the entire Twenty Two Million Dollar ($22,000,000) commitment. |
| **Security:** | Series B Convertible Preferred Stock (the "Series B Preferred"). |
| **Valuation:** | Pre-Money:  Approximately $60 million on a fully-diluted basis, including all shares reserved under the stock option plan and all shares of Common Stock issuable upon the exercise or conversion of outstanding options, warrants and Series A Preferred Stock. |
| **Percentage:** | Andrx will purchase up to twenty-seven percent (27%) of the Company, as measured upon execution of the Stock Purchase Agreement.  A reduced pro-rata percentage will be purchased if the full $22 million is not taken down by the Company. |
| **Use of Proceeds:** | Working capital, investments in sales, marketing and product development and other normal corporate uses. |
| **Rights, Preferences, Privileges and Restrictions of Series A Preferred:** | (1) *Dividend Provisions:* Each share of Series B Preferred will be entitled to dividends as, when and if declared by the Board of directors but in any event at the same rate as the Series A Preferred and the Common Stock.  Declared and unpaid dividends on the Series B Preferred will be payable upon the liquidation or winding up of the Company first to holders of Series B Preferred.<br><br>(2) *Liquidation Preference:* In the event of a liquidation, sale, |

5

merger, consolidation, or winding up of the Company, the holders of Series B Preferred will receive their original purchase price, plus declared but unpaid dividends, prior to any distribution to the holders of the Series A Preferred or Common Stock. Any assets remaining after such preferential distribution will be distributed first to the Series A Preferred holders in an amount equal to their original purchase price plus declared but unpaid dividends. If assets still remain, such assets will be distributed ratably to the holders of Common Stock.

(3) *Conversion Price:* The holders of Series B Preferred will have the right, at any time, to convert into shares of Common Stock. The number of shares of Common Stock into which each share of Series B Preferred initially may be converted will be determined by dividing the original purchase price by the conversion price. The initial conversion price will be the purchase price per share. The conversion price will be subject to adjustment as provided in paragraph (5) below.

(4) *Automatic Conversion:* Upon the closing of an underwritten initial public offering of shares of the Common Stock with net proceeds to the Company of at least $20 million, the Series B Preferred will automatically convert into Common at the then applicable conversion price. Upon an event that would constitute a Liquidating Event except that the proceeds distributable to the holders of the Series B Preferred and Series A Preferred equal or exceed the Series B Preferred liquidation preference and the Series A Preferred liquidation preference, the Series B Preferred will automatically convert into Common Stock at the then applicable conversion price

(5) *Antidilution Provisions:* If the Company issues additional shares of capital stock at a purchase price less than the applicable conversion price of Series B Preferred (excluding shares issued to employees in the form of stock options and other customary exceptions), the conversion price will be adjusted on a broad-based weighted average formula. There will also be automatic adjustment of the conversion price for stock splits, stock dividends, recapitalizations, etc.

(6) *Voting Rights:* Except with respect to election of directors and certain protective provisions or as required by law, the Series B Preferred (and the Series A Preferred) will vote together with the Common Stock with the right to that number of votes equal to the number of shares of Common Stock issuable upon conversion of the Series B Preferred or Series A Preferred, as applicable.

FEB-14-'01 WED 09:45 ID:PENTECH00000030000     TEL NO:1-708-4°     5602          #631 P07

(7) *Protective Provisions:* So long as at least 50,000 shares of Series B Preferred remain outstanding, the consent of a majority of the Series B Preferred will be required for: (i) any action that alters the rights of the Series B Preferred, (ii) any increase or decrease in the total number of authorized shares of Series B Preferred, (iii) the issuance or creation by reclassification of any security senior to or on parity with the Series B Preferred, and (iv) the payment of any dividend on or the purchase, redemption or other acquisition by the Company of its capital stock (except for customary exceptions). The provisions of items (iii) and (iv) will not apply to the Series B Preferred if such actions by the Company relate to (a) a financing whereunder the Company receives at least a Ten Million Dollar ($10,000,000) investment at a pre-money valuation of at least Sixty Million Dollars ($60,000,000) or (b) a sale of the Company whereby the holders of the Series B Preferred receive an amount equal to or greater than the Series B Preferred liquidation preference.

**Board of Directors:** The Company's certificate of incorporation will provide that the Board of Directors will consist of seven (7) members. The holders of the Series B Preferred will have the right to designate one director, subject to the existing rights of the holders of the Series A Preferred.

**Director Indemnification:** The Company will provide directors with indemnification to the fullest extent provided by law.

**Information Rights:** The Company will deliver to Andrx audited annual and unaudited quarterly financial statements with related management discussion and analysis and annual budgets.

**Inspection Rights:** The Company will permit Andrx, or its authorized representatives, to visit and inspect the properties of the Company, including its corporate and financial records, and to discuss its business and finances with officers of the Company, during normal business hours following reasonable notice and as often as may be reasonably requested.

**Registration Rights:** Standard registration rights granted in financings of this type, including demand rights, S-3 rights and piggyback rights.

**First Refusal Right for Purchase of New Securities:** Andrx will have a pro rata right, based on its percentage ownership of the total outstanding Series A Preferred and Series B Preferred, to purchase such percentage of any new securities issued by the Company (subject to customary exclusions).

The existing holders of Series A Preferred may exercise this right with respect to all or a portion of the Series B Preferred offered to Andrx.

**The Purchase Agreement:** The purchase of the Series A Preferred will be made pursuant to a Series B Preferred Stock Purchase Agreement prepared by the Company's counsel. Such agreement will contain, among other things, appropriate representations and warranties of the Company; covenants of the Company reflecting the provisions set forth herein and other typical covenants; and appropriate conditions of closing.

**Expenses:** Each party will pay its own expenses incurred with respect to this transaction.

If the terms and conditions of the transactions outlined in this Letter of Intent are acceptable to you, please so indicate by executing and returning this Letter of Intent and upon receipt of such acceptance, the Company will immediately begin to prepare definitive agreements based upon the terms and conditions contained in this Letter of Intent.

ANDRX CORPORATION

By:_____

Name:_____

Title:_____

PENTECH PHARMACEUTICALS, INC.

By:_____

Name:_____

Title:_____

8

# EXHIBIT L

# APPOINTMENT OF PROXY

I, _____, the undersigned shareholder of Pentech Pharmaceuticals, Inc., an Illinois corporation (the "Corporation"), do hereby constitute and appoint Albert F. Hummel and James D. Lumsden, or either of them, as my proxy (the "Proxy"), each with full power of substitution, for and on my behalf to attend all meetings of the shareholders of the Corporation and to act, vote, and execute consents and waivers with respect to my shares of common stock in the Corporation as fully and to the same extent and effect as I might do myself; provided, however, that the foregoing appointment of proxy shall be expressly limited to limited in scope to voting the undersigned's shares at any annual or special meeting of the shareholders in favor of each of the following:

1. A bridge financing by the Corporation of up to Three Million Dollars ($3,000,000), including the issuance of warrants to the bridge lenders (which may include one or more existing common or preferred shareholders of the Corporation) to purchase Common Stock of the Corporation, upon such terms and conditions as the Board of Directors may approve.

2. A Series B financing with Andrx Corporation on substantially similar terms and conditions as set forth in the Letter of Intent attached hereto as Exhibit A, with such changes thereto as the Board of Directors of the Corporation may approve, including the filing of Amended and Restated Articles of Incorporation of the Corporation.

3. Such other financings and issuances of debt and/or securities by the Corporation as the Board of Directors of the Corporation approve from time to time, which financings are based on a pre-money valuation of the Corporation of at least Fifty Million Dollars ($50,000,000), including the filing of Amended and Restated Articles of Incorporation, as necessary.

4. Amending the Articles of Incorporation of the Corporation to clarify that, for those actions under Illinois law that require the vote of the shareholders of the Company, such actions shall require only a simple majority vote of such shareholders.

5. Strategic transactions of the Corporation as approved by the Board of Directors, including sale of substantially all of the assets, merger, sale of stock or reorganization in which the valuation of the Corporation or consideration for the sold assets is greater than $100,000,000.

6. All such actions as are recommended or necessary as determined by the Board of Directors of the Corporation to accomplish the foregoing items.

CORF-13123-4-208777-01

DRAFT

This appointment of proxy is coupled with an interest and is irrevocable. This appointment of proxy shall terminate ten years from the date hereof. This proxy will not affect the proxy granted in Section 5.2 of the Investor Rights Agreement dated July 14, 1998.

Dated: February ___, 2001

_____

# EXHIBIT   M

# M E M O R A N D U M

*Via Certified Mail*

---

TO:       DR. RAGAB EL-RASHIDY
             DR. ROBERT L. FAIT

FROM:    JIM LUMSDEN, CHAIRMAN, PENTECH BOARD OF DIRECTORS

SUBJECT:   *REQUESTED RESPONSE FROM YOU ON PROXY PROPOSAL NO LATER THAN 5:00 PM EST, MONDAY, FEBRUARY 26, 2001*

CC:       ALL BOARD MEMBERS

DATE:    FEBRUARY 21, 2001

---

In our last board meeting, at which Dr. Fait was present as a guest of the board, the finances of the company were discussed. Management stated that the company needed a bridge facility or it would run out of funding within a short time. Further, management reported that it had been able to arrange a highly favorable strategic transaction involving Andrx (a large-cap public company with significant resources), under which the company would receive both the strategic partnership and the financing that management believes is needed to pursue its various product opportunities. Management stated its opinion that this transaction very likely represented the best that could be achieved for Pentech at the current time. Finally, management indicated its belief that, for both downside protection and strength in negotiations, the bridge was a prerequisite to the Andrx (or substitute) transaction.

Given the recent contentious events involving you as major common shareholders against management and other investors in the company, it was explained that arranging a bridge loan or other facility on reasonably attractive terms, and a permanent financing as well, could only be done if there were certainty that management and/or the company had the authority and backing required from all parties to complete a more permanent financing and strategic relationship, such as the one proposed with Andrx or one with any other party (assuming one could be completed on terms more or less in line with the Andrx term sheets presented). The board accepted this argument, and adopted various motions in support of management's financial goals (although it is noted that Dr. El-Rashidy voted against all of them).

