Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2771 | **DATE** | 3/21/2002 |
| **CASE TITLE** | ROBERT FAIT vs. ALBERT HUMMEL, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Defendants' motion for summary judgment [48-1] is denied. The joint modified pretrial order shall be presented on April 23, 2002 at 9:00 a.m. Plaintiff's draft shall be submitted to defendants by April 15, 2002. Bench trial is set on May 1, 2002 at 9:00 a.m. ENTER MEMORANDUM OPINION AND ORDER.

*Suzanne B. Conlon*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | MAR 22 2002 | |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials |
| | Mail AO 450 form. | | 3/21/2002 |
| | Copy to judge/magistrate judge. | | date mailed notice |
| CB | courtroom deputy's initials | 02 MAR 21 PM 5: 13 | CB |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT FAIT )
)
Plaintiff, ) No. 01 C 2771
)
v. ) Suzanne B. Conlon, Judge
)
ALBERT HUMMEL, et al. )
)
Defendants. )

MAR 2 2 2002

## MEMORANDUM OPINION AND ORDER

Robert Fait ("Fait") sues Albert Hummel ("Hummel"), James Lumsden ("Lumsden"), Howard Myles ("Myles"), FF-Pentech, L.P. and Pentech Investors, LLC (collectively, "defendants") over the May 3, 2001 offering of Pentech Pharmaceuticals, Inc. ("Pentech") common stock ("the offering"). Specifically, Fait, individually and derivatively on behalf of Pentech (Count I), alleges the offering violated the Illinois Business Corporation Act ("IBCA")(Count II) and Hummel, Lumsden and Myles breached their fiduciary duty (Count IV) by using the offering to seize control of Pentech. The court previously denied Fait's amended motion for temporary restraining order seeking to halt the offering (Count III). Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## BACKGROUND

### I. Facts

The following facts are undisputed. Pentech develops drugs for ultimate sale to consumers in the United States and abroad. Fait is a trustee of the Robert L. and Judith R. Fait Trust ("the

1



trust"). The trust owns 2,500 shares of Pentech common stock. In addition, members of Fait's family, as well as entities controlled by Fait, own approximately 977,500 shares of Pentech common stock. Prior to the offering, Fait and Ragab El-Rashidy ("El-Rashidy"), Pentech's founder and chief executive officer, controlled the majority of the outstanding Pentech shares.

### A. The Series A Offering

In 1998, Pentech raised $15.2 million through the issuance of Series A preferred stock ("Series A offering"). As part of the Series A offering, Pentech issued Series A stock to FF-Pentech, L.P., Pentech Investors, LLC and Hummel. Lumsden is affiliated with both FF-Pentech, L.P. and Pentech Investors, LLC. As a result of the Series A offering, FF-Pentech, L.P. and Pentech Investors, LLC owned a majority of Pentech Series A stock. Thereafter, Hummel owned $500,000 of Series A stock and $500,000 of common stock.

In connection with the Series A offering, the Series A shareholders entered into an investor rights agreement ("rights agreement") with Pentech and its principal common shareholders, Fait and El-Rashidy. The rights agreement provided, in relevant part, that: (1) the Series A shareholders could elect two members of Pentech's five-member board; (2) the Series A shareholders could elect four of the five members of Pentech's board for a two-year period if Pentech violated certain covenants in the rights agreement; and (3) the Series A shareholders had a right of first refusal on any future stock offering.

### B. Pentech's Board

On June 1, 2000, Pentech's board held a special meeting. At that time, Pentech's board was comprised of Fait, El-Rashidy, Hummel, Lumsden and John Urheim. During the meeting, Hummel

and Lumsden requested the removal of El-Rashidy from his position as chief executive officer. The motion failed by a vote of 3-2, with Fait, El-Rashidy and Urheim voting against removal.

On August 4, 2000, FF-Pentech, L.P. and Pentech Investors, LLC claimed a violation of the rights agreement. On August 30, 2000, Pentech, acting at the direction of Fait, El-Rashidy and Urheim, sued Lumsden, Hummel, FF-Pentech, L.P. and Pentech Investors, LLC in the Circuit Court of Cook County, Illinois, seeking to enjoin the defendants from exercising their rights under the rights agreement. After a trial, the Circuit Court denied Pentech's motion for preliminary and permanent injunction. The court also denied Pentech's motion to stay pending appeal.

