# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 2771 | DATE | 9/3/2002 |
| CASE TITLE | FAIT vs. HUMMEL, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   ENTER DECISION ON THE MERITS.

*Suzanne B. Conlon*

(11) ■ [For further detail see decision on the merits attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | SEP 04 2002 | |
| ✓ | Notices mailed by judge's staff. | | date docketed | 126 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | 9/3/2002 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| CB | courtroom deputy's initials | Date/time received in central Clerk's Office | PW mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT FAIT, | ) | |
| | ) | |
| Plaintiff, | ) | No. 01 C 2771 |
| | ) | |
| v. | ) | Suzanne B. Conlon, Judge |
| | ) | |
| ALBERT HUMMEL, JAMES LUMSDEN, | ) | |
| HOWARD MYLES, FF-PENTECH, L.P., | ) | |
| and PENTECH INVESTORS, LLC and | ) | |
| PENTECH PHARMACEUTICALS, INC., | ) | |
| an Illinois corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## DECISION ON THE MERITS

This dispute over control of Pentech Pharmaceuticals, Inc. ("Pentech") was tried by the court without a jury. After reviewing the trial testimony and exhibits, the pleadings,[1] as well as considering the arguments of counsel, the court enters its findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52(a). Diversity jurisdiction is undisputed and clearly established by the record. Only Counts II and IV remain for decision.

---

[1] In their joint final pretrial order, the parties failed to agree to any facts except identity and jurisdiction. At trial, the court adopted admitted facts from the parties' Local Rule 56 statements filed in connection with defendants' unsuccessful summary judgment motion. Uncontested summary judgment facts were not dispositive of any issue tried, but eliminated testimony on at least some undisputed facts.



## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

### **Background**

In his second amended complaint, Robert Fait bases his claims on an offering of 4,220,921 Pentech common shares on May 3, 2001. Fait, members of his family and entities he controls, own approximately 977,500 shares of Pentech common stock. Before the May 3rd offering, Fait and Ragab El-Rashidy, Pentech founder and former chief executive officer ("CEO"), controlled a supermajority of the common stock,[2] permitting them to block amendments to the articles of incorporation and certain transactions by the board of directors. As a result of the May 3rd offering, Fait and El-Rashidy lost supermajority control over Pentech.

Defendants include Pentech's major preferred [or Series A] shareholders, FF-Pentech and Pentech Investors. In addition, defendants James Lumsden, Albert Hummel and Howard Myles were members of the board of directors during the relevant period. Fait claims that defendants improperly gained voting control over Pentech by offering common stock for only $1 per share. Under an investor rights agreement entered in 1998, preferred shareholders had an undisputed contractual right of first refusal for common stock offerings. Preferred shareholders subscribed to the entire May 3rd offering. The investor rights agreement also provided that preferred shareholders could elect two of Pentech's five directors. And if Pentech violated covenants in the investor rights agreement, preferred shareholders had the right to elect four of the five directors.

In June 2000, Pentech's board of directors consisted of Fait, El-Rashidy, Hummel, Lumsden and John Urheim. A prior offering of convertible preferred stock was postponed at that time

---

[2] Under Illinois law, a supermajority consists of shareholders who control 66 2/3 % of the outstanding common stock. 805 ILCS 5/10.20.

2

because of opposition by the major preferred shareholder, FF-Pentech. There was apparent conflict between El-Rashidy and preferred shareholders, particularly about the company's strategic direction and management. An attempt to remove El-Rashidy as CEO failed on a 3-2 vote, with Lumsden and Hummel voting in favor of removal. Fait, El-Rashidy and Urheim voted against removal.

The conflict degenerated further. Major preferred shareholders FF-Pentech and Pentech Investors claimed a violation of the preferred shareholders' investor rights agreement. At the direction of El-Rashidy, Fait and Urheim, in August 2000 Pentech sued FF-Pentech, Pentech Investors, Hummel and Lumsden in the Circuit Court of Cook County, Illinois. The suit sought to enjoin defendants from exercising their rights under the preferred shareholders' investor rights agreement; the state court denied the requested injunction. Plaintiffs' state court appeal was pending until April 6, 2001, when an Illinois appellate court affirmed denial of an injunction against defendants.

