CERTIFIED COPY

In the

# United States Court of Appeals

## For the Seventh Circuit

FILED

JUL 2 2 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

No. 02-3500

ROBERT FAIT, as Trustee of the
Robert L. and Judith R. Trust,

Plaintiff-Appellant,

v.

ALBERT HUMMEL, JAMES LUMSDEN,
HOWARD MYLES, FF-PENTECH, L.P.,
PENTECH INVESTORS, LLC and
PENTECH PHARMACEUTICALS, INC.,
an Illinois corporation,

**DOCKETED**

JUL 2 3 2003

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 2771—Suzanne B. Conlon, Judge.

ARGUED MAY 13, 2003—DECIDED JUNE 27, 2003

Before ROVNER, DIANE P. WOOD, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* In May 2001, the board of directors of Pentech Pharmaceuticals, Inc. approved a stock offering they hoped would ward off bankruptcy by infusing the company with more than $4 million. But the ability to keep the company afloat wasn't the transaction's only selling point to the board. In addition, the offering diluted the voting power of the existing common stock,

allowing the preferred shareholders (who had elected all of the board members at the time) to keep control of the company out of the hands of Fait—Robert Fait, who, along with Pentech founder Ragab El-Rashidy, owned more than two-thirds of Pentech's common stock. In this appeal, as Fait would have it, the power grab was the board's sole motivation for the transaction and the offering was not fair to the corporation and its shareholders.

In order to understand how the preferred shareholders had the chance to seize control of the company, we must look back to 1998 when Pentech, a pharmaceutical company in the business of developing drugs, issued Series A preferred shares to a number of investors, including several of our defendants. As part of that offering, the Series A shareholders entered into an investor rights agreement that gave them the right of first refusal on any newly issued stock. The agreement also gave the preferred shareholders the right to elect two of the five board members and the power to elect four of the five for a period of 2 years if Pentech violated certain covenants in the agreement.

The Series A shareholders took advantage of the latter provision in the fall of 2000 when an Illinois court agreed with the Series A shareholders' contention that Pentech had violated the rights agreement, giving the preferred shareholders the right to elect four of the five directors. They used their opportunity to replace Fait and another director elected by the common shareholders and then placed El-Rashidy on administrative leave from his duties as CEO. El-Rashidy resigned from the board of directors soon after and was not immediately replaced, leaving just four board members (all elected by the preferred shareholders) at the time of the offering—Dr. Bruce Ronsen and defendants James Lumsden, Albert Hummel, and Howard Myles.

No. 02-3500          3

On May 3, 2001, Ronsen, Hummel, and Myles voted unanimously to offer 4,220,921 shares of common stock for $1/share (because of his close ties to many of the Series A shareholders, Lumsden abstained). On the advice of Lumsden, the Series A shareholders exercised their right of first refusal and bought all of the available shares. Fait challenged the validity of the transaction, claiming it was unfair because it diluted the interest of the common shareholders and because the $1/share price was inadequate. He thinks Pentech would have been better off raising capital by taking on an investor, specifically Julphar Pharmaceuticals, Inc. Julphar had been discussing the possibility of buying up to $20 million worth of Series B preferred stock from Pentech, but the talks broke down. Fait claims the Pentech board gave up on the deal with Julphar prematurely because the May 3 offering gave the Series A shareholders a chance to achieve their true objective of retaining permanent control of Pentech. As such, he says the board should have had to prove that the offering was the best option for Pentech and that it was fair. The district court denied the board's motion for summary judgment but found in favor of the board after a 7-day bench trial, concluding that Fait had the burden of proving that the offering was not fair and that he did not meet that burden. Fait appeals that ruling.

Under Illinois law (which applies in this diversity case) a director who receives a personal benefit from a corporate transaction has the burden of showing that the transaction was fair to the corporation, unless the transaction was approved by disinterested directors or shareholders with knowledge of all material facts. 805 ILCS 5/8.60; *Olsen v. Floit*, 219 F.3d 655, 657 (7th Cir. 2000). Fait admits that the transaction was approved by a majority of the disinterested directors (as a Series A shareholder, Hummel benefitted from the offering, but Myles and

No. 02-3500

Ronsen were disinterested). Instead, Fait argues that the interested directors should have borne the burden of proving the fairness of the offering because Myles and Ronsen did not have sufficient knowledge of all material facts. Fait wants us to review the knowledge requirement *de novo*, but his argument ignores the fact that the district court's interpretation of the knowledge requirement was based on her factual findings, which we review only for clear error. *See, e.g., Olsen*, 219 F.3d at 657.

Although Illinois courts have rarely explored what constitutes "knowledge" in this context, some factors include whether the disinterested directors knew the market value of the proposed shares, whether they knew of the effects of the deal on the existing shareholders, and whether they knew of possible alternative sources of revenue. *See, e.g., Shlensky v. South Parkway Bldg. Corp.*, 166 N.E.2d 793, 801-02 (Ill. 1960) (outlining factors to examine in deciding whether a transaction was "fair"). Myles and Ronsen knew all of that and more.

Fait admits that Myles had general knowledge of Pentech's financial condition but says that he should have had more specific information and done more independent research, especially as to an appropriate share price, before making his decision. Similarly, Fait argues that Ronsen, who has a doctorate in pharmacology, knew a lot about the drugs Pentech was developing but very little about the business side of the company. Fait also claims that any information Myles and Ronsen had about the transaction was tainted because it came from Lumsden and Hummel, who stood to gain financially if the offering went through.

Although Myles and Ronsen could have hired outside experts or done more research, both had sufficient knowledge to meet the requirements of 805 ILCS 5/8.60. Myles

No. 02-3500                                                        5

worked as an independent consultant for pharmaceutical medical device companies, so he was very familiar with the industry. In addition, he had spent nearly 5 years during two stints on the Pentech board, reviewed monthly reports on Pentech's financial condition, and frequently attended meetings and discussed Pentech's financial condition and options with other members of the board. Ronsen was equally well-informed. He voted for the offering after spending 7 years as Pentech's senior vice-president. During that time he was in charge of all of Pentech's daily operations, making him, as the district judge accurately noted, "personally familiar with Pentech's financial history and the value of its stock." In addition, both Myles and Ronsen had first-hand information about Julphar and other opportunities for outside investment. They knew about Pentech's dire financial situation, and they knew of the risks of trying to strike a deal with Julphar (which had never done business in the United States) or waiting for another outside investor. And although much of their information came from discussions with Lumsden and Hummel, they knew that their fellow board members had personal stakes in seeing the deal go through and were able to evaluate those conversations accordingly. Put together, Myles and Ronsen had knowledge of all material facts, leaving Fait with the burden to prove that the offering was not fair to the corporation.

Almost by his own admission, Fait cannot meet that burden. He fails to offer any experts or evidence to counteract the board's two expert witnesses, who testified that $1/share was a fair price. In fact, at oral argument, Fait was unable to offer a price he would have considered fair. In addition, neither side disputes that Pentech was experiencing serious financial problems, with bankruptcy (which would have left the common stock virtually worthless) a real possibility. Although Fait and the board

**6**                    No. 02-3500

disagreed about the best place to secure the capital they agree Pentech needed, the ultimate decision rested with the board as long as that decision was fair to Pentech, and Fait has not proven that it was not.

Because we find that Fait did not prove the transaction was unfair, we do not have to reach the issues he appeals regarding an appropriate remedy.

AFFIRMED.

A true Copy:

Teste:

Clerk of the United States Court of
Appeals for the Seventh Circuit