Given the recent past, and our understanding of the financial requirements of the company, a majority of the board agreed that certainty and comfort must be provided to

both the providers of a bridge and to new investors regarding the potential for the company's internal conflicts to hamper management's ability to enhance their investment. The only way the board can imagine this occurring is for the major commo shareholders to agree to provide a limited proxy to the company regarding future financing efforts by management, to be given with an understanding about minimum acceptable terms, such as company valuation. At that point you stated your preferences (later reinforced at your meeting with another prospective investor) for a transaction sourced by you. However, management stated that that transaction has been pursued by the company, and at present does not exist, or if it does exist, that it would be neither as attractive nor close enough to fruition to be comparable to the proposed Andrx transaction, based on management's most recent discussion with this prospective investor. (You took issue with this at the meeting, and that is your prerogative.)

It is worth noting that the Series A investors' investment contract with the company gives them virtually absolute approval and/or first refusal rights in subsequent financings by Pentech. The Series A investors viewed the lost June financing (at a pre-money valuation of $110 MM), the wasteful legal battle which came after, and the unauthorized and ill-advised letter executed by Dr. El-Rashidy in September with Julphar (regarded by the Series A investors as at best amateurish and dangerous, and at worst a wholesale sale of virtually all the assets of the company) as indicating that you will not support proposals that are in the best interests of the company and all of its shareholders. At a minimum, these events convinced them that it would be folly to set aside their rights in favor of your preferences. That is their prerogative as well.

It is true that legally, neither you -- in your role as common shareholders -- nor the Series A investors are required to look after anybody else's interests. As shareholders you are of course free to pursue such policies as you believe suit your interests and desires, including those that to others may seem spiteful or economically illogical. But the directors have to measure the interests of all stakeholders. The board (excepting El-Rashidy) is on record as favoring a deal such as the Andrx opportunity, and regards it as highly attractive, representing the best that can be achieved at this time and under current circumstances. Above all, a majority of the board believes it is in the best interests of the company as a whole. This is in spite of the fact that, setting aside the indisputable value of a strategic association with Andrx, the worst-case financial terms would have the effect of "marking to market" your own combined shares at a value of approximately $38 million (on an investment of $1 million), while *marking down* the Series A investors' investment from $15.5 million to about $13 million. If the board was working the Series A point of view instead of the company's, it would almost certainly seek some other outcome.

Today the board is in a quandary: both of you gentlemen have said repeatedly, in effect, that you will not provide management, or the company generally, with even a limited proxy which would allow management the freedom (through its ability to guarantee amendments to the articles of incorporation) to make the best deal it can under the circumstances, nor will you vote in favor of such amendments in the context of the Andrx financing. On the other hand the board has been informed by representatives of

*February 21, 2001*

the Series A investors that such a proxy is the Series A investors' price for allowing a "down round" to occur. We disclosed to you, as we have to the Series A investors, that this standoff could result in a liquidity crisis for the company.

Since our board meeting, we have realized that we must make certain that we understand your position. So that you understand fully, know that the Series A investors have confirmed that they are willing to follow management's recommendation that they accept a "down round," but only if management has confirmation of the backing of the major common shareholders in subsequent financial dealings. Further, they would support and possibly fund an inexpensive bridge for the company. Otherwise, they would prefer to exit the investment immediately, even if that were to occur through a forced liquidation.

Likewise, at the meeting and after, you have indicated your position consistently: you will give no advance authority to the company relative to any deal which would require alterations to the company's articles, including a financing or a merger or sale on minimum terms (pre-money valuation of $50 million for financings, or $100 million for merger or sale), and this would include bridge financing. If this is your position, the board is left with very little leeway in finding the best solution for the company as a whole.

Therefore, we are asking you to respond. There can be no doubt that time is of the essence. If we hear nothing different from you prior to 5:00 pm EST, Monday, February 26, 2001, this will confirm that the above paragraph accurately represents your final position on the matter.

jdl:ks

# EXHIBIT  N

Subj:   **Fw: Julphar Offer**
Date:   3/5/01 4:06:04 PM Central Standard Time
From:   skniazi@julpharpharma.com (Julphar Pharma Inc)
To:  ashmanstein@aol.com

—— Original Message ——
From: Julphar Pharma Inc
To: Jim Lumsden
Sent: Monday, March 05, 2001 4:06 PM
Subject: Julphar Offer


Dear Jim:

This saturday I am leaving for UAE for the purpose of discussing and finalizing our offer to invest in Pentech. It was not possible for me to conclude our evaluation of Pentech without meeting with the Chairman and some members of the Board as well. I will return to US on the 16th and likely have a final decision about our interest in Pentech.

With best regards.

Sarfaraz K Niazi, Ph.D
CEO, Julphar Pharma Inc
111 Pfingsten Road Suite 180
Deerfield, Illinois 60015
Phone 847-205-0899
Fax 847-205-0926


<!DOCTYPE HTML PUBLIC "-//W3C//DTD HTML 4.0 Transitional//EN">
<HEAD>
<META content="text/html; charset=iso-8859-1" http-equiv=Content-Type>
<META content="MSHTML 5.00.2920.0" name=GENERATOR>
<STYLE></STYLE>
</HEAD>


<DIV> </DIV>
<DIV style="FONT: 10pt arial">—— Original Message ——
<DIV style="BACKGROUND: #e4e4e4; font-color: black">**From:** Julphar
Pharma Inc </DIV>
<DIV>**To:** Jim Lumsden </DIV>
<DIV>**Sent:** Monday, March 05, 2001 4:06 PM</DIV>
<DIV>**Subject:** Julphar Offer</DIV></DIV>
<DIV>
</DIV><DIV>Dear Jim:</DIV><DIV> </DIV><DIV>This saturday I am leaving for UAE for the purpose  of discussing and finalizing our offer to invest in Pentech. It was not possible  for me to conclude our evaluation of Pentech without meeting with the Chairman  and some members of the Board as well. I will return to US on the 16th and  likely have a final decision about our interest in Pentech.</DIV><DIV> </DIV><DIV>With best regards.</DIV><DIV> </DIV><DIV>Sarfaraz K Niazi, Ph.D
CEO, Julphar Pharma Inc
111 Pfingsten Road Suite 180
Deerfield, Illinois 60015
Phone 847-205-0899
Fax 847-205-0926</DIV>

———————— Headers ————————

# EXHIBIT   O

From: Sarfaraz K Niazi [niazi@niazi.com]
Sent: Sunday, March 18, 2001 10:14 AM
To: pentech@email.msn.com
Subject: Fw: Pentech investment

CONFIDENTIALLY SENT
----- Original Message -----
From: "Sarfaraz K Niazi" <niazi@niazi.com>
To: "Jim Lumsden" <jlumsden@thehalifaxgroup.com>
Cc: "Julphar" <julphar8@emirates.net.ae>
Sent: Saturday, March 17, 2001 11:59 AM
Subject: Pentech investment


> Dear Jim:
>
> I have just returned from my visit to the UAE where I had the opportunity
to
> discuss at length the documents you had submitted to Julphar. AFter
> reviewing all of it out position is that we would like to continue with
due
> diligence for investment with following stipulations:
>
> 1. We will receive class B shares as laid out in the draft of class B
> prepared by Pentech last year.
> 2. We will not assign our voting interest to class A shareholders;
however,
> we hope our interests are conjugal.
> 3. We will be allowed exactly the same number of members of Board as class
A
> shareholders have.
> 4. Finally, most importantly, we would like to see the current dispute
among
> the top management of Pentech brought to a written resolution wherein the
> differences are set aside permanently. We believe that the current tussle
in
> the top management and controlling structure has caused substantial damage
> to Pentech. We would like to see this to end so that we will never be
faced
> with a situation of being accused of taking sides; we will only vote on
what
> we feel is most benefical to Pentech.
>
> If these terms are still acceptable to the Board of Pentech, we will be
> pleased to lay out a time table of events for you.
>
> With best regards.
>
> Sarf
>
>

# EXHIBIT   P

# MEMORANDUM

*via facsimile*

DATE:     March 19, 2001

TO:     Pentech Board of Directors

CC:     ✓ Ragab El-Rashidy
          Robert L. Fait
          Jerry Hartzell
          Larry Robbins, Company Counsel

FROM:   Jim Lumsden

RE:     Julphar USA

---

I received an email from Dr. Niazi of Julphar USA Saturday. Unfortunately, the communication did not contain an offer, but rather set some preconditions for a possible offer. They held open the possibility of "continuing due diligence" but only under certain conditions, including a final settlement between the Series A investors and the Urheim Group, and further, that their board representation be "exactly the same as Class A shareholders." This obviously would put an effective veto into their hands, giving them control in the same means that the Urheim Group has currently. Or, more likely, such would result in majority control reverting back to the Urheim Group in the short term.

I responded by thanking Dr. Niazi for his efforts, but told him that only a signed term sheet, with all terms included, could be considered at this time. Further I communicated my lack of confidence that the Board of Pentech could force the Series A and the Urheim Group to agree, based on their demand for payment to them by the Series A Investors of $15 million plus a put for another $15 million, or else $7.5 and $7.5 million, with terms already rejected by the Series A investors. Finally, I had some doubt that the Series A investors would wish to risk having board control revert to the Urheim Group, given its history. Nonetheless, the board of course would put a complete offer, if delivered by Julphar (and properly executed by Mr. Yousef) in front of both groups, and also the board would analyze it promptly if received soon.

I consider that the possibility of Julphar providing a real financing alternative that would be acceptable either to the Urheim Group or the Series A Investors in the relevant time frame to be very remote indeed. I suggest we continue to focus on possibilities that might provide cash to the company, such as the "distress investor" groups mentioned at the board meeting last Friday.