On October 10, 2000, Pentech elected new directors under the rights agreement. Myles and Armistead Burwell replaced Fait and Urheim on the board. Myles previously served on the board from 1994 to 1997. Myles holds 80,000 Pentech common shares. Myles' family owns 110,000 Pentech common shares. At that time, El-Rashidy was relieved of his day-to-day responsibilities as chief executive officer.

On March 4, 2001, Burwell resigned from his position on the board. On March 14, 2001, El-Rashidy did the same. In early April 2001, Bruce Ronsen, Senior Vice President of Pentech, became a member of Pentech's board.

C.  **Pentech's Financial Woes**

From its inception in 1990, Pentech has not been profitable. As of December 31, 2000, Pentech incurred a total loss of $17.7 million. During 2000 and early 2001, Pentech's cash declined from $1,898,000 to $92,000. During the same time period, Pentech's liabilities increased from $1,340,000 to $1,545,000. In early 2001, Pentech's auditing firm, Arthur Andersen & Co., advised Pentech that it would provide a qualified "going concern" audit opinion on Pentech's financial

statements for the year ending December 31, 2000, unless Pentech could secure the financing necessary to remain in business through December 31, 2001.

D.  **Pentech's Search for Capital**

In early 2000, Pentech had five promising drugs at various states of development. One of these drugs was Uprima, a form of apomorphine, which Pentech licensed to TAP Pharmaceuticals ("TAP"). In July 1999, TAP submitted Uprima to the Food and Drug Administration ("FDA") for approval as a new drug therapy for male erectile dysfunction. Thereafter, Uprima received a favorable recommendation from the FDA's scientific advisory committee. Pentech expected Uprima to begin generating substantial royalty revenues within 18 to 24 months of its FDA approval.

In the interim, Pentech planned to raise additional capital of $10 to $20 million through the sale of a new class of Series B preferred stock ("Series B offering"). In June 2000, Lumsden unilaterally decided to withhold the Series B offering. The board planned on offering the Series B stock once El-Rashidy was no longer chief executive officer.

In August 2000, Fait met with representatives of Gulf Pharmaceuticals, Inc., the parent company of Julphar Pharmaceuticals, Inc. (collectively, "Julphar"), to obtain financing for Pentech. On September 9, 2000, Julphar provided Pentech with a letter of intent to invest up to $20 million in exchange for 1,311,475 shares of Pentech Series B stock. Lumsden considered Julphar's proposal to be "2.5 million financing at about $7.00 per share."

By letter dated September 21, 2000, Julphar indicated "we are moving ahead with our due diligence and hope to complete it within the next couple of weeks when we should be able to enter into a formal agreement." On October 26, 2000, Julphar asked Pentech when it would be ready to sign the deal and issue a press release.

4

On November 10, 2000, Pentech forwarded a proposed letter of intent and associated manufacturing agreement to Julphar. On November 19, 2000, Julphar returned a revised term sheet to Pentech. That same day, Lumsden informed Julphar, "We just spent 8 months and a whole lot of money getting a 2-year license to control the board . . . It is in your interest for the Series A (and Series B) to retain that control."

On December 15, 2000, Julphar informed Pentech that the letter of intent could be finalized. On January 9, 2001, Pentech forwarded a revised letter of intent to Julphar. The finalized letter of intent contained a term limiting Julphar's participation on the board to two directors who were required to vote their shares in common with the Series A preferred shareholders for a period of five years.

On February 9, 2001, representatives from Julphar met with Lumsden, Hummel and Myles. During the meeting, Lumsden and Hummel stated that they could not stand by the outdated due diligence information previously provided by Pentech. Nevertheless, Julphar informed Pentech after the meeting that it remained interested in pursuing the transaction.

Thereafter, Pentech provided Julphar with additional information. On February 20, 2001, Lumsden informed Julphar, "If Julphar is going to make an offer, now is the time." The next day, Lumsden informed another Series A shareholder that they had three options: (1) agree with Fait on the Julphar deal; (2) bankrupt Pentech, which would leave Fait "SOL"; or (3) issue Pentech's remaining common shares to the Series A shareholders, which would dilute the voting power of the common shareholders, including Fait.