In October 2000, preferred shareholders took control of the board of directors under the investor rights agreement. El-Rashidy was removed as CEO; Fait and Urheim were replaced as directors. El-Rashidy resigned from the board in February 2001.

Meanwhile, the company's financial condition went from problematic in June 2000 to insolvency in April 2001. All attempts to obtain outside investor financing were unfruitful. Fait and El-Rashidy's candidate for investment financing was Julphar Pharma, Inc., a wholly-owned subsidiary of Gulf Pharmaceutical Industries (collectively "Julphar"), based in the United Arab Emerates. Julphar has never done business in the United States, nor has it ever invested in an American company. The negotiations started in August 2000 between El-Rashidy and his graduate school mentor, Sarfarez Niazi, who was Julphar's sole American representative. Niazi lacked

3

authority to bind Julphar to an agreement with Pentech; only Gulf's board of directors in Dubai could do so. Although proposals and counter-proposals were exchanged between Pentech and Julphar between September 2000 and March 2001, no agreement was ever reached and significant issues were never resolved.

Bankruptcy was a looming possibility, particularly in April 2001 when Pentech was only several weeks away from inability to meet its payroll. After several months of discussion, on April 10, 2001, directors Hummel, Myles and Bruce Ronsen approved the May 3rd offering. In response, Fait and El-Rashidy filed this lawsuit.[3] On April 25, 2001, this court denied a motion for temporary restraining order to enjoin the May 3rd offering.

After discovery closed, defendants' summary judgment motion was denied. The court found there were disputed issues of material fact with respect to Fait's claims that defendants violated the Illinois Business Corporation Act [Count II] and that Hummel, Lumsden and Myles breached their fiduciary duties [Count IV]. Memorandum Opinion and Order of March 21, 2002. A seven-day bench trial began on May 1, 2002. At the conclusion of Fait's evidence, defendants' motions for judgment were granted in part. The unopposed motion to dismiss Count III to enjoin the May 3rd offering was granted as moot. The purported derivative claims on behalf of Pentech in Count I were stricken. In addition, Fait's claim to rescind the May 3rd offering, asserted only in the final pretrial order, was stricken because "[t]his extraordinary form of relief was not sought in any of [Fait's] three complaints, and he fails to name all potentially affected Series A [preferred] shareholders as defendants." Minute Order of May 8, 2002. Defendants' motion for judgment was denied as to

---

[3] El-Rashidy later withdrew as a plaintiff in this case and is presently pursuing a similar suit against defendants in Illinois state court.

4

Counts II and IV. Fait's post-trial motion to reconsider the partial granting of defendants' motion for judgment was denied. Minute Order of June 12, 2002.

### A. Illinois Business Corporation Act [Count II]

It is Fait's theory that the board of directors' approval of the May 3rd offering violated the Illinois Business Corporation Act because the offering exclusively benefitted preferred shareholders to the detriment of common shareholders. A director who receives a personal benefit from a corporate transaction must show that the transaction was fair to the corporation, unless the transaction was approved by disinterested directors or shareholders with knowledge of all material facts. 805 ILCS § 5/8.60; *Olsen v. Floit*, 219 F.3d 655, 657 (7th Cir. 2000). The burden shifts to defendants to prove the offering was fair only if Fait first establishes the offering was not approved by a majority of disinterested directors with the requisite knowledge.

The May 3rd offering was approved by Hummel, Myles and Ronsen.[4] As a preferred shareholder, Hummel benefitted from the offering because it enabled preferred shareholders to take control over the company by eliminating Fait and El-Rashidy's supermajority perogatives. Myles and Ronsen were clearly disinterested directors. Myles and his family owned only common stock. Ronsen did not own any Pentech stock. Therefore, a majority of the directors who approved the May 3rd offering were disinterested.