# EXHIBIT   Q

WYRICK
ROBBINS
YATES
& PONTON
LLP

ATTORNEYS AT LAW

LARRY E. ROBBINS
lrobbins@wyrick.com

The Summit
4101 Lake Boone Trail
Suite 300
Raleigh, NC 27607.7506

PO Drawer 17803
Raleigh, NC 27619

ph 919 781 4000
fax 919.781.4865
www.wyrick.com

March 22, 2001

Via Facsimile

Carey M. Stein, Esq.
Ashman & Stein
Attorneys at Law
150 North Wacker Drive
Suite 3000
Chicago, Illinois  60606

Dear Carey:

Over the past several weeks, I have reviewed a variety of events which lead me to believe that Pentech needs to take dramatic actions to facilitate an immediate capital infusion in order to salvage anything of value for the shareholders. After an exhaustive search by the shareholders, management and the Board, no financial partners or investors have been identified that would in my opinion, be willing to provide capital to the Company, unless drastic and immediate actions are taken. Further, no potential partner has communicated to management or delivered to the Company a proposal that can be closed immediately, nor has any potential partner indicated a willingness to consummate a transaction with a company embroiled in shareholder threats and acrimonious litigation. Therefore, I am convinced that the Company will be unsuccessful in securing interim or permanent funding without a complete resolution of all pending and threatened litigation and all shareholder governance issues.

Because the shareholders do not appear to me to be close to resolving their litigation and corporate governance differences, the Board must prepare for all eventualities. One of the alternatives that the Board must consider under these circumstances is the filing of a petition for reorganization with the bankruptcy courts. Debtor-in-possession could be obtained to finance

LTR-13123-4-213886-01

Carey M. Stem, Esq.
March 20, 2001
Page 2 of 4

the Company in the near term without the specter of litigation threats that have consistently been
made against the Board, the Board members individually, and the Series A investors. Indeed, the
Board member recruited to serve as an independent outside director resigned as soon as he
received your letter designed to intimidate him by threatening his personal wealth. You have the
right to make whatever assertions you desire; however, you must live with the consequences. In
my opinion, there has been a material adverse consequence to the Company's fund raising ability
and potentially to the common shareholders equity value as a result. Nevertheless, under the
protected financing environment of the bankruptcy court, capital could be sought, immediately,
on whatever terms are acceptable to the court, and a plan of reorganization could be
implemented. Please note that this course could be disadvantageous to all shareholders, since the
Company would need to be valued at a time when it is in acute financial distress. While this type
of filing hurts all shareholders, it should be noted that the common shareholders' ownership
interest would likely be substantially reduced or (if the Company is determined to have a value
less than the amount of outstanding debts and Series A preferences) their interests could be
eliminated entirely. Moreover, a bankruptcy filing would disadvantage all shareholders
regardless of the value of residual equity, because in my opinion, the filing would have a
negative effect on the Company's ability to continue to engage in certain aspects of its business.

As an alternative to a formal filing and an alternative that I believe is in the best interests
of all shareholders, the Board is firmly resolved to continue its efforts to raise money outside the
context of a bankruptcy reorganization. The Company cannot, however, realistically pursue this
alternative unless it can provide certainty to potential financing sources that the Company will in
fact be able to close on any financing negotiated with a strategic partner. Based upon my
observations of the parties, I believe that the following items will need to be irrevocably inacted
in order to raise capital in a timely fashion and in an amount that is sufficient to support the
operations of the Company pending negotiation of an acceptable strategic partnership:

1.  Settlement of the existing lawsuit, retraction of all threatened litigation and
    general releases for all parties.

2.  Reorganization of the Company as a Delaware corporation.

3.  Funding of a bridge loan (possibly secured) in the minimum amount of
    $3,000,000 with warrant coverage sufficient to insure that no existing shareholder
    deadlock could bring the Company operations to another standstill.

4.  Prompt agreement of the Series A investors and the Common shareholders to
    approve all of the above proposals.

Item one should be self-evident. I do not believe that any funding source is going to
expend money or time on due diligence relating to this Company, unless there is an immediate
formal settlement. You have acknowledged this fact on a variety of occasions. Also, immediate
interim financing is not realistic unless there is a clear and convincing case that a bridge lender
would stand a reasonable chance to be taken out or would be protected by an indication of

Carey M. Stein, Esq.
March 20, 2001
Page 3 of 4

probability of closing on permanent financing with a strategic partner. The release must be full
and complete. Any response to the first item by the Series A investors or the common
shareholders which delays or conditions an immediate release or termination of the litigation
does not work due to the existing cash constraints of the Company.

Item two puts the Company in a jurisdiction that the financial community prefers. This
move eliminates all super majority corporate governance issues. Discussions with the various
potential partners and with all other funding sources have implicitly stated that adjusting the
existing corporate governance restraints is a condition to a closing.

Item three is based upon the current and immediate obligations of the Company. This
amount is needed immediately to cover Company expenses during what I believe to be a realistic
amount of time required for any pharmaceutical company to complete its business, scientific and
legal due diligence and to draft and negotiate definitive agreements. Because the Company is at
this time insolvent, and given the problems associated with the shareholder disputes and
intellectual property litigation, it is unrealistic to believe—and for over a year we have not been
able to do so—that in the current funding environment, we will be able to attract capital on terms
that are inconsistent with this approach. Financing resources will not be available to the
Company, in my experience, unless there is sufficient capital to fund the cumulative cash flow
drain on the Company caused by the typical stumbling blocks and delays normally encountered
by reasonable parties engaged in the strategic partnership process. Without sufficient resources
to withstand inevitable delays, the Company will not be able to negotiate from a position of
strength.

As I indicated at the most recent board meeting, coupling the bridge loan with the ability
to avoid shareholder log jams in the future through the issuance of shares or the right to purchase
shares is an issue critical to the successful attraction of immediately required bridge funding
sources. The number of shares or rights granted to the funding source will be significant in this
respect, and we can expect that the rights will accompany the financing for only nominal
additional cost. Although I cannot predict the probability of success of getting someone to fund,
I hope that by accomplishing the first two items, that we can present this interim funding
proposal to all logical funding sources with a realistic possibility of success.

Again, item 4 should be self-explanatory. In order to advance this funding proposal, I
believe that the Board must receive immediate indications of interest from substantially all of the
Series A investors and the common shareholders to support these items. If we are successful, the
potential funding would provide the Company sufficient capital and time to negotiate the best
strategic alliance possible. If either the Series A investors or the common shareholders are not
willing to permit the Board to implement this plan, I believe that the Board will have exhausted
all of the available alternatives and that a formal filing will take place rather quickly given the
inability of the Company to pay its debts as they come due.

In case there is any misunderstanding regarding strategic partners, this letter is being
written subsequent to your letter regarding Julphar. In contrast with your opinion, there is no

TR-13123-4-213886-01

Carey M. Stein, Esq.
March 20, 2001
Page 4 of 4

Julphar deal, and nothing more exists than an indication of interest continue to due diligence. As I am certain you are aware, the message delivered to the Company means that shareholders must resolve their differences before any deal can be consummated. Even assuming we had an acceptable term sheet from a partner, the Company cannot today meet its debts as they come due, or even fund operations during an already lengthy negotiation and due diligence process. I hope that you appreciate and come to understand and acknowledge the reality of this extremely distressed financial situation. Your letters to date give me no confidence in this respect, based upon your statements relating to your casual approvals of indications of interest that are not supported by immediate interim funding. Consequently, I must reiterate that the Company is required to raise capital immediately to avoid a formal filing, because the Company has no funds and no commitments to finance its operations for the three to four month period of time normally required to negotiate and finalize definitive agreements with a strategic partner. Consequently we must move expeditiously on this plan in order to have a chance to survive without a formal filing.

Given the time sensitive nature of our efforts, I would appreciate your prompt response. If you have questions, please call me. If your clients have interim funding available immediately, in the amounts indicated above, please put me in touch with the sources. Otherwise, if your clients support the proposal, I will prepare the definitive documentation. If they do not, I will immediately report their position to the Board. In either case, the Board will continue its efforts to seek immediate interim funding.

Very truly yours,

Larry E. Robbins

LER/bwl

# EXHIBIT   R



# JULPHAR PHARMA INC.

111 DEERGSTEN ROAD, SUITE 180 • DEERFIELD, IL 60015

CONFIDENTIAL DRAFT

March 26, 2001

VIA FACSIMILE: (919) 743-2526

Dear Mr. Lumsden:

The following is a summary of the principal terms with respect to a proposed equity financing between Julphar Pharmaceuticals, Inc. ("Julphar") and Pentech Pharmaceuticals, Inc. ("Pentech" or the "Company"). Such summary of terms is intended solely as a letter of intent and is not intended to be and does not constitute a legally binding obligation. A legally binding obligation will only be made pursuant to a definitive agreement to be negotiated and executed by the parties.

The principal terms of the Financing would be as follows:

1. The Company will issue up to $20 million of Series B Convertible Preferred Stock to Julphar, convertible into 27.2 percent of the fully diluted shares of the Company (i.e., a $50 million pre-money valuation for Pentech). The Series B issue would be identical to, and *pari passu* with, the Series A Convertible Preferred Issue now outstanding (the "Series A issue"), except it shall be senior to the Series A issue with respect to liquidation preference, and shall differ otherwise as described below.

2. The Series B investment would be divided into four $5 million tranches, with $5 million (or one-fourth of the Financing) to be delivered at the first closing. The remainder would be callable by the Company, in amounts equal to the first closing amount at its option with 15 days notice; however, notices and calls shall not occur more often than quarterly, and shall be authorized by the Board of Directors of Pentech. The Company may issue such calls for capital during the two years following the initial closing. To secure its obligations under the Series B Financing, Julphar will provide to Pentech irrevocable Letters of Credit, drawn up on a recognized international bank with a least $2 billion of assets in the United States.