On March 5, 2001, Julphar informed Pentech that Julphar would "likely have a final decision" on March 16, 2001. Lumsden responded Julphar needed to provide the details of the

5

proposed investment quickly. On March 18, 2001, Julphar accepted all terms of the transaction except the term limiting Julphar to two directors who were required to vote their shares in common with the Series A preferred shareholders for a period of five years. Lumsden informed Julphar, "only a signed term sheet, with all terms included, could be considered at this time." The next day, Lumsden informed the board of Julphar's offer.

On March 26, 2001, Julphar provided Pentech with another letter of intent. Lumsden valued Julphar's offer at $7.00 to $8.00 per share.

On March 30, 2001, Lumsden responded to Julphar's letter of intent, requesting a $3 million bridge loan. That same day, Lumsden informed another Series A shareholder, "Julphar did indeed put in what appears to be an offer, except that control reverts back to them and [El-Rashidy]. Of course, the Series A [shareholders] will not accept this."

Thereafter, Julphar informed Pentech that it would consider the loan request upon return of a signed term sheet. Pentech did not return a signed term sheet.

### E. The Offering

On April 10, 2001, the board convened a special meeting. Lumsden told Hummel, Myles and Ronsen that the Series A shareholders rejected the terms of Julphar's proposal, in part, because it would have resulted in a loss of control by the Series A shareholders. During the meeting, the board authorized the sale of the remaining common stock to Pentech's existing shareholders, subject to the Series A shareholders' right of first refusal.

Thereafter, the board approved the offering, including the price of $1.00 per share. Pentech did not obtain any opinion as to the value of Pentech prior to approval of the offering. On April 27, 2001, Lumsden recommended to the Series A shareholders that they exercise their right of first

6

refusal, telling them, "assuming [Pentech] closes the offering soon, [Pentech] will be freed of [Fait and El-Rashidy] from a governance point of view, and interaction with them in the future will be limited to court appearances."

On May 3, 2001, the offering closed. The Series A shareholders exercised their right of first refusal and purchased the approximately 4.2 million common shares for $1.00 per share. As a result, the interests of Pentech's common shareholders were diluted.

## DISCUSSION

### I. Jurisdiction

The court has an independent duty to determine whether subject matter jurisdiction exists before deciding the merits of a case. *Weaver v. Hollywood Casino-Aurora, Inc.*, 255 F.3d 279, 281 (7th Cir. 2001). Based on the parties' pleadings, the court ordered the parties to file a jurisdictional statement clarifying the basis for diversity jurisdiction under 28 U.S.C. § 1332.

According to the parties' pleadings, Fait and the other trustees of the trust are Wisconsin residents. On the other side, Hummel, Lumsden, Myles, FF-Pentech, L.P., Pentech Investors, LLC and Pentech are residents of different states. Specifically, Hummel is a California resident, Lumsden is a North Carolina resident and Myles is a Nevada resident. Not one of the members or managers of FF-Pentech, L.P. or Pentech Investors, LLC are residents of Wisconsin. Pentech is an Illinois corporation with its sole place of business in Illinois. Assuming the parties will confirm each party's citizenship is the same as their residency, there is complete diversity of the parties.

In addition, the amount in controversy exceeds $75,000. If the amount in controversy is uncontested, the court must accept the parties' representation unless it "appears to a legal certainty that the claim is really for less than the jurisdictional amount." *Target Market Publishing, Inc. v.*

*ADVO, Inc.*, 136 F.3d 1139, 1141-42 (7th Cir. 1998), *quoting St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938). The offering generated $4.2 million at $1.00 per share. Fait claims the offering price was too low. Therefore, it does not appear to a legal certainty that Fait's claim is for less than $75,000.

## II. Standard of Review

Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *King v. National Human Resource Committee, Inc.*, 218 F.3d 719, 723 (7th Cir. 2000). Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

## III. Violation of the Illinois Business Corporation Act

Fait claims the offering violated the IBCA because it was part of defendants' scheme to remain in control of Pentech. Under the IBCA, a director or officer who receives personal benefit from a corporate transaction must show that the transaction was fair to the corporation, unless the transaction was approved by disinterested directors or shareholders with knowledge of all material facts. *Olsen v. Floit*, 219 F.3d 655, 657 (7th Cir. 2000), *citing* 805 ILCS § 5/8.60. In other words, the burden shifts to defendants to prove the offering was fair only if Fait first establishes the offering was not approved by a majority of disinterested directors with the requisite knowledge. Defendants

claim Fait cannot meet this initial burden because Hummel, Myles and Ronsen approved the offering with knowledge of Lumsden's interest as the managing partner of the largest Series A shareholders. Not surprisingly, Fait disagrees.