Fait contends that although disinterested, Myles and Ronsen lacked the requisite knowledge to approve the May 3rd offering. This contention is not supported by a preponderance of the evidence. Myles is an independent consultant in the pharmaceutical medical device industry. He

---

[4] Lumsden recused himself from voting on the May 3rd offering because of his association with FF-Pentech, the major preferred shareholder. Lumsden actively recommended that preferred shareholders exercise their first refusal rights.

5

was on Pentech's board of directors from 1993 to 1997, and was elected to the board again in October 2000. The court found Myles to be a knowledgeable and credible witness. His testimony demonstrated his familiarity with Pentech's principal assets - pharmaceutical patents still in the development stage - as well as its financial problems. He received and reviewed monthly financial reports prepared by Pentech's comptroller, Jeff Grolig. Myles regularly discussed Pentech's financial condition with Ronsen, its senior vice president.

Myles attended several meetings involving prospective outside investors Julphar and Andrx. Based upon his personal observations of negotiations, Myles did not believe Pentech should pursue a deal with Julphar. Myles had read in a pharmaceutical trade publication and press releases that Julphar was involved in piracy of intellectual property. Nor did he think Julphar was serious in its negotiations with Pentech. Myles' view was corroborated by the eight-month history of Julphar negotiations. For example, Myles traveled to Chicago in February 2001 so the board would have a quorum for a planned day and a half of meetings with Abdul Youssef, Niazi's supervisor who was based in the United Arab Emerates. Lumsden anticipated that an agreement with Julphar could be finalized during these meetings. However, Youssef attended to other business during his Chicago visit and only met with Pentech representatives for little more than an hour. A month later, Julphar advanced a proposed letter of intent with an unacceptable new term: settlement of the state court lawsuit that was still on appeal by Fait and El-Rashidy. The evidence established that Julphar's proposed letter of intent did not originate with Julphar, but was in fact secretly drafted by Fait's attorney Carey Stein and given to Niazi. Niazi then retyped the letter on Julphar stationery and signed the letter. Niazi testified at trial that he telephoned Youssef in the United Arab Emerates to explain Stein's draft and to obtain Youssef's authorization to sign the draft. The court finds Niazi's

6

authoritity to sign a letter of intent on behalf of Gulf's board of directors questionable and contrary to Niazi's own testimony that he lacked authority to bind Julphar/Gulf. Lumsden promptly responded to Niazi's request for additional due diligence information. There was complete "radio silence" from Julphar after April 3rd.

Knowing firsthand of Pentech's financial and product development problems, Myles had sound reasons for believing its common stock was virtually worthless in the first quarter of 2001. In addition, he had conversations with approximately eight other common shareholders who were unwilling to make further investments in the company. In his opinion, Pentech's common stock was not worth even $1 a share. The court finds credible and persuasive Myles' testimony that he believed the May 3rd offering would save Pentech from bankruptcy and would adequately fund its operations until other financing could be secured. By approving the May 3rd offering, Myles intended to raise essential financing for the company and avoid bankruptcy.

Fait's contention that Ronsen was uninformed is even less persuasive. Ronsen was a consultant to Pentech in 1994. He became its senior vice president in 1995 and a member of the board of directors in March 2001. His testimony established that he was personally familiar with Pentech's financial history and the value of its stock. As senior vice president for seven years, Ronsen has been in charge of all Pentech's daily operations. This includes financial operations and participation in budget preparation. He maintains control over the company's due diligence files and is the contact person for prospective investors seeking information. He prepared a proposed manufacturing agreement for Julphar. He did not receive any due diligence contact from Julphar after October 2000. Based on his own observations, Ronsen doubted Julphar's intention to go forward with an investment in Pentech. He was also personally familiar with interest in Pentech by

Andrx and Watson Pharmaceutical. Although he did not attend board meetings before March 2001, he regularly interacted with board members.

Ronsen held options to purchase Pentech common stock. He did not exercise these options because he believed Pentech's common stock was virtually worthless. Instead, he surrendered his options so that the shares could be included in the May 3rd offering. The court found Ronsen's testimony that he approved the May 3rd offering to save Pentech from bankruptcy credible and well-informed.