3. Julphar and/or any other Series B investors will have the right to invest the remainder of their commitment, if any such commitments remain

uncalled by the Company, at their option during the final 90 days prior to the end of the two-year post-closing period. The above notwithstanding, the Company's ability to call capital shall terminate at such time as the Board of Directors shall have committed the Company to any of the following: (1) a sale of all or substantially all of the company's assets or a merger; (2) an underwritten Initial Public Offering by which the Company shall raise gross proceeds of $25 million or more; or (3) a subsequent round of financing of at least $20 million, all at a valuation in excess of $100 million pre-money; provided however, that the Company's rights to call for capital shall be reinstated 90 days after such commitment by the Board, and shall be extended by 90 days, if the action committed to by the Board shall fail to close within 90 days, and such rights will remain outstanding for 90 days past the second anniversary of the initial closing.

4. The Company may require Series B holders to convert during the first five years of the investment if there is a liquidity event such as (I) an initial public offering of at least $25.0 million, or (2) sale of 50 percent or more of the Company's common stock, either of which establishes a valuation for the Company of $150.0 million or more.

5. At closing, Pentech will reimburse Julphar for its expenses related to the Financing, in particular such expenses as are necessary as in the negotiating and preparing closing documentation, including the reasonable fees of accountants, attorneys and other representatives. Such amounts will be limited to $25,000 unless a larger amount is agreed to in writing by Pentech in advance.

6. Pentech agrees to afford Julphar and its representatives prompt and full access to its books, records, properties and key personnel, so that Julphar may complete its due diligence as expeditiously as possible.

7. Closing of the transaction shall occur within 90 days from the execution date of this letter.

8. In the event the Company elects to raise any additional Financing, the Series B investors shall have pro rata rights *pari passu* to Series A investors to provide said Financing, upon the same terms and conditions.

9. Julphar shall have, at all times, the right to name the same number of voting members to the Board of Directors as the Series A investors.

10. Julphar further wishes to iterate that the current dispute between the present and the former management needs to be resolved immediately as we consider this to be detrimental to the future growth and even survival of company. A timely resolution of the dispute is prerequisite to our decision to invest in Pentech.

This letter is an expression of intent between the parties and is non-binding on both Julphar and Pentech. Of course, the closing of any transaction will be subject to Pentech providing Julphar with suitable representations and warranties that the contemplated Financing is duly authorized by the Board of Directors and not in contravention or otherwise violative of any other business relationship, agreement, association, contract, state, federal or local law, regulation or statute and will also be subject to the dismissal of the lawsuit now pending between Pentech and the Series A investors.

We hope these basic terms are agreeable to you and are anxious to move expeditiously towards a closing. Upon your execution of this letter, we will work aggressively towards finalizing the Financing.

If the foregoing is consistent with your understanding, please indicate by signing below and returning the executed copy to us prior to April 15, 2001.

Sincerely,

Julphar Pharma Inc./On behalf of Gulf Pharmaceutical Industries

By _____

Sarfaraz Niazi, Ph.D, CEO

Agreed and accepted this _____ day of _____,2001.

Pentech Pharmaceuticals, Inc.

By _____

Jim Lumsden, Chairman

EXHIBIT   S

March 30, 2001

VIA FACSIMILE  (847) 205-0926

Dr. Sarfaraz Niazi
Chief Executive Officer
Julphar Pharma, Inc.
111 Pfingsten Road, Suite 180
Deerfield, IL 60015

RE:  Pentech

Dear Dr. Niazi:

Thank you for your draft inquiry regarding Pentech. As I believe you know, based upon your description of the Pentech shareholder dispute in your draft letter, actions by certain common shareholders to initiate actual and threatened litigation against the Company's only funding source to date have caused several funding opportunities for Pentech to terminate prior to funding. These actions have placed the Company in a situation where your draft proposal, describing a non-binding indication of interest that might close in 90 days, does not work for the Company.

In order to fund the Company's working capital requirements while the parties hammer out the terms of a transaction acceptable to you and all the parties involved, we need to secure a bridge loan. Our belief is that your forecast of 90 days may not be a sufficient amount of time to close a transaction, given 1) that you have performed no due diligence to date; 2) the terms of your draft inquiry require a shift of control; and 3) the terms of your draft inquiry require actions by third parties whom the Company does not control. [In fact, I suspect that by requiring a change of control at the board level, your draft inquiry could not be brought to a closing in any event. That very subject (board control) has been the central issue of a year-long litigation which involved a five-day trial, consumed almost $1 million of the Company's precious resources, and caused other transactions to fail. Nonetheless, the board would, after receiving bridge financing, take your expression of interest to the common shareholders, the Series A investors, and the Company.] In addition, your requirement that all shareholder disputes be resolved has proven to be an elusive, but highly sought, action item on the part of management that may require additional time.

Under these circumstances, and given other factors that relate to our on-going working capital needs, we respectfully request that you provide the Company with a bridge loan to fund the operations during this period of time. We estimate our requirements to be $3,000,000, and that the funding must come immediately. Although the amount is significant, Julphar has been talking with the Company for approximately one year. If you have a serious interest in the Company, this is the time to demonstrate that interest. If not, then we must pursue other alternatives prior to focusing on a more permanent financing. We need an answer by Monday, April 2, 2001, and a closing by the end of the day on Friday, April 6, 2001. While this is a tight schedule, we hope that you will find the opportunity. If not, we will understand, particularly given the fact that Mr. Yousef was unwilling to commit anything to the Company, both at our recent meeting, subsequent to your trip, and upon our recent request. He also has apparently declined to execute the draft indication of interest delivered by you. (Some have questioned whether the home office of Julphar has authorized this inquiry; could you provide more data? Better still, as we discussed before, to have Mr. Yousef execute any indication of interest or bridge financing offer.) We look forward to hearing from you.

Very truly yours,

James D. Lumsden
Chairman, Pentech Board of Directors

# EXHIBIT   T

 JULPHAR PHARMA INC.

111 PFINGSTEN ROAD, SUITE 180 • DEERFIELD, IL 60015

April 1, 2001: 7:30 am Sunday

VIA FACSIMILE: (919) 743-2326

Dear Mr. Lumsden:
Chairman, Pentech Board of Directors

Dear Mr. Lumsden:

Your facsimile was received in our office on Saturday. Your insistence on having a commitment for bridge financing by Monday was unrealistic. I wish to clarify some misconcepts and iterate regarding Julphar's interest in investing in Pentech.

1. I signed the letter of intent on behalf of Mr. Yousef as he was traveling but after fully disclosing to him all terms and seeking his full approval to sign it. An action of this magnitude needed unequivocal approval from the highest management. It should not be construed as reluctance on part of Mr. Yousef to sign this letter of intent. I do not know the source of your information that lead to this suspicion but this is incorrect.

2. At all meetings held between Pentech and Julphar we have stayed on a steady course of showing our serious interest in investing in Pentech; in fact, we had arranged an overseas meeting to discuss and finalize the terms at our own behest. Morever, to show our serious intent, we have dropped the most significant portion of agreement reached with Pentech earlier, the manufacturing contract. This should provide ample evidence of our seriousness.

3. We iterate that our interest in Pentech is due to its products and potential and not to support any groups of shareholders.

4. Our offer to Pentech will have to be ratified by our shareholders but ONLY after we have definitive terms agreed upon as we had sent to you. No money can be disbursed without this action. We understand that similar restrictions apply to your board as well that no investment can be accepted without board approval. Does this mean that you board has approved these terms? If so, please do let us know and return the signed sheet of terms to us as soon as possible.

5. We had never offered to provide bridge financing at any time; it is neither possible nor practical for us to respond to you within 48 hrs including the weekend on this suggestion. This too, if we decide to do so, would have to go through our board of directors as it will

be a part of the total investment package. Our Board will not consider any suggestion unless we have a signed agreement on the terms of investment.

6. We continue to believe that the past and present management should resolve all differences as we intend to work with both and consider this to be a pivotal action for the success of Pentech. You have not mentioned any specifics on how this issue is being resolved.

Jim, please understand that we are ready to make a substantial investment in Pentech. Investments of this magnitude can not be made without proper due diligence and it begins by having a signed and agreed sheet of terms. Since we have already done much of the due diligence in the first round of our investigation, we believe the timetable proposed is realistically achievable. So, instead of wasting more time, might I suggest that you review these terms and send us an approved letter of intent so that we can immediately place it before our board?

Sincerely,

Sarfaraz K Niazi, Ph.D.
CEO

# EXHIBIT   U

April 3, 2001

VIA FACSIMILE: (919) 743-2526

Mr. James Lumsden:
Chairman, Pentech Board of Directors

Dear Mr. Lumsden:

If Pentech has agreed to the terms presented for Julphar investment, please return the
signed memorandum to me as soon as possible. Without a signed acceptance by you, we
will not be able to return to our Board for approval of fund disbursement. It is possible
that Julphar might extend part of the proceeds on an expedited and urgent basis, as a loan,
until such time that the due diligence and documentation are completed. However, this
cycle can only begin upon receipt of your written acceptance of the terms.

Sincerely,

Sarfaraz K Niazi, Ph.D.
CEO

# EXHIBIT V

# MEMORANDUM

| | |
|---|---|
| *DATE:* | *APRIL 12, 2001* |
| *TO:* | *PENTECH PHARMACEUTICALS, INC. COMMON SHAREHOLDERS* |
| *FROM:* | *BOARD OF DIRECTORS, PENTECH (OR, THE "COMPANY")* |
| *RE:* | *RIGHTS OFFERING* |

First, some facts:

- Pentech is in dire need of capital. The company currently has about $430,742 in cash and receivables, and trade and other payables of $1,283,831. We hope to receive a $500,000 progress payment from TAP Pharmaceuticals in the next couple of months (if Uprima™ wins final regulatory approval in Europe), but the fact and timing of this payment remains uncertain.

- For a number of reasons, the Company can find no prospective third party to come forward with emergency capital within the time frame in which it is needed.

As a result of these facts, the Board has examined the possibility of filing for protection under federal bankruptcy law; however, the Board has been advised that a Chapter 11 filing would likely mire the Company in legal proceedings for an extended period. This would put all the Company's non-Uprima projects at serious risk, especially the ANDA for paroxetine HCL. Therefore, the Board has determined that avoiding bankruptcy must be a top priority. (Of course, even if bankruptcy is avoided, there is no guarantee that any of the Company's potential products will make it to market, or if they make it to market, that they will be successful in generating revenues and profits.)