Fait first claims Hummel was not disinterested in the offering because he also owned Series A stock. Under the rights agreement, both Hummel and Lumsden had a right of first refusal to purchase the common stock offered as part of the offering for $1.00 per share. Nevertheless, defendants claim any interest Hummel had in the offering as a Series A shareholder was eliminated by his concurrent ownership of $500,000 of common stock. The parties' competing interpretation of the evidence raises a genuine issue of material fact that must be resolved at trial.

Fait next claims Ronsen did not approve the offering with knowledge of all material facts. Under the IBCA, Ronsen was required to have knowledge not only of his fellow board members' interest in the offering, but also knowledge of "the material facts of the transaction." 805 ILCS 5/8.60(1).

At the time of the vote, Ronsen had been a member of the board for approximately seven days. Fait disputes whether Ronsen had enough time to familiarize himself with Pentech's financial condition, including Pentech's search for capital, prior to the vote. Drawing all reasonable inferences in Fait's favor, a genuine issue of material fact exists as to whether the offering was approved by Ronsen with knowledge of all material facts.

The burden then shifts to defendants to prove the offering was fair to Pentech. A transaction is fair to a corporation when it receives at least what it would have obtained following arms' length bargaining in competitive markets. *Olsen*, 219 F.3d at 657, *citing Shlensky v. South Parkway*

9

*Building Corp.*, 19 Ill.2d 268, 283, 166 N.E.2d 793, 801 (1960). Defendants must prove the offering price of $1.00 per share was more than Pentech could have received on the open market.

Defendants offer the opinion of its expert, Richard May, to support its position that the offering was fair. May estimated the value of Pentech at the time of the offering as $12 to $14 million. Therefore, May claims the $1.00 per share realized through the offering was in excess of fair market value.

Fait counters with evidence that Lumsden valued the offer made by Julphar two weeks prior to the board's approval of the offering at $7.00 to $8.00 per share. At that time, Julphar also agreed to discuss $3 million in bridge financing upon execution of the term sheet. Based on the history of negotiations between Pentech and Julphar, a reasonable factfinder could conclude that the offering was unfair to Pentech.

### IV. Breach of Fiduciary Duty

The Illinois business judgment rule shields corporate directors who act diligently and carefully from liability for honest errors or mistakes in judgment. *Treco, Inc. v. Land of Lincoln Savings & Loan*, 749 F.2d 374, 377 (7th Cir. 1984). Fait claims the Illinois business judgment rule only protects directors who "exercise their best care, skill and judgment in the management of the corporate business *solely in the interest of the corporation*." *South Parkway*, 19 Ill.2d at 278 (emphasis added). Defendants disagree, relying on the Seventh Circuit's decision in *Treco*. The business judgment rule applies to insulate directors' actions in response to a takeover threat, even though successful resistance may have the collateral effect of perpetuating the incumbent directors' control. *Treco*, 749 F.2d at 378-379. In reaching its decision, the Seventh Circuit found that "it is clear that Illinois would adopt [this rule followed by other jurisdictions] to decide the issue of

director liability for conduct defending against a takeover and liquidation threat, an issue not before the Illinois Supreme Court when it decided *South Parkway* in 1960." *Id.* at 379.

Lumsden, Hummel and Myles did not propose the offering in response to a takeover or liquidation threat. To the contrary, Fait claims Lumsden, Hummel and Myles used the offering to seize control from him. As a result, "the transaction will be subject to the closest scrutiny, and if not conducted with the utmost fairness, to the end that the corporation shall have received full value, it will be set aside." *See South Parkway*, 19 Ill.2d at 278. A reasonable factfinder could conclude Lumsden, Hummel and Myles sabotaged a more lucrative financing option to serve their own self-interests.

## CONCLUSION

Defendants' motion for summary judgment is denied.

March 21, 2002

ENTER:

*Suzanne B. Conlon*
Suzanne B. Conlon
United States District Judge