It is Fait's position that Myles and Ronsen's approval of the May 3rd offering was tainted because they relied on Lumsden and Hummel, directors with preferred shareholder interests, to pursue financing opportunities and deferred to their financial expertise. Fait complains Myles and Ronsen did not conduct their own due diligence investigation about prospective financing sources and the value of Pentech common stock. However, Fait failed to produce convincing evidence that either Lumsden or Hummel provided the board of directors with incomplete, misleading or fraudulent information. The argument that Myles and Ronsen's approval of the May 3rd offering was tainted is not supported by any evidence, much less a preponderance of the evidence. Nor does Fait cite legal authority for his questionable argument that directors lacking expertise on a particular subject must seek advice from independent experts.

The court finds Myles and Ronsen were disinterested directors who knew of Lumsden and Hummel's interests in the May 3rd offering, and that their decisions to approve the offering were made with knowledge of all material facts. Accordingly, the burden does not shift to defendants to prove the May 3rd offering was fair. Rather, it is Fait's burden to show the offering was unfair. He has not carried that burden. Pentech was insolvent at the time of the offering. It had incurred losses

8

totaling $17.7 million. Its cash dwindled to $92,000, while its liabilities increased to $1,545,000. The company was on the verge of inability to meet its payroll. Defendants' experts, whose testimony the court found reliable and probative, testified Pentech's fair market value when the May 3rd offering was authorized ranged from $12 to $14 million. Potential claims against its equity by creditors and preferred shareholders who invested $15 million in the company three years earlier approximated $19 million. On liquidation or bankruptcy, the value of Pentech common stock would be *de minimus*. Pentech's major preferred shareholder, FF-Pentech, informed Lumsden that it was unwilling to pay more than $1 a share for the offering and was of the opinion the stock was worth even less.

Fait did not offer expert testimony to support his contention that $1 per share was an unfairly low price when the offering was approved by the board of directors. Instead, he relies on an outdated, unduly optimistic business plan developed by El-Rashidy more than a year earlier, and Lumsden's opinion about the *conversion value of preferred stock* in spring/early summer of 2000. The court finds this evidence irrelevant and not probative of the value of Pentech *common stock* in April 2001. Moreover, Fait ignores adverse events that impacted Pentech between early 2000 and April 2001: failure to obtain Federal Drug Administration approval for its patented drugs; problems with its testing program; failure to realize projected income from its patents; protracted, multimillion dollar litigation over its most valuable patent; insufficient funds for product development; lack of immediate outside financing; growing indebtedness and shrinking cash reserves; and an impending inability to meet its payroll.

An offering of $1 per share was fair to all shareholders because raising essential operating funds protected their investments. Fait has not proven that the offering injured common shareholders

9

or diluted his own financial interest in the company. The evidence suggests quite the contrary. Infusion of $4 million capital from the offering kept the company operating and saved it from bankruptcy or liquidation, which would have rendered common stock worthless.

## B. Breach of Fiduciary Duty [Count IV]

Fait claims Lumsden, Hummel and Myles breached their duties of loyalty, care, good faith and fair dealing by thwarting the Julphar deal and conspiring with other preferred shareholders and defendants to purchase a controlling interest in Pentech at an unfair price in a transaction that was unfair and oppressive to Pentech, Fait and other common shareholders. Second Amended Complaint, Ct. IV ¶ 51. Directors and officers of Illinois corporations are fiduciaries who are required to exercise the same degree of care and prudence that a person would when prompted by self-interest in the management of her own affairs. *Resolution Trust Company v. Platt*, 1992 WL 672942. *4 (S.D.Ill. 1992), citing *Fields v. Sax*, 462 N.E.2d 983, 986 (Ill.App. 1984); *Shlensky v. South Pkway. Bldg. Corp.*, 166 N.E.2d 793 (Ill. 1960). Under Illinois law, a complaining shareholder's judgment shall not be substituted for that of directors who have acted in good faith. *Lower v. Lanark Mutual Fire Insurance Co.*, 448 N.E.2d 940, 944-45 (Ill.App.1983) (citations omitted). Corporate directors who act diligently and carefully are shielded from liability for honest errors or mistakes in judgment when they act solely in the corporation's interest. *Treco, Inc. v. Land of Lincoln Savings & Loan*, 749 F.2d 374, 377 (7th Cir. 1984); *Shlensky v. South Parkway Building Corp.*, 19 Ill.2d 268, 278 (1960).