The Board believes that the Company must immediately raise capital sufficient to stabilize itself, to avoid bankruptcy and/or to avoid being forced to accept undesirable deal terms from potential outside investors. The amount required for this purpose is estimated by management to be slightly over $4,000,000. The Board also believes that under the Company's current circumstances, the only realistic source of such funding will be those who have the greatest stake in the Company's survival – its current shareholders. *Therefore, to raise the funds, the Board is calling upon its shareholders to immediately purchase approximately 4.2 million of its authorized but unissued common stock (the "Shares") at a price of $1.00 per share.*

It is critical that you understand that the Series A Preferred Investors by their documents have, among a number of other privileges, an unequivocal right to: 1) accept or reject any financial transaction by the Company; and 2) purchase up to 100% of any offering the Company may contemplate. The Board of Directors of Pentech cannot and does not herein claim to speak for these investors. **However, the Company desires to know your interest in purchasing your pro rata portion of the Shares.** With that knowledge, the Board, in the hope of moving the Company forward again, will attempt to persuade the Series A investors to allow some or all of your indicated interest in the Shares to be realized.

Enclosed you will find documents which describe the terms of the offering, a description of your pro rata amount, and subscription forms. Due to the company's current financial position, time is of the essence. To be included in the Company's approach to the Series A investors, and to have any hope of purchasing your pro rata portion of the Shares, YOU MUST RESPOND NO LATER THAN FRIDAY, APRIL 20th, 2001. The offering will close the following week. . Between April 20th and April 23rd, the Company will determine the response of the Series A investors to your indication of interest and you will be notified of the results. If the Company's attorneys have not heard from you by April 20th through the execution and delivery to them of the enclosed documents (along with your check), the Company will have no further obligation to pursue a pro rata waiver on your behalf.

If the Company cannot secure a waiver from a majority of the Series A Preferred investors, your funds will be immediately returned.

As to the Shares, please understand also that neither the Company nor the Board of Directors can advise you as to their suitability as an investment for you, or the prospects for a return from such an investment. At $1.00 per share, the implied post-money valuation for the company is $27.0 million (based upon roughly 8 million common shares which would be outstanding after the offering, valued at $8 million, plus the Series A Preferred face value of $19.03 million, as of May 1). *Given the Company's current situation, this may be considered a "full" valuation, and the Company cannot and does not warrant the fairness of the valuation. Nor does the Company and/or the Board make any express or implied representation with respect to the potential risk and reward for purchasing Shares, other than to state that any such investment will be illiquid and will involve a high degree of risk.*

We look forward to hearing from you at your earliest convenience, but in any event no later than Friday, April 20th, 2001.

**SUMMARY OF TERMS**
**SALE OF COMMON STOCK**
**PENTECH PHARMACEUTICALS, INC.**
**April 12, 2001**

This term sheet summarizes the principal terms of a proposed offering of common stock by Pentech Pharmaceuticals, Inc. (the "Company").

## THE OFFERING:

| | |
|---|---|
| A. Security: | Up to 4,220,921 shares of the Company's Common Stock (the "Shares"). |
| B. Price Per Share: | $1.00 per Share |
| C. Closing: | The Closing will occur no later than 5 p.m. EDT, April 25, 2001 at the offices of the Company's legal counsel, Wyrick Robbins Yates & Ponton LLP ("WRYP"), 4101 Lake Boone Trail, Suite 300, Raleigh, North Carolina 27607, unless extended by the Company's Chief Executive Officer. |
| D. Purchase Price | Purchase price must be paid by certified check or wire transfer of immediately available funds to the Wyrick Robbins Yates & Ponton LLP Trust Account (*see* Appendix B to the enclosed "Subscription Agreement"). |
| E. Use of Proceeds: | Working Capital. |
| F. Restrictions: | No offeree may assign purchase rights. |

## OFFERING PROCEDURE

| | |
|---|---|
| G. Existing Common Holders and Preferred Holders (on as-converted basis): | The Shares shall first be offered on a pro-rata basis to all existing holders of Company Common Stock ("Existing Common Holders") and all holders of the Company's outstanding shares of Series A Preferred Stock (the "Preferred Holders) on an as-converted basis. Each Existing Common Holder's pro-rata purchase amount is set forth on Appendix A to the Subscription Agreement. The Existing Common Holders shall exercise their subscription rights by delivering executed subscription agreements, stock powers and payment of their total purchase price to the offices of WRYP, no later than 5:00 p.m. EDT, April 20, 2001. |

| H. Preferred Holders: | In exchange for a one-time waiver of their anti-dilution rights set forth in the Company's Articles of Incorporation and their rights of first refusal to purchase all of the Shares as provided in the Investor Rights Agreement, the Preferred Holders will be entitled to purchase at the price per share above, all shares not subscribed for by the Existing Common Holders by the April 17, 2001 deadline (the "Unsubscribed Shares"). The Preferred Holders may elect to purchase their pro-rata share as well any additional available Unsubscribed Shares after exercise by Preferred Holders of their pro-rata rights. The Preferred Holders shall exercise their subscription rights by delivering executed subscription agreements, stock powers and payment of their total purchase price to the offices of WRYP no later than 5:00 p.m. EDT, April 24, 2001. |

## TERMS OF THE SUBSCRIPTION AGREEMENT

| J. Representations and Warranties of Company: | The investment will be made pursuant to the Subscription Agreement that contains, among other things, appropriate representations and warranties of the Company. |
| --- | --- |
| K. Representations of Purchasers: | Each purchaser will make appropriate investment representations under the Subscription Agreement to ensure compliance with federal and state securities laws registration exemption for issuance of Shares. |
| L. Stock Power: | Each purchaser must execute a stock power in blank with respect to the Shareholders Agreement (see below) and return it with the Subscription Agreement. |
| M. Shareholders Agreement: | All purchasers of Shares shall be required to enter into a Shareholders Agreement to provide, among other things, a right of first refusal to the other purchasers in the event of any proposed sale, pledge, transfer, hypothecation or other disposition of any and all Shares by such purchasers, and escrow of all Shares by the Company to enforce the restrictions on transfers contained in the Shareholders Agreement. Violation of restrictions will trigger unconditional right of repurchase by the Company at $0.01 per share. |

## OTHER MATTERS

N. Amendment of Existing Registration Rights:

The existing Investor Rights Agreement among the Company, the Preferred Holders and Certain Common Holders (the "Rights Agreement") shall be amended to provide registration rights to the Preferred Holders with respect to the Shares purchased by them and to provide voting rights on an "as converted" basis for all underlying common shares receivable upon conversion of the Preferred Shares.

# PENTECH PHARMACEUTICALS, INC.
## SHAREHOLDERS AGREEMENT

THIS SHAREHOLDERS AGREEMENT (the "Agreement") is made as of the ____ day of April, 2001, by and among Pentech Pharmaceuticals, Inc., an Illinois corporation (the "Company"), and the undersigned holders of the Company's Common Stock (the "Common Stock"), who shall be listed on Schedule 1 hereto (the "Common Holders"). Each Common Holder is purchasing shares of Common Stock pursuant to the Summary of Terms of Sale of Common Stock of the Company, dated April 12, 2001, and the terms of the Subscription Agreement thereto between each Common Holder and the Company (together, the "Subscription Agreements").

WHEREAS, in connection with the purchase of Common Stock pursuant to the Subscription Agreements, the Company is requiring each Common Holder to enter into this Agreement;

NOW, THEREFORE, in consideration of the premises, and the mutual covenants and terms hereof, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows.

1.     Prohibited Transfers.  The Common Holders shall not sell, assign, transfer, pledge, hypothecate, mortgage or dispose of, by gift or otherwise, or in any way encumber (collectively or singly, a "Transfer"), all or any part of the Shares (as hereinafter defined) owned by them during the term of this Agreement other than in compliance with the terms of this Agreement.  For purposes of this Agreement, the term "Shares" shall mean and include all shares of Common Stock of the Company acquired pursuant to the Subscription Agreements.

2.     Right of First Refusal.

2.1     Right to Purchase Offered Shares.  If at any time any Common Holder desires (or is required) to Transfer in any manner any Shares to any party (the "Offeree") other than the Company, as a condition to such Transfer, such Common Holder (the "Seller") shall first offer to sell such Shares (the "Offered Shares") to the other parties to this Agreement who then hold Shares (the "Other Holders") on a pro rata basis at the same price per share and on the same terms and conditions as agreed to by the Offeree.  To the extent that the Other Holders do not exercise this right of first refusal to acquire all of the Offered Shares within the period provided under Section 2.2 hereof, the Company shall have the right to exercise such right to purchase the balance of the Offered Shares within the period provided under Section 2.2 hereof.  The Company may, in its discretion, assign, in whole or in part, its right of first refusal described in this Section 2.1 to any one or more persons or entities.  For purposes of this Section 2, the pro rata share of each Other Holder electing to purchase the Offered Shares shall be the percentage equal to (i) the number of such Other Holder's Shares then held, divided by (ii) the number of Shares then held by all Other Holders electing to purchase the Offered Shares, unless otherwise determined by the Other Holders within the 15-day period provided under Section 2.2 hereof.

2.2    Notice.  In the event the Seller proposes to undertake a Transfer of Shares, it shall deliver to the Company and the Other Holders written notice of its bona fide intention to Transfer the Shares, providing (i) the price and other material terms upon which the Seller proposes to transfer the Offered Shares, (ii) the name, address and telephone number of the Offeree, (iii) the number of Offered Shares and (iv) the date of the proposed Transfer, and (v) firm evidence of the Offeree's bona fide intent to purchase and close, such as a bond or escrowed funds giving the Seller the unconditional right to take delivery of the Offeree's purchase price and unilaterally close the Transfer (the "Sale Notice").  The Other Holders shall have fifteen (15) days from the date of any such Sale Notice to exercise their right of first refusal under Section 2.1 for the price and upon the general terms specified in the Sale Notice by giving written notice to the Seller and stating therein the quantity of Offered Shares to be purchased.  To the extent that the Other Holders do not exercise their right of first refusal to acquire all of the Offered Shares within such 15-day period, the Company (or its transferee or assignee, if applicable), shall have fifteen (15) additional days to exercise its right of first refusal to purchase the balance of the Offered Shares for the price and upon the general terms specified in the Sale Notice by giving written notice to the Seller and stating therein the quantity of Offered Shares to be purchased.