Fait has failed to prove by a preponderance of the evidence that Lumsden, Hummel and Myles did not act prudently, diligently or carefully. For the reasons explained above, Fait has not established the $1 per share offering was unfair in April 2001. The evidence fails to establish there

was ever any firm deal with Julphar. Significant issues were never resolved. There were merely exchanges of various proposed letters of intent and Pentech's draft manufacturing agreement, which was subsequently abandoned. The court finds that Lumsden, Hummel and Myles made good faith efforts to reach an agreement with Julphar after reconstitution of the board of directors and El-Rashidy's departure as CEO in October 2000. In particular, the documentary evidence shows that Lumsden responded promptly to Julphar's requests for draft agreements and information. Julphar's responses to Lumsden were sporadic. Significantly, Julphar ignored Lumsden's urging that an offer be made in early February 2001.

The court finds defendants' concerns before the offering was approved that an alliance with Julphar might be undesirable were prudent and not contrary to Pentech's best interests. Julphar was a foreign corporation that had never done business in the United States or invested in an American company. Julphar was closely allied with a supermajority common shareholder who did not have the confidence or trust of either the board or preferred shareholders who invested $15 million in the company three years earlier. Julphar was not agreeable to only two directors' positions. The court infers Julphar sought to control the five-member board. Julphar was unwilling to agree to vote its shares with the Series A preferred shareholders for two years.

Youssef's limited availability to the Pentech board during his trip to Chicago and his delays in responding to Lumsden's communications were a reasonable basis to question Julphar's seriousness. And concern that Julphar would reestablish El-Rashidy's control over the board and management of the company was certainly a realistic threat to the company's future stability, given Fait and El-Rashidy's conduct behind the scenes during Lumsden's negotiations with Julphar. Between them, Fait and El-Rashidy filed three lawsuits against Pentech's principal investors and

11

directors in 2000-2001. It was not contrary to Pentech's best interests to seek a financing solution that not only provided immediate funds but would also nullify the ability of two common shareholders with comparatively small financial investments to frustrate decisions of the majority of Pentech shareholders who had substantial investments at stake. Moreover, Julphar's less than sterling reputation in the pharmaceutical industry was a prudent reason for Pentech's directors to question Fait's insistence that Julphar was the only funding source Pentech should pursue.[5]

Finally, Fait failed to prove defendants conspired to sabotage a financing agreement with Julphar. It is undisputed that preferred shareholders had a contractual right to reject the transaction. By early April, it was clear there was no viable agreement with Julphar in the foreseeable future, and funding was needed immediately. The evidence failed to establish that actions by Lumsden, Hummel and Myles to obtain immediate funding from preferred shareholders who already had the largest financial stake in the company were imprudent, disloyal, careless or in bad faith. Rather, the evidence established that defendants acted in Pentech's best interests.

## CONCLUSION

For the foregoing reasons, judgment is entered for defendants Albert Hummel, James Lumsden, Howard Myles, FF-Pentech, L.P., and Pentech Investors, LLC and against plaintiff Robert

---

[5] At trial, Fait testified he had $3 million available to loan Pentech in early 2001. He admitted, however, that he never communicated any interest in providing financing to Pentech at board meetings when the company's dire financial situation was discussed and possible financing alternatives were explored. The court finds Fait's belated suggestion that he could have provided urgently needed funds both self-serving and disingenuous.

Fait, as Trustee of the Robert L. and Judith R. Trust on Counts II and IV of the second amended complaint.

September 3, 2002                          ENTER:

                                                        Suzanne B. Conlon
                                                        United States District Judge