2.3    Closing.  If the Other Holders and/or the Company (or its assignee or transferee, if applicable) exercise their right of first refusal to purchase all of the Offered Shares, the closing shall take place at such time and place as the Other Holders and/or the Company specify to the Common Holder but in any event no later than sixty (60) days from the date of the Sale Notice.  At such closing, the Common Holder shall deliver the Offered Shares free and clear of liens and encumbrances, against delivery of payment by check or wire transfer for the aggregate purchase price.

2.4    Non-Exercise.  If the Other Holders and/or the Company (or its assignee or transferee, if applicable) do not exercise their right of first refusal to purchase all of the Offered Shares prior to the end of the 30-day period, then the Seller shall have within 60 days from the date of the Sale Notice to complete the transfer of the Offered Shares to the Offeree for the same price and under the same terms set forth in the Sale Notice.

2.5    Failure to Comply with Terms.  In the event any Common Holder Transfers any Shares in contravention of the terms of this Agreement, such Shares shall not be transferred on the books of the Company, such Transfer shall be void *ab initio* and, in addition to any other remedies available to the Company at law, in equity or under the terms of this Agreement, the Company shall have the right to repurchase any or all of such Shares for a price of one cent ($0.01) per Share.  The Company (or its transferee or assignee, if applicable) shall have 90 days from the date it has actual notice of the prohibited transfer to exercise its rights under this Section 2.5 by giving written notice to such Common Holder and stating therein the quantity of Shares to be purchased.  The closing shall take place at such time and place as the Company specifies to the Common Holder but in any event no later than 60 days from the date of the Company's written notice thereto.  At such closing, the Common Holder shall deliver the Shares free and clear of liens and encumbrances, against delivery of payment by check or wire transfer for the aggregate purchase price.

2.6 <u>Escrow</u>. To enforce the terms of this Section 2, the Company shall hold all certificates representing the Shares purchased pursuant to the Subscription Agreements in escrow with stock powers in the form accompanying the Subscription Agreement, endorsed in blank by the Common Holders thereof. As a condition to acceptance of each Common Holder's Subscription Agreement by the Company, such Common Holder shall have executed such stock power and delivered the same to the Company with its Subscription Agreement and the purchase price paid thereunder. Except as provided herein, the Common Holders shall retain all other incidents of ownership in the Shares, including voting rights and the right to receive dividends and distributions with respect thereto.

3. <u>Permitted Transfers</u>. This Agreement shall not apply with regard to a merger of the Company with or into another corporation in which more than fifty percent (50%) or more of the voting power of the Company is sold to one or more third parties, or the sale of substantially all of the assets or stock of the Company. The rights set forth in Section 2 hereof shall not apply to any transfer of Shares by a Common Holder by bequest or inheritance to any spouse, ancestor, sibling or descendant of such Common Holder; provided, however, that the transferee of the Shares shall hold the Shares so acquired with all the rights conferred by, and subject to all the restrictions imposed by, this Agreement.

4. <u>Termination</u>. This Agreement shall terminate upon the earlier to occur of the following: (i) the effective date of a merger of the Company with or into another corporation in which more than fifty percent (50%) of the voting power of the Company is sold to one or more third parties, or the sale of substantially all of the assets or stock of the Company; and (ii) the effective date of a registration statement under the Securities Act of 1933, as amended, relating to a bona fide, firm commitment underwriting of the Company's Common Stock.

5. <u>Specific Performance</u>. The rights of the parties under this Agreement are unique and, accordingly, the parties shall, in addition to such other remedies as may be available to any of them at law, in equity or under the terms of this Agreement, have the right to enforce their rights hereunder by actions for specific performance to the extent permitted by law.

6. <u>Legend</u>. Each certificate held by or issued to the Common Holders, whether now outstanding or subsequently issued, shall be surrendered to the Company for endorsement or shall be endorsed by the Company prior to its issuance with substantially the following legend.

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A SHAREHOLDERS AGREEMENT AMONG THE HOLDER OF THESE SECURITIES AND THE ISSUER, AND MAY NOT BE SOLD, ASSIGNED, TRANSFERRED, PLEDGED, HYPOTHECATED, MORTGAGED, DISPOSED OF OR IN ANY WAY ENCUMBERED EXCEPT AS PROVIDED THEREIN. A COPY OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST BY THE HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OF THE CORPORATION AT THE PRINCIPAL EXECUTIVE OFFICES OF THE CORPORATION."

Nothing in this Agreement should be construed as a modification or amendment of any restrictions on transfer under applicable federal or state securities laws.

7.    General Provisions.

7.1    This Agreement shall be governed by the laws of the State of Illinois.

7.2    This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings between them or any of them as to such subject matter.

7.3    This Agreement may be amended only upon the written consent of Common Holders holding at least a majority of the then-outstanding Shares and the Company and the holders of Preferred Stock.

7.4    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their heirs, executors, legal representatives, successors and permitted transferees, except as may be expressly provided otherwise herein.

7.5    In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement and such invalid, illegal and unenforceable provision shall be reformed and construed so that it will be valid, legal, and enforceable to the maximum extent permitted by law.

7.6    Any notice, demand or request required or permitted to be given by either the Company or the Common Holders pursuant to the terms of this Agreement shall be in writing and shall be deemed given when delivered personally or deposited in the United States mail, first class with postage prepaid, and addressed to the parties at their addresses set forth at the end of this Agreement or such other address as a party may request by notifying the other in writing.

7.7    Any party's failure to enforce any provision or provisions of this Agreement shall not in any way be construed as a waiver of any such provision or provisions, nor prevent that party thereafter from enforcing each and every other provision of this Agreement.  The rights granted both parties herein are cumulative and shall not constitute a waiver of either party's right to assert all other legal remedies available to it under the circumstances.

7.8    The Common Holders agree to execute upon request any further documents or instruments necessary or desirable to carry out the purposes or intent of this Agreement.

7.9    This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties executing such counterparts, and all of which together shall constitute one and the same instrument.

## [THE NEXT PAGE IS THE SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first set forth above.

PENTECH PHARMACEUTICALS, INC.

By:_____
Title:_____
Address:

COMMON HOLDER:

ENTITY:                                              INDIVIDUAL

_____                    _____
Name                                                 Signature

By:_____                  Name:_____

Name:_____              Address:

Title:_____

Address:                                              _____

_____                    _____

_____

_____

[SIGNATURE PAGE TO SHAREHOLDERS AGREEMENT]

Schedule 1

# Pentech Pharmaceuticals, Inc.
## Subscription Agreement

1.     Pursuant to the Summary of Terms of Sale of Common Stock of Pentech Pharmaceuticals, Inc., an Illinois corporation ("Pentech"), dated April 12, 2001, and enclosed herewith (the "Summary of Terms"), the undersigned ("Subscriber") hereby subscribes for the purchase from Pentech, of the number of shares of Common Stock of Pentech set forth on the signature page of this Subscription Agreement (the "Shares"), which shall not exceed Subscriber's Pro Rata Purchase Amount set forth on Appendix A, included herewith, for a purchase price of One Dollar ($1.00) per Share.  Subscriber hereby acknowledges that (i) this subscription shall not be deemed to have been accepted by Pentech until Pentech indicates its acceptance by returning to Subscriber an executed copy of this subscription, and (ii) acceptance by Pentech of this subscription is conditioned upon (A) receipt by Pentech of such waivers from the holders of Pentech's Series A Preferred Stock (the "Preferred Holders") as are required by the Company to act materially in accordance with the Summary of Terms (B) the information and representations of Subscriber hereunder being complete, true and correct as of the date of this subscription and as of the date of closing of sale of the Shares to Subscriber, (C) execution and delivery to Pentech of the attached Shareholders Agreement, and (D) endorsement and delivery to Pentech of the attached Stock Power in blank as required under the Shareholders Agreement.

2.     Subscriber hereby tenders with this Subscription Agreement the signed Stock Power enclosed herewith and a certified check payable to the order of Wyrick Robbins Yates & Ponton LLP Trust Account, or shall tender the amount set forth on the signature page of this Subscription Agreement by wire transfer of immediately available funds to Wyrick Robbins Yates & Ponton LLP Account pursuant to the Wire Transfer Instructions as set forth on Appendix B, included herewith.  Subscriber acknowledges that such wire must be received with confirmation in the above Trust Account no later than 5:00 p.m. EDT, April 20, 2001.  If Pentech does not accept this subscription, then this Subscription Agreement, together with the funds and any other documents delivered to Pentech, will be promptly returned to Subscriber.

3.     Until actual delivery of the purchase price to Pentech and acceptance by Pentech of the purchase price and this Subscription Agreement, Pentech shall have no obligation to Subscriber. Pentech may revoke a prior acceptance of this Subscription Agreement at any time prior to delivery to and acceptance by Pentech of the purchase price for the Shares.

4.     Subscriber represents and warrants as follows:

(a)     Subscriber is either an accredited investor as defined under Rule 501 of Regulation D, promulgated under the Securities Act of 1933, as amended (the "Securities Act"), or Subscriber has, either alone or with purchaser representative, such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of this investment, and has the capacity to protect his own interest in connection with this transaction by reason of such business or financial experience, or due to prior personal or business relationships with Pentech or its management.

(b)     Subscriber is acquiring the Shares for investment only for his own account, and has not reoffered or resold any portion of the Shares for which Subscriber hereby subscribes and has no present intention of dividing such Shares with others, or reselling or otherwise distributing all or any portion of such Shares.

(c)     Subscriber has adequate means of providing for current needs and possible personal contingencies and has no need for liquidity in his investment in the Shares. Subscriber's financial commitment to his investments (including investment in Pentech) is reasonable in relationship to his net worth.

(d)     All available information pertaining to this investment has been made available to Subscriber or his representative and Subscriber or his representative has had an opportunity to ask questions of and receive answers from Pentech concerning the terms and conditions of this investment, and all information so requested has been received. Subscriber understands that certain officers of Pentech are authorized to answer questions of Subscriber and to explain any matter related to this investment by Subscriber. Subscriber acknowledges that, except as set forth herein or related by authorized officers of Pentech, no representations or warranties have been made to Subscriber by any party regarding Pentech or the offering of the Shares.

(e)     The representations, warranties, understandings, acknowledgments and agreements in this Subscription Agreement are true and accurate as of the date hereof, shall be true and accurate as of the date of the acceptance hereof by Pentech and shall survive thereafter. Subscriber understands the meaning and legal consequences of the representations and warranties contained herein and hereby agrees to indemnify and hold harmless Pentech, its agents and employees from and against any and all loss, claim, damage or liability due to or arising out of a breach of any representation or warranty of Subscriber contained in this Subscription Agreement.

5.     Subscriber understands, acknowledges and agrees as follows: An investment in the Shares is an illiquid investment. There is no established market for the Shares, and it is not anticipated that any market for the Shares will develop in the future. Consequently, Subscriber must bear the economic risk of investment in the Shares for an indefinite period of time. The Shares have not been registered under the Securities Act or under any state securities laws (and such registrations are neither contemplated by nor required of Pentech). Because the Shares have not been registered under the Securities Act or applicable state securities laws, Subscriber cannot dispose of any or all of the Shares unless such Shares are subsequently registered under the Securities Act, and applicable state securities laws, or exemptions from such registration are available. Pentech, as a condition to the transfer of any of the Shares, may require an opinion of counsel in form and substance satisfactory to Pentech (and preceded by prior written notice) to the effect that the proposed transfer does not result in violation of the Securities Act or applicable state securities laws. Each certificate representing the Shares and any securities issued upon conversion or exercise of the Shares or on account of ownership thereof will bear the following legend or one substantially similar thereto:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMEND-ED, OR APPLICABLE STATE SECURITIES LAWS. THESE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE, AND MAY NOT BE SOLD, MORTGAGED, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT FOR SUCH SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND ANY

APPLICABLE STATE SECURITIES LAWS, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.

6.      This Subscription Agreement shall be enforced, governed and construed in all respects in accordance with the laws of the State of Illinois and shall be binding upon Subscriber, his heirs, estate, legal representatives, successors and assigns and shall inure to the benefit of Pentech and its successors and assigns.

7.      This Subscription Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any and all prior or contemporaneous representations, warranties, agreements and understandings in connection therewith. As used herein, masculine, feminine and neuter pronouns shall be interpreted interchangeably, and the singular shall include the plural and vice versa, as appropriate to the context. This Subscription Agreement and the subscription hereby represented are not transferable or assignable. This Subscription Agreement may be amended only by a writing executed by all parties hereto. This Subscription Agreement may be executed in one or more counterparts.

[NEXT PAGE IS SIGNATURE PAGE]

**IF AN INDIVIDUAL**

IN WITNESS WHEREOF, Subscriber has executed this Subscription Agreement this _____ day of April, 2001.

_____                   Address:
Name Of Subscriber
                                                   _____
_____
Signature                                          _____

_____
Social Security Number                             _____

## SUBSCRIPTION

$ _____           Total Purchase Price (@ $1.00 per Share)

Check one:  _____          total payment by certified check is enclosed (make checks payable to Wyrick Robbins Yates & Ponton LLP Trust Account)

            _____          total payment will be made by wire transfer of immediately available funds to the Wyrick Robbins Yates & Ponton LLP Trust Account pursuant to the Wire Transfer Instructions on Appendix B for confirmed receipt no later than 5:00 p.m. EDT, April 20, 2001.

**Send signed Subscription Agreement, Shareholders Agreement, Stock Power and (if applicable) certified check to:**

> **Wyrick Robbins Yates & Ponton LLP**
> **4101 Lake Boone Trail, Suite 300**
> **Raleigh, North Carolina 27607-7506**
> **Attn: James M. Yates, Jr., Esq.**

## ACCEPTANCE

The foregoing Subscription Agreement is accepted as of the ____ day of April, 2001.

> **Pentech Pharmaceuticals, Inc.**

> By: _____

> Its: _____

4

## IF AN ENTITY

IN WITNESS WHEREOF, Subscriber has executed this Subscription Agreement this _____ day of April, 2001.

_____
Name Of Subscriber                                          Address:

By:_____                      _____

Its:_____                      _____

                                                            _____

## SUBSCRIPTION

$_____          Total Purchase Price (@ $1.00 per Share)

Check one:    _____          total payment by certified check is enclosed (make checks payable to Wyrick Robbins Yates & Ponton LLP Trust Account)

                   _____          total payment will be made by wire transfer of immediately available funds to the Wyrick Robbins Yates & Ponton LLP Trust Account pursuant to the Wire Transfer Instructions on Appendix B for confirmed receipt no later than 5:00 p.m. EDT, April 20, 2001

**Send signed Subscription Agreement, Shareholders Agreement, Stock Power and (if applicable) certified check to:**

**Wyrick Robbins Yates & Ponton LLP**
**4101 Lake Boone Trail, Suite 300**
**Raleigh, North Carolina 27607-7506**
**Attn: James M. Yates, Jr., Esq.**

## ACCEPTANCE

The foregoing Subscription Agreement is accepted as of the \_\_\_\_ day of April, 2001.

**Pentech Pharmaceuticals, Inc.**

By:    _____

Its:    _____

4

## APPENDIX A

Pro Rata Purchase Amounts

## Offering to Common Holders

| Last Name / Address | First Name | Amount of Shares Currently Held | Shares and dollars the same ===> | Number of Shares Available for Purchase |
|---|---|---|---|---|
| **4,220,921** | | | | |
| El-Rashidy 130 Exmoore Ct. Deerfield, IL 60015 | Ragab | 1,917,500 | 40.39074% | 1,704,861 |
| | Nader | 45,000 | 0.94789% | 40,010 |
| | Hany | 45,000 | 0.94789% | 40,010 |
| | Emad | 10,000 | 0.21064% | 8,891 |
| | Osama | 10,000 | 0.21064% | 8,891 |
| | Mohamed | 10,000 | 0.21064% | 8,891 |
| **El-Rashidy Total** | | **2,037,500 Total** | | |
| Fait Wisconsin Vision Associates 139 W. Chestnut Street Burlington, WI 53105 | Family Trust | 852,500 | 17.95729% | 757,963 |
| | Alison c/o Robert | 31,875 | 0.67142% | 28,340 |
| | Shannon c/o Robert | 31,875 | 0.67142% | 28,340 |
| | Christopher c/o Robert | 31,875 | 0.67142% | 28,340 |
| | Garrett Gait c/o Robert | 31,875 | 0.67142% | 28,340 |
| **Fait Total** | | **980,000 Total** | | |
| Ames c/o Robert Fait Wisconsin Vision Associates 139 W. Chestnut Street Burlington, WI 53105 | Rebecca | 2,500 | 0.05266% | 2,223 |
| | Jared | 2,500 | 0.05266% | 2,223 |
| | Loren & Margret | 21,500 | 0.45288% | 19,116 |
| **Ames Total** | | **26,500 Total** | | |
| Myles 5300 E. Desert Inn Rd., #183 Las Vegas, NV 89122 | Howard | 80,000 | 1.68514% | 71,129 |
| | Steven B. | 50,000 | 1.05321% | 44,455 |
| | Sam A. | 35,000 | 0.73725% | 31,119 |
| | Lewis & Geri | 25,000 | 0.52661% | 22,228 |
| **Myles Total** | | **190,000 Total** | | |
| Kadow 825 Pine Street Arlington Heights, IL 60004 | James L. | 35,000 | 0.73725% | 31,119 |
| | Christine Kadow-Dougherty | 4,000 | 0.08426% | 3,556 |
| | Theresa | 1,000 | 0.02106% | 889 |
| **Kadow Total** | | **40,000 Total** | | |

## Offering to Common Holders

| Last Name / Address | First Name | Amount of Shares | | Number of Shares Available for Purchase |
|---|---|---|---|---|
| Becker<br>5150 Carol Street<br>Skokie, IL 60077 | Mildred | 25,000 | 0.52661% | 22,228 |
| **Becker Total** | | **25,000 Total** | | |
| Crenshaw<br>210278 Chula Vista<br>La Jolla, CA 91921-0278 | Roger T. | 55,000 | 1.15854% | 48,901 |
| **Crensha Total** | | **55,000 Total** | | |
| Weisner<br>7115 Olivestas Ave.<br>La Jolla, CA 92037-5332 | Mark G. | 37,000 | 0.77939% | 32,897 |
| **Weisner Total** | | **37,000 Total** | | |
| Juster<br>248 Ivy Lane<br>Highland Park, IL 60035 | Mark L. & Janine L. | 25,000 | 0.52661% | 22,228 |
| **Juster Total** | | **25,000 Total** | | |
| Steinberg<br>4039 Nogales Drive<br>Tarzana, CA 91356 | James M. & Deborah L. (joint tenancy) | 50,000 | 1.05321% | 44,455 |
| **Steinberg Total** | | **50,000 Total** | | |
| Burbulys<br>c/o William Blair & Co.<br>222 W. Adams Street<br>Chicago, IL 60606 | Grace M. | 12,500 | 0.26330% | 11,114 |

## Offering to Common Holders

| Last Name / Address | First Name | Amount of Shares | | Number of Shares Available for Purchase |
|---|---|---|---|---|
| Delaware Charter Guarantee & Trust FBO Grace M. Burbulys c/o William Blair & Co. | | 12,500 | 0.26330% | 11,114 |
| **Burbulys Total** | | **25,000 Total** | | |
| Flank 601 Bordeau Rd. Northbrook, IL 60062 | Susan B. | 17,500 | 0.36862% | 15,559 |
| **Flank Total** | | **17,500 Total** | | |
| Kruse 4286 S. Elm Court Englewood, CO 80110 | Robert L. | 4,000 | 0.08426% | 3,556 |
| **Kruse Total** | | **4,000 Total** | | |
| Hanafy, M.D., S.C. 404 N. Commercial P.O. Box 783 Harrisburg, IL 62946 | Han | 4,000 | 0.08426% | 3,556 |
| **Hanafy Total** | | **4,000 Total** | | |
| Hummel P.O. Box 3407 Rancho Santa Fe, CA 92067 | Al | 50,000 | 1.05321% | 44,455 |
| **Hummel Total** | | **50,000 Total** | | |
| McKinney 333 Church Street Burlington, WI 53105 | Jon W. | 4,000 | 0.08426% | 3,556 |
| **McKinney Total** | | **4,000 Total** | | |

## Offering to Common Holders

| Last Name / Address | First Name | | Amount of Shares | | Number of Shares Available for Purchase |
|---|---|---|---|---|---|
| Holton 9528 Highview Dr. Eden Prairie, MN 55347 | James P. | | 2,500 | 0.05266% | 2,223 |
| Holton Total | | 2,500 Total | | | |
| Green 2997 Rothmore Lane Fitchburg, WI 53711 | James T. | | 2,000 | 0.04213% | 1,778 |
| Green Total | | 2,000 Total | | | |
| Smith 316 Highridge Road Burlington, WI 53105 | John S. | | 2,000 | 0.04213% | 1,778 |
| Smith Total | | 2,000 Total | | | |
| Chambers 1000 Hart Rd., #260 Barrington, IL 60010 | Richard L. | | 6,000 | 0.12639% | 5,335 |
| Chambers Total | | 6,000 Total | | | |
| Hyland 1387 The Point Barrington, IL 60010 | T.P. | | 4,000 | 0.08426% | 3,556 |
| Hyland Total | | 4,000 Total | | | |
| Urheim 5417 Taylor Lane Ft. Collins, CO 80525 | John | | 4,000 | 0.08426% | 3,556 |
| Urheim Total | | 4,000 Total | | | |

## Offering to Common Holders

| Last Name / Address | First Name | Amount of Shares | | Number of Shares Available for Purchase |
|---|---|---|---|---|
| Euto c/o James G. Flaherty 575 Charring Cross Dr., #100 Westerville, OH 43081 | Jennifer, Trustee of the Jennifer DYN trust | 1,000 | 0.02106% | 889 |
| Euto, Jennifer K., Administrator c/o James G. Flaherty | Nicholas | 4,000 | 0.08426% | 3,556 |
| **Euto Total** | | 5,000 Total | | |
| Noursalehi 1459 Inverrary Dr. Naperville, IL 60563 | Mojtaba | 1,000 | 0.02106% | 889 |
| **Noursalehi Total** | | 1,000 Total | | |
| **Total this Group this page** | | 3,597,000 — CS | 75.76819% | 3,198,116 |
| **Total All Shares: Outstanding as of April 1, 2001** | | 4,747,375 | 75.76819% | |

## APPENDIX B

Wire Transfer Instructions

Wyrick Robbins Yates & Ponton LLP
Trust Account
Branch Banking & Trust Company
Raleigh, North Carolina
Account #1301101682
Routing #ABA 0531-0112-1

## PENTECH PHARMACEUTICALS, INC.

## STOCK POWER

FOR VALUE RECEIVED, the undersigned does hereby sell, assign and transfer to Pentech Pharmaceuticals, Inc., or its successors or assigns (the "Company"), a total of

_____ shares of the Common Stock of the Company, represented by Certificate No(s). _____ (the "Shares"), standing in the name of the undersigned on the books of the Company; and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's true and lawful attorney, for it and in its name and stead, to sell, assign and transfer all or any of the Shares, and for that purpose to make and execute all necessary endorsements or acts of assignment and transfer thereof, and to substitute one or more persons with like full power, hereby ratifying and confirming all that said attorney or substitute or substitutes shall lawfully do by virtue hereof.

Notwithstanding anything to the contrary set forth above, this Stock Power shall only be effective to transfer the Shares upon a Transfer of Shares in contravention of the terms of that certain Shareholders Agreement, dated as of April __, 2001, between the Company and the undersigned.

Individual: _____
Signature

_____
Name

Entity: _____
Name

By:_____

Its: _____

# EXHIBIT W

**ASHMAN & STEIN**
ATTORNEYS AT LAW
150 NORTH WACKER DRIVE
SUITE 3000
CHICAGO, ILLINOIS 60606

TELEPHONE
(312) 782-3484

FACSIMILE
(312) 782-4279

April 18, 2001

VIA FACSIMILE: (919) 781-4866
and FIRST CLASS MAIL

Mr. James Yates
Pentech Pharmaceuticals, Inc.
c/o Wyrick Robbins Yates & Ponton LLP
4101 Lake Boone Trail, Suite 300
Raleigh, North Carolina 27607-7506

VIA FACSIMILE: (847) 459-5602
and FIRST CLASS MAIL

Mr. Albert Hummel
President, Pentech Pharmaceuticals, Inc.
417 Harvester Court
Wheeling, Illinois 60090

VIA FACSIMILE: (312) 876-0288
and FIRST CLASS MAIL

Mr. Jerold N. Siegan
Registered Agent, Pentech Pharmaceuticals, Inc.
120 S. Riverside Plaza, Suite 1200
Chicago, Illinois 60606

VIA FACSIMILE: (847) 459-5602
and FIRST CLASS MAIL

Mr. Howard Myles
Secretary, Pentech Pharmaceuticals, Inc.
417 Harvester Court
Wheeling, Illinois 60090

Gentlemen:

The following shareholders of record of Pentech Pharamaceuticals, Inc. (Pentech), through their counsel, hereby demand that the Board of Directors of Pentech raise the offering price set forth in its purported, proposed April 12, 2001 Rights Offering to $10 per share; and further demand that in the event that the Board of Directors fails or refuses to raise the offering price in the aforesaid purported Rights Offering, that Pentech pursue all appropriate legal remedies against Pentech's Board of Directors and others who have acted, are acting, or will act in a manner that is illegal, oppressive or fraudulent with respect to Pentech and Pentech's common shareholders:

Dr. Ragab El Rashidy
Dr. Robert Fait

Sincerely,

ASHMAN & STEIN

Carey M. Stein

R:\STEIN\ELRASHID\DEMAND.WPD



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet

JUDGE CONLON

MAGISTRATE JUDGE SCHENKIER

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

**Plaintiff(s): RAGAB EL RASHIDY and ROBERT FAIT**

County of Residence: COOK

Plaintiff's Atty:  CAREY M. STEIN
                   ASHMAN & STEIN
                   150 NORTH WACKER,
                   CHICAGO
                   312-782-3484

**Defendant(s): ALBERT HUMMEL, JAMES LUMSDEN, HOWARD MYLES, FE-PENTECH, L.P., and PENTECH INVESTORS, LLC.**

County of Residence:

Defendant's Atty:

01C 2771

DOCKETED APR 20 2001

FILED 01 APR 19 CLERK U.S. DISTRICT COURT

II. Basis of Jurisdiction:        **4. Diversity (complete item III)**

III. Citizenship of Principle Parties **(Diversity Cases Only)**
                    Plaintiff: **- 1 Citizen of This State**
                    Defendant: **- 2 Citizen of Another State**

IV. Origin :                **1. Original Proceeding**

V. Nature of Suit:          **890 Other Statutory Actions**

VI. Cause of Action:        **28 USC 1332(a)(1):Plaintiffs sue individually and derivatively on behalf of Pentech Pharmaceutical, Inc. to enjoin a proposed Rights Offering,for remedies under the Illinois Business Corporation Act and for breach of fiduciary and other duties.**

VII. Requested in Complaint
            Class Action: **No**
            Dollar Demand: **$10,000,000**
            Jury Demand: **No**

VIII. This case **Is NOT** a refiling of a previously dismissed case. (If yes case number __ by Judge __)

Signature:

4/19/01

NOTE: When the print dialogue box appears, be sure to uncheck the Annotations option.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

### Eastern Division



Double click on question mark for appearance form instructions

In the Matter of

RAGAB EL RASHIDY and ROBERT FAIT v
ALBERT HUMMEL, JAMES LUMSDEN, HOWARD
MYLES, FF-PENTECH, L.P. and PENTECH
INVESTORS, LLC.

JUDGE CONLON

Case Number:

MAGISTRATE JUDGE SCHENKIER  01C 2771

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

RAGAB EL RASHIDY and ROBERT FAIT

DOCKETED
APR 20 2001

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME CAREY M. STEIN | NAME |
| FIRM ASHMAN & STEIN | FIRM |
| STREET ADDRESS 150 NORTH WACKER DRIVE | STREET ADDRESS |
| CITY/STATE/ZIP CHICAGO, ILLINOIS 60606 | CITY/STATE/ZIP |
| TELEPHONE NUMBER (312) 782-3484 | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER 37710 | IDENTIFICATION NUMBER |
| MEMBER OF TRIAL BAR? YES ✔ NO | MEMBER OF TRIAL BAR? YES NO |
| TRIAL ATTORNEY? YES ✔ NO | TRIAL ATTORNEY? YES NO |
| | DESIGNATED AS LOCAL COUNSEL? YES NO |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER | IDENTIFICATION NUMBER |
| MEMBER OF TRIAL BAR? YES NO | MEMBER OF TRIAL BAR? YES NO |
| TRIAL ATTORNEY? YES NO | TRIAL ATTORNEY? YES NO |
| DESIGNATED AS LOCAL COUNSEL? YES NO | DESIGNATED AS LOCAL COUNSEL? YES